ORIGINAL

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      Frederick A. Lorig (Bar No. 057645)
2     fredericklorig@quinnemanuel.com
      Steven M. Anderson (Bar No. 144014)
3     stevenanderson@quinnemanuel.com
      Joseph M. Paunovich (Bar No. 228222)
4     josephpaunovich@quinnemanuel.com
      Anthony P. Alden (Bar No. 232220)
5     anthonyalden@quinnemanuel.com
    865 South Figueroa Street, 10th Floor
6   Los Angeles, California  90017-2543
    Telephone:  (213) 443-3000
7   Facsimile:  (213) 443-3100

8   Attorneys for Plaintiff Teledyne
    Technologies Incorporated

9

10                 UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12                      WESTERN DIVISION

13
    TELEDYNE TECHNOLOGIES              CASE NO. 06-06803-MMM (SHx)
14  INCORPORATED, a Delaware
    corporation,                       FIRST AMENDED COMPLAINT FOR:
15
               Plaintiff,              1)  PATENT INFRINGEMENT;
16                                     2)  BREACH OF CONTRACT;
          vs.                          3)  MISAPPROPRIATION OF TRADE
17                                         SECRETS;
    HONEYWELL INTERNATIONAL,           4)  COMMON LAW
18  INC., a Delaware corporation,          MISAPPROPRIATION;
                                       5)  INTENTIONAL INTERFERENCE
19             Defendant.                  WITH PROSPECTIVE ECONOMIC
                                           ADVANTAGE;
20                                     6)  NEGLIGENT INTERFERENCE
                                           WITH PROSPECTIVE ECONOMIC
21                                         ADVANTAGE;
                                       7)  INTENTIONAL
22                                         MISREPRESENTATION; and
                                       8)  NEGLIGENT
23                                         MISREPRESENTATION.

24
                                       DEMAND FOR JURY TRIAL
25

26

27

28

20101/2215610.1

1  Plaintiff Teledyne Technologies Incorporated ("Teledyne"), for its First
2  Amended Complaint herein, alleges as follows:

3

4  <u>NATURE OF THE CASE</u>

5

6  1.   Plaintiff Teledyne brings this action seeking injunctive relief and
7  damages for Defendant's breach of contract, misappropriation of trade secrets,
8  intentional and negligent interference with prospective economic advantage, and
9  intentional and negligent misrepresentation concerning Teledyne's technology for
10  the automatic acquisition and transmission of aircraft data for analysis and
11  maintenance.  Teledyne also seeks relief for Defendant's unauthorized manufacture,
12  use, sale, and offer for sale of products that infringe a Teledyne patent directed to
13  such technology.

14

15  <u>THE PARTIES</u>

16

17  2.   Plaintiff Teledyne is a corporation organized and existing under the
18  laws of the State of Delaware.  Teledyne's principal place of business is located at
19  1049 Camino Dos Rios, Thousand Oaks, California 91360.

20  3.   Defendant Honeywell International, Inc. ("Honeywell") is a corporation
21  organized and existing under the laws of the State of Delaware.  Honeywell's
22  principal place of business is located at 101 Columbia Road, Morris Township, New
23  Jersey 07962.

24

25  <u>JURISDICTION AND VENUE</u>

26

27  4.   This action arises under the patent laws of the United States, 35 U.S.C.
28  § 271.  This Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331

1  and 1338(a)-(b), and pursuant to its powers of supplemental and pendent

2  jurisdiction, 28 U.S.C. § 1367.

3      5.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c) and

4  1400(b).

5

6                      FACTUAL BACKGROUND

7                        Teledyne's Business

8

9      6.      Teledyne is a leading provider of sophisticated electronic components,

10  instruments, and communication products, including defense electronics, data

11  acquisition and communications equipment for airline and business aircraft,

12  monitoring and control instruments for industrial and environmental applications

13  and components, and subsystems for wireless and satellite communications.

14      7.      Teledyne Controls, a business unit of Teledyne, specifically focuses on

15  the design and manufacture of avionics and ground-related electronic systems for

16  commercial air transport, business and regional aviation, government, and defense

17  applications, and has been a leader in that industry for over 40 years.  Its product

18  lines include such technologies as data acquisition and management systems, data

19  recording and transfer systems, flight safety and training solutions, aircraft

20  information systems, and airport systems.  (Teledyne Controls, as a business unit of

21  Teledyne, is also referred to herein as "Teledyne").

22      8.      Among the many innovations that Teledyne has developed for the

23  aviation industry are systems that permit aircraft data, such as flight performance

24  and maintenance characteristics, to be automatically transferred from an aircraft

25  after the aircraft lands.  Alternative methods for obtaining and transferring such data

26  require either extensive human involvement in downloading and/or transporting the

27  data to a site for analysis, or the installation of costly infrastructure at each airport

28  and/or terminal gate at which the data is to be obtained.  In contrast, Teledyne's

1  novel and elegant solution utilizes the preexisting cellular infrastructure for mobile
2  telephones to receive wireless transmission of the data from the aircraft, and to
3  direct that data, for example through the Internet, to any desired location in the
4  world for analysis.  Teledyne's cost-efficient method allows almost immediate
5  access to the data for analysis, and eliminates the often-lengthy delays and
6  uncertainty inherent in alternative methods of transferring this data.

7       9.     These Teledyne systems also permit the wireless transfer of
8  information and files to an aircraft over the cellular infrastructure, which can be
9  used, for example, to update software and other files on the aircraft.

10       10.    Teledyne markets products utilizing this wireless data transfer
11  technology under its Wireless GroundLink® ("WGL") brand.  These products have
12  been highly successful and have been enthusiastically accepted by the airline
13  industry.

14       11.    For its innovation in developing its wireless data transfer technology,
15  Teledyne was rewarded by the United States Patent and Trademark Office with
16  United States Patent No. 6,181,990 (the "'990 patent"), entitled "Aircraft Flight Data
17  Acquisition and Transmission System."  (A true and correct copy of the '990 patent
18  and its associated reexamination certificate are attached to this Complaint as Exhibit
19  A.).

20       12.    Teledyne marks and has marked the '990 patent on its WGL products.

### The Confidential Disclosure Agreement

24       13.    On information and belief, in or about November 2002, Honeywell
25  recognized the problems inherent in other methods of obtaining and transferring
26  aircraft data and sought a solution.  In particular, Honeywell sought a cost-effective
27  and reliable means and method for automatically transferring aircraft data from an
28  aircraft after the aircraft lands anywhere in the world.

14.     The same month, November 2002, Steve Kersh, Customer Support Program Manager for Honeywell, contacted Tamas Igloi of Teledyne.  During their conversation, Mr. Kersh expressed interest to Mr. Igloi in meeting for the purpose of discussing Teledyne's wireless data transfer technology, and for devising a solution to Honeywell's data transfer needs.  Mr. Kersh represented that Honeywell was interested in pursuing a business relationship with Teledyne with respect to these issues.

15.     Thereafter, on or about November 22, 2002, Teledyne and Honeywell, through its Honeywell Engines, Systems & Services business unit, entered into a Confidential Disclosure Agreement ("Agreement").  The Agreement stated that Teledyne "is a manufacturer of Wireless Ground Link and possesses certain information, data, and experience relating thereto . . . which it considers to be confidential, proprietary, and a valuable commercial asset of" Teledyne.  The Agreement further stated that its purpose was "to facilitate discussions between the [Parties] . . . to enable the [Parties] to technically evaluate the other's [information] for the purpose of discussing possible application of the Wireless Ground Link product to transmit engine data for processing and of furthering the business relationship between the [Parties]."  (A true and correct copy of the Agreement is attached to this Complaint as Exhibit B and is incorporated herein by reference).

16.     Under the Agreement, Honeywell was obligated to "not disclose [Teledyne information] to other than its officers and employees who need to receive such [information] for purposes of discussion, and who are informed of the obligations of this Agreement."  Honeywell was further obligated to "not use any of the [Teledyne information] . . . except as contemplated by this Agreement."

<u>Teledyne's Trade Secret Information</u>

17.     Following the execution of the Agreement, and in reliance on Honeywell's representations therein and by Mr. Kersh, the parties entered into discussions and exchanges concerning the application of Teledyne's WGL technology to transmit Honeywell engine data.  During these discussions and exchanges, Teledyne disclosed confidential and trade secret information to Honeywell.

18.     On December 13, 2002, a meeting was held among senior executives and other personnel of Honeywell and Teledyne at the offices of Honeywell Engines, Systems & Services ("HESS") in Phoenix, Arizona.  The purpose of the meeting was for Teledyne to demonstrate to Honeywell how its WGL technology operated, and how it could provide a cost-efficient and reliable solution to Honeywell's data transfer needs.

19.     Attending the meeting from Teledyne were Ghobad Karimi and Tamas Igloi.  On information and belief, Mr. Karimi was the Director, Flight Data Services, for Teledyne Controls at that time, and Mr. Igloi was the Marketing Director, Flight Data Services.  Attending the meeting from HESS were Messrs Vince Trim, Vice President - Business Aviation Propulsion; Kevin S. Dittmar, Principal Engineer - New Business, APU Projects Airframe Systems; Paul D. Schmidt, Manager - Aftermarket Maintenance Programs; Richard Horvath, TFE731 Product Line Manager - Propulsion Systems; and Steve Kersh - Customer Support Program Manager.  Attending from Honeywell Aerospace Electronic Systems was Victor Vasquez, Sales Manager - Aviation Information Services.  Also attending from Honeywell was Tim Belling, Controls Engineer - Business Aviation.

20.     At the meeting, and in reliance on the Agreement and Honeywell's representations that it intended in good faith to pursue a business relationship with Teledyne, Teledyne disclosed to Honeywell highly confidential and trade secret

20101/2215610.1

1  information.  Specifically, Teledyne disclosed to Honeywell the particular manner

2  and means for creating a wireless data transfer system that would meet Honeywell's

3  specific needs.  The confidential and trade secret information disclosed by Teledyne

4  to Honeywell during the meeting (the "trade secret information"), included, without

5  limitation:

6          a)    technical details concerning the complete architecture of a

7                proposed system, tailored to Honeywell's requirements, utilizing

8                Teledyne's WGL technology;

9          b)    the interfaces for such a system with aircraft systems and

10               engines;

11         c)    the environmental specifications, wiring, sensors and activation

12               of such a system;

13         d)    the costs associated with implementing the proposed system,

14               including the costs associated with downloading the data;

15         e)    information concerning the speed associated with the proposed

16               system's operation, including the speed of downloading the data;

17         f)    information concerning the reliability and efficiency of the

18               proposed system's performance;

19         g)    the implementation and certification process for the proposed

20               system; and

21         h)    information concerning a schedule for implementing Teledyne's

22               proposed system, including timeframes for each implementation

23               phase and the steps to be taken during each phase.

24         21.    All of this information was highly confidential and proprietary to

25  Teledyne, and provided to Honeywell in reliance on its representations that it

26  intended in good faith to pursue a business relationship with Teledyne.

27

28

22.     Subsequently, a meeting was held in January 2003, at which Mr. Igloi of Teledyne was introduced by Honeywell to a Honeywell client, NetJets, as being part of the "partnership" between Honeywell and Teledyne.

23.     In the normal course, following the December 2002 and January 2003 meetings, a trial of Teledyne's proposed system would have been undertaken on an aircraft.  Indeed, Honeywell's Steve Kersh had talked of such a trial.  These trials usually take between six and nine months to prepare and execute.  However, on February 17, 2003, only two months after Teledyne first explained the system to Honeywell, and without even a test trial on an aircraft,  Honeywell sent Teledyne a Request for Quotation for an aircraft-based TFE731 ECTM Data Download System.

24.     On March 28, 2003, Teledyne provided a Technical and Commercial Proposal in response to Honeywell's request.  Teledyne's Proposal contained further confidential documents and information concerning its WGL technology.  As with all the prior information disclosed by Teledyne to Honeywell, the Proposal was provided under the terms of the Agreement and in reliance on Honeywell's representations.

25.     The trade secrets described above and that were disclosed to Honeywell in the December 2002 meeting, the March 2003 Proposal, and various other conversations, are not publicly available or ascertainable by Teledyne's competitors. In addition, Teledyne has devoted substantial efforts and expense to maintain the confidentiality and security of its trade secrets regarding its technology for the automatic acquisition and transmission of aircraft data for analysis and maintenance.

Honeywell's Decision to Breach the Agreement, Misappropriate Teledyne's Trade Secret Information, and to Develop an Infringing System

26.     On or about May 13, 2003, Honeywell notified Teledyne that Honeywell had supposedly made a decision to use "another source" for a solution to

1   its data acquisition and transmission problems rather than the WGL technology

2   proposed by Teledyne.

3       27.     On information and belief, Honeywell's notice that it intended to use

4   "another source" was a ruse, and, in fact, Honeywell had intended all along to

5   manufacture a solution to its data acquisition and transmission problems itself after

6   receiving confidential and other information from Teledyne.  Indeed, on information

7   and belief, Honeywell's representations that it intended to pursue in good faith a

8   relationship with Teledyne concerning a solution to Honeywell's data acquisition

9   and transmission problems were false.

10      28.     On information and belief, in or about June 2005, Honeywell began

11  marketing and offering for sale its FliteLink Wireless Data Management system

12  ("FliteLink"), both separately and in conjunction with its Flight Data Acquisition

13  and Management System ("FDAMS").  The FliteLink system automatically

14  downloads aircraft data from, for example, the FDAMS or other flight data

15  recorders and wirelessly transmits such data for analysis from the aircraft after

16  landing using the existing cellular infrastructure for mobile telephones.

17      29.     On information and belief, Honeywell's manufacture, use, sale, and

18  offer for sale of the FliteLink system, and the FliteLink system in conjunction with

19  Honeywell's FDAMS or other such equipment, infringes claims of  Teledyne's '990

20  patent.

21      30.     On information and belief, in or about August 2006, Honeywell began

22  marketing and offering for sale its Honeywell Gatelink system.  The Gatelink

23  system automatically downloads aircraft data and wirelessly transmits such data for

24  analysis from the aircraft after landing using the existing cellular infrastructure for

25  mobile telephones.  In addition, the Gatelink system allows for the transfer of

26  information and files, using the existing cellular infrastructure for mobile

27  telephones, to an aircraft.

28

31.    On information and belief, Honeywell's manufacture, use, sale, and offer for sale of the Gatelink system, and the Gatelink system in conjunction with other equipment, infringes claims of Teledyne's '990 patent.

32.    On information and belief, Honeywell has developed, or is currently developing, a system referred to as its Zing Intelligent Monitoring Network ("Zing") for wirelessly obtaining Honeywell engine data from a Honeywell TFE731 Digital Electronic Engine Controller.  Discovery may reveal that Honeywell's Zing system also infringes one or more claims of Teledyne's '990 patent.

33.    Honeywell is not licensed or otherwise authorized to make, use, sell, or offer for sale any system or method claimed in the '990 patent, and Honeywell's conduct is, in every instance, without Teledyne's consent.

## FIRST CLAIM FOR RELIEF

(Infringement of the '990 Patent - 35 U.S.C. § 271(a)-(c))

34.    Teledyne incorporates by reference each and every allegation contained in paragraphs 1 through 33, as though fully set forth at length.

35.    Teledyne owns all right, title, and interest in and to the '990 patent, including the right to sue thereon and the right to recover for infringement thereof.

36.    On information and belief, Honeywell has infringed and is infringing the '990 patent by making, using, selling, and offering to sell the inventions defined by one or more claims of this patent.

37.    On information and belief, Honeywell is aiding and abetting, and actively inducing and contributing to, infringement of the '990 patent by its customers.

38.    Honeywell's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Teledyne for which it has no adequate remedy at law. Teledyne is therefore entitled to a preliminary and permanent injunction restraining and enjoining Honeywell, its agents, servants, and employees, and all persons acting

1   thereunder, in concert with, or on its behalf, from infringing the claims of the '990

2   patent.

3       39.   As a result of the aforementioned conduct, Teledyne has suffered

4   damages and will imminently suffer further damages, including the loss of its

5   proprietary information and competitive position.  Such damages cannot presently

6   be ascertained with precision.

7       40.   Upon information and belief, Honeywell's infringement has been and

8   continues to be willful.

9

10                  SECOND CLAIM FOR RELIEF

11                      (Breach of Contract)

12      41.   Teledyne incorporates by reference each and every allegation contained

13   in paragraphs 1 through 40, as though fully set forth at length.

14      42.   On or about November 22, 2002, Teledyne and Honeywell entered into

15   a Confidential Disclosure Agreement ("Agreement").

16      43.   Implied in the Agreement is a covenant by Honeywell that it would act

17   in good faith and deal fairly with Teledyne; that it would do nothing to interfere

18   with Teledyne's right to receive the benefit of the Agreement including, without

19   limitation, Teledyne's expectation that the information disclosed pursuant to the

20   Agreement would be used solely in furtherance of a relationship between Teledyne

21   and Honeywell; and that Honeywell would place Teledyne's interests concerning

22   Teledyne's technology for the automatic acquisition and transmission of aircraft data

23   for analysis and maintenance on an equal footing with its own interests.

24      44.   Teledyne has performed all obligations and conditions precedent under

25   the Agreement.

26      45.   On information and belief, Honeywell breached the Agreement,

27   including, without limitation, the implied covenant of good faith and fair dealing, by

28   using and disclosing confidential information provided to Honeywell by Teledyne

1  under and in accordance with the Agreement for purposes not permitted under the

2  Agreement.  Honeywell has failed to perform its obligations under the Agreement

3  and committed the acts and omissions alleged hereinabove, for the conscious

4  purpose of withholding from Teledyne the rights and benefits to which it is entitled

5  under the Agreement.

6       46.    Honeywell's conduct has caused, and unless enjoined will continue to

7  cause, irreparable injury to Teledyne for which it has no adequate remedy at law.

8  Teledyne is therefore entitled to a preliminary and permanent injunction restraining

9  and enjoining Honeywell, its agents, servants, and employees, and all persons acting

10  thereunder, in concert with, or on its behalf, from disclosing or using any

11  confidential, proprietary or trade secret information regarding Teledyne's technology

12  for the automatic acquisition and transmission of aircraft data.

13       47.    As a result of the aforementioned conduct, Teledyne has suffered

14  damages and will imminently suffer further damages, including the loss of its

15  proprietary information and competitive position.  Such damages cannot presently

16  be ascertained with precision.

17

18                                 **THIRD CLAIM FOR RELIEF**

19                                 (Misappropriation of Trade Secrets)

20       48.    Teledyne incorporates by reference each and every allegation contained

21  in paragraphs 1 through 47, as though fully set forth at length.

22       49.    By reason of the foregoing acts, Honeywell has engaged in

23  misappropriation of Teledyne's trade secrets, without Teledyne's express or implied

24  consent, in violation of <u>California Civil Code</u> Sections 3426-3426.10.

25       50.    Teledyne has developed highly valuable trade secrets regarding

26  technology for the automatic acquisition and transmission of aircraft data for

27  analysis and maintenance.  This information (1) is not generally known to the

28  public, or to other persons, who could obtain economic value from its disclosure or

1   use; (2) derives independent economic value from not being so known, in that it has

2   been generated over a long period of time through the expenditure of substantial

3   money, expertise and effort; and (3) is the subject of reasonable efforts by Teledyne

4   to maintain its secrecy.

5        51.    Teledyne is informed and believes that Honeywell  improperly acquired

6   Teledyne's trade secrets regarding technology for the automatic acquisition and

7   transmission of aircraft data for analysis and maintenance.  Honeywell represented

8   to Teledyne that Honeywell intended to pursue in good faith a relationship with

9   Teledyne to solve Honeywell's aircraft data acquisition and transmission problems

10   and requirements.  On information and belief, these representations were false, and

11   Honeywell knew that they were false when made.  On information and belief,

12   Honeywell in actuality intended to manufacture a solution to its data acquisition and

13   transmission problems itself after receiving confidential and other information from

14   Teledyne.

15        52.    On information and belief, Honeywell made these representations to

16   Teledyne with the intent that Teledyne would rely on these representations to enter

17   into the Confidential Disclosure Agreement with Honeywell and to induce Teledyne

18   to disclose confidential and other information about Teledyne's wireless data

19   acquisition and transmission technology to Honeywell.

20        53.    Teledyne is informed and believes that Honeywell has also improperly

21   disclosed and used Teledyne's trade secrets regarding technology for the automatic

22   acquisition and transmission of aircraft data for analysis and maintenance.  Under

23   the terms of the Agreement, Honeywell was permitted to disclose and use

24   Teledyne's trade secret information for the *sole purpose* of "furthering the business

25   relationship between the [Parties]."  Notwithstanding these restrictions, Honeywell

26   disclosed and used Teledyne's trade secret information for the antithetical purpose of

27   manufacturing a solution to its data acquisition and transmission problems itself.

28

54.   Honeywell's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Teledyne for which it has no adequate remedy at law. Teledyne is therefore entitled to a preliminary and permanent injunction restraining and enjoining Honeywell, its agents, servants, and employees, and all persons acting thereunder, in concert with, or on its behalf, from disclosing or using any confidential, proprietary or trade secret information regarding Teledyne's technology for the automatic acquisition and transmission of aircraft data, for any purpose.

55.   As a result of the aforementioned conduct, Teledyne has also suffered damages and will imminently suffer further damages, including the loss of its trade secrets and competitive position.  Such damages cannot presently be ascertained with precision.

56.   The aforementioned conduct has been despicable, wanton, oppressive, willful, malicious, duplicitous, and performed with conscious disregard of Teledyne's rights and with the intent to deprive Teledyne of its rights.  Accordingly, Teledyne is entitled to an award of punitive and exemplary damages pursuant to California Civil Code Sections 3294 and 3426.3(c), and reasonable attorneys' fees pursuant to California Civil Code Section 3426.4.

## FOURTH CLAIM FOR RELIEF
### (Common Law Misappropriation)

57.   Teledyne incorporates by reference each and every allegation contained in paragraphs 1 through 56, as though fully set forth at length.

58.   By reason of the foregoing acts, Honeywell has engaged in the common law tort of misappropriation.  Teledyne made a substantial investment of time, effort, and money to develop its trade secrets regarding its technology for the automatic acquisition and transmission of aircraft data.  Honeywell has improperly obtained these trade secrets from Teledyne and has used them in a manner and for a purpose not authorized by Teledyne.

59.     Honeywell's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Teledyne for which it has no adequate remedy at law. Teledyne is therefore entitled to a preliminary and permanent injunction restraining and enjoining Honeywell, its agents, servants, and employees, and all persons acting thereunder, in concert with, or on its behalf, from disclosing or using any confidential, proprietary or trade secret information regarding Teledyne's technology for the automatic acquisition and transmission of aircraft data, for any purpose.

60.     As a result of the aforementioned conduct, Teledyne has also suffered damages and will imminently suffer further damages, including the loss of its trade secrets and competitive position.  Such damages cannot presently be ascertained with precision.

61.     The aforementioned conduct has been despicable, wanton, oppressive, willful, malicious, duplicitous, and performed with conscious disregard of Teledyne's rights and with the intent to deprive Teledyne of its rights.  Accordingly, Teledyne is entitled to an award of punitive and exemplary damages pursuant to California Civil Code Section 3294 and the common law.

## FIFTH CLAIM FOR RELIEF

(Intentional Interference With Prospective Economic Advantage)

62.     Teledyne incorporates by reference each and every allegation contained in paragraphs 1 through 61, as though fully set forth at length.

63.     On information and belief, there existed an economic relationship between Teledyne and certain airlines and/or aircraft companies (collectively, the "airlines"), whereby such airlines were willing to acquire systems incorporating Teledyne's technology for the automatic acquisition and transmission of aircraft data.  These economic relationships contained the probability of future economic benefit to Teledyne.

64.     On information and belief, Honeywell knew of the existence of the economic relationships between Teledyne and the airlines.

65.     On information and belief, Honeywell intentionally and wrongfully interfered with Teledyne's relationship with the airlines by, *inter alia*, selling to the airlines competing systems for the automatic acquisition and transmission of aircraft data that infringe Teledyne's patent, and that were developed and manufactured using confidential and trade secret information misappropriated from Teledyne.

66.     As a direct and proximate result of the aforementioned conduct, Teledyne's relationship with the airlines has been disrupted, and Teledyne has been deprived of the significant economic benefit of contracting with the airlines for the sale of its systems for the automatic acquisition and transmission of aircraft data.

67.     On information and belief, one example of Honeywell's intentional and wrongful interference concerns Teledyne's relationship with DB Airlines ("DBA"). In January 2006, DBA sought tenders for the acquisition of a wireless data acquisition system.  Both Teledyne and Honeywell tendered bids.  On information and belief, Honeywell's bid involved the use of systems that infringe Teledyne's patent, and that were developed and manufactured using Teledyne's misappropriated trade secret information.

68.     Within the last month, Teledyne was informed by DBA that it would not receive the contract.  Rather, DBA informed Teledyne that it would acquire a wireless acquisition and transfer system from Honeywell.  Consequently, Teledyne was intentionally and wrongfully deprived of a significant economic benefit because of an infringing system that Honeywell developed from Teledyne's own trade secret information.

69.     As a result of the aforementioned conduct, Teledyne has suffered damages and will imminently suffer further damages.  Such damages cannot presently be ascertained with precision.

70.     The aforementioned conduct has been despicable, wanton, oppressive, willful, malicious, duplicitous, and performed with conscious disregard of Teledyne's rights and with the intent to deprive Teledyne of its rights.  Accordingly, Teledyne is entitled to an award of punitive and exemplary damages.

## SIXTH CLAIM FOR RELIEF

(Negligent Interference With Prospective Economic Advantage)

71.     Teledyne incorporates by reference each and every allegation contained in paragraphs 1 through 70, as though fully set forth at length.

72.     On information and belief, there existed an economic relationship between Teledyne and certain airlines and/or aircraft companies (collectively, the "airlines"), whereby such airlines were willing to acquire systems incorporating Teledyne's technology.  These economic relationships contained the probability of future economic benefit to Teledyne.

73.     On information and belief, Honeywell knew of the existence of the economic relationships between Teledyne and the airlines.

74.     On information and belief, Honeywell wrongfully interfered with Teledyne's relationship with the airlines by, *inter alia*, selling to the airlines competing systems for the automatic acquisition and transmission of aircraft data that infringe Teledyne's patent, and that were developed and manufactured using confidential and trade secret information misappropriated from Teledyne.

75.     It was reasonably foreseeable that Honeywell's wrongful conduct would interfere with Teledyne's economic relationships with the airlines if Honeywell failed to exercise due care.

76.     As a direct and proximate result of the aforementioned conduct, Teledyne's relationship with the airlines has been disrupted, and Teledyne has been deprived of the significant economic benefit of contracting with the airlines for the sale of its systems for the automatic acquisition and transmission of aircraft data.

77.     As a result of the aforementioned conduct, Teledyne has suffered damages and will imminently suffer further damages.  Such damages cannot presently be ascertained with precision.

## SEVENTH CLAIM FOR RELIEF

(Intentional Misrepresentation - Cal. Civ. Code §§ 1709-10 and 1572)

78.     Teledyne incorporates by reference each and every allegation contained in paragraphs 1 through 77, as though fully set forth at length.

79.     Honeywell represented to Teledyne that Honeywell intended to pursue in good faith a relationship with Teledyne to solve Honeywell's aircraft data acquisition and transmission problems and requirements.

80.     On information and belief, these representations were false, and Honeywell knew that they were false when made.  On information and belief, Honeywell in actuality intended to manufacture a solution to its data acquisition and transmission problems itself after receiving confidential and other information from Teledyne.

81.     On information and belief, Honeywell made these representations to Teledyne with the intent that Teledyne would rely on these representations to enter into the Confidential Disclosure Agreement with Honeywell and to induce Teledyne to disclose confidential and other information about Teledyne's wireless data acquisition and transmission technology to Honeywell.

82.     Teledyne was unaware of the falsity of Honeywell's representations and justifiably relied on them in entering into the Agreement and disclosing confidential and other information to Honeywell about Teledyne's wireless data acquisition and transmission technology.

83.     As a result of the aforementioned conduct, Teledyne has suffered damages and will imminently suffer further damages, including the loss of its trade

FIRST AMENDED COMPLAINT

1   secrets and competitive position.  Such damages cannot presently be ascertained

2   with precision.

3        84.     The aforementioned conduct has been despicable, wanton, oppressive,

4   willful, malicious, duplicitous, and performed with conscious disregard of

5   Teledyne's rights and with the intent to deprive Teledyne of its rights.  Accordingly,

6   Teledyne is entitled to an award of punitive and exemplary damages.

7

8                    EIGHTH CLAIM FOR RELIEF

9       (Negligent Misrepresentation - Cal. Civ. Code §§ 1709-10 and 1572)

10      85.     Teledyne incorporates by reference each and every allegation contained

11   in paragraphs 1 through 84, as though fully set forth at length.

12      86.     Honeywell represented to Teledyne that Honeywell intended to pursue

13   in good faith a relationship with Teledyne to solve Honeywell's aircraft data

14   acquisition and transmission problems and requirements.

15      87.     On information and belief, these representations were false when made

16   and were made without any reasonable ground for believing them to be true.  On

17   information and belief, Honeywell in actuality intended to manufacture a solution to

18   its data acquisition and transmission problems and requirements itself after receiving

19   confidential and other information from Teledyne.

20      88.     On information and belief, Honeywell made these representations to

21   Teledyne with the intent that Teledyne would rely on these representations to enter

22   into the Confidential Disclosure Agreement with Honeywell and to disclose

23   confidential and other information about Teledyne's wireless data acquisition and

24   transmission technology to Honeywell.

25      89.     Teledyne was unaware of the falsity of Honeywell's representations and

26   justifiably relied on them in entering into the Agreement, and disclosing confidential

27   and other information to Honeywell about Teledyne's wireless data acquisition and

28   transmission technology.

90.     As a result of the aforementioned conduct, Teledyne has suffered damages and will imminently suffer further damages, including the loss of its trade secrets and competitive position.  Such damages cannot presently be ascertained with precision.

## PRAYER FOR RELIEF

WHEREFORE, Teledyne prays for judgment against Honeywell as follows:

A.     That Honeywell has infringed and is infringing the '990 patent, and that such infringement is willful;

B.     That Honeywell and its subsidiaries, affiliates, parents, successors, assigns, officers, agents, representatives, servants, and employees, and all persons in active concert or participation with them, be preliminarily and permanently enjoined from continued infringement of the '990 patent;

C.     That Honeywell be ordered to pay Teledyne its damages caused by Honeywell's infringement of the '990 patent, and that such damages be trebled, together with interest thereon;

D.     That this case be declared exceptional pursuant to 35 U.S.C. § 285 and that Teledyne be awarded its reasonable attorneys' fees and costs;

E.     That Teledyne recover the greater of the amount of Honeywell's unjust enrichment or its actual damages and lost profits arising from Honeywell's breach of the Confidential Disclosure Agreement, misappropriation of Teledyne's trade secret information, intentional and negligent interference with Teledyne's prospective economic advantage, and intentional and negligent misrepresentation, in an amount to be proved at trial, and recover statutory damages, pursuant to California Civil Code Sections 3426-3426.10, and the common law, together with interest thereon from the dates such damages were incurred or profits lost;

1    F.    That Honeywell, as well as its employees and agents, and all those

2    acting in concert or participation with them, be preliminarily and permanently

3    enjoined from disclosing or using any of Teledyne's confidential, proprietary or

4    trade secret information regarding Teledyne's wireless data acquisition and

5    transmission technology;

6    G.    That Honeywell pay to Teledyne the full cost of this action and

7    Teledyne's reasonable attorneys' fees pursuant to <u>California Civil Code</u> Section

8    3426.4;

9    H.    That Honeywell be ordered to pay Teledyne punitive and exemplary

10   damages pursuant to <u>California Civil Code</u> Section 3426.3(c) and 3294, and the

11   common law, in a sum sufficient to punish Honeywell, and to make an example of

12   it, and deter it from similar wrongdoing; and

13   I.    That Teledyne have such other and further relief as the Court deems

14   just and proper.

15   DATED: September _26_, 2007      QUINN EMANUEL URQUHART OLIVER &
16                                    HEDGES, LLP

17

18   By _Frederick Lorig per AFA w/permission_
         Frederick A. Lorig
19       Attorneys for Plaintiff Teledyne
         Technologies Incorporated

20

21   DEMAND FOR JURY TRIAL

22   Teledyne hereby demands a trial of all issues by jury.

23

24   DATED: September _26_, 2007      QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES, LLP
25

26   By _Frederick Lorig per AFA w/permission_.
         Frederick A. Lorig
27       Attorneys for Plaintiff Teledyne
         Technologies Incorporated

28

                                                      FIRST AMENDED COMPLAINT

US006181990UB1

(12) **United States Patent** (10) **Patent No.:** **US 6,181,990 B1**
Grabowsky et al. (45) **Date of Patent:** **Jan. 30, 2001**

(54) **AIRCRAFT FLIGHT DATA ACQUISITION AND TRANSMISSION SYSTEM**

(75) Inventors: **John Francis Grabowsky**, Camarillo; **David Ray Stevens**, Simi Valley, both of CA (US)

(73) Assignee: **Teledyne Technologies, Inc.**, Los Angeles, CA (US)

(*) Notice: Under 35 U.S.C. 154(b), the term of this patent shall be extended for 0 days.

(21) Appl. No.: 09/126,156

(22) Filed: **Jul. 30, 1998**

(51) Int. Cl.[7] .......................... **H04B 7/00**; G06F 17/40; G06F 13/00
(52) U.S. Cl. ................................ **701/14**; 701/35; 455/431
(58) Field of Search ...................................... 701/14, 3, 24, 701/35; 455/431, 422, 456

(56) **References Cited**

U.S. PATENT DOCUMENTS

| Re. 35,590 | 8/1997 | Bezos et al. . | |
| 4,729,102 | 3/1988 | Miller, Jr. et al. . | |
| 4,804,937 | * 2/1989 | Barbiaux et al. | .................. 340/459 |
| 4,926,331 | 5/1990 | Windle et al. . | |
| 4,939,652 | * 7/1990 | Steiner | .................. 701/35 |
| 5,124,915 | * 6/1992 | Krenzel | .................. 702/5 |
| 5,185,700 | 2/1993 | Bezos et al. . | |
| 5,283,767 | * 2/1994 | McCoy | .................. 367/4 |
| 5,400,018 | 3/1995 | Scholl et al. . | |
| 5,440,544 | * 8/1995 | Zinser, Jr. | .................. 370/319 |
| 5,519,663 | * 5/1996 | Harper, Jr. et al. | .................. 365/229 |
| 5,524,272 | * 6/1996 | Podowski et al. | .................. 455/3.2 |
| 5,550,738 | 8/1996 | Bailey et al. . | |
| 5,680,328 | 10/1997 | Skorupski et al. . | |
| 5,714,948 | * 2/1998 | Farmakis et al. | .................. 340/961 |
| 5,793,813 | * 8/1998 | Cleave | .................. 375/259 |
| 5,826,195 | * 10/1998 | Westerlage et al. | .................. 455/456 |
| 5,844,473 | * 12/1998 | Kaman | .................. 340/439 |
| 5,852,825 | * 12/1998 | Winslow | .................. 707/6 |
| 5,890,079 | * 3/1999 | Levine | .................. 701/14 |
| 5,901,142 | * 5/1999 | Averbuch et al. | .................. 370/329 |
| 5,919,239 | * 7/1999 | Fraker et al. | .................. 701/35 |
| 5,926,759 | * 7/1999 | Severwright | .................. 455/431 |
| 6,047,165 | * 4/2000 | Wright et al. | .................. 455/66 |

* cited by examiner

*Primary Examiner*—William A. Cuchlinski, Jr.
*Assistant Examiner*—Eric M Gibson
(74) *Attorney, Agent, or Firm*—Kirkpatrick & Lockhart LLP

(57) **ABSTRACT**

An aircraft data transmission system used with an aircraft having a data acquisition unit. The system includes a communications unit located in the aircraft and in communication with the data acquisition unit. The system also includes a cellular infrastructure in communication with the data communications unit after the aircraft has landed. The system further includes a data reception unit in communication with the cellular infrastructure.

**33 Claims, 10 Drawing Sheets**



EXHIBIT A

**U.S. Patent**     Jan. 30, 2001     Sheet 1 of 10     US 6,181,990 B1



FIG. 1

EXHIBIT A



FIG. 2

EXHIBIT  A



*FIG. 3*

Case 2:06-cv-06803-MMM-SH   Document 29   Filed 10/31/07   Page 26 of 43   Page ID #:96

## FIG. 4



EXHIBIT  A



FIG. 5

Case 2:06-cv-06803-MMM-SH   Document 29   Filed 10/31/07   Page 28 of 43   Page ID #:98

## F I G. 6



EXHIBIT   A

*FIG. 7*



EXHIBIT   A

# FIG. 8



# FIG. 9



EXHIBIT A

# FIG. 10



EXHIBIT   A

Case 2:06-cv-06803-MMM-SH   Document 29   Filed 10/31/07   Page 32 of 43   Page ID #:102



*FIG. II*

EXHIBIT   A

US 6,181,990 B1

| 1 | 2 |

# AIRCRAFT FLIGHT DATA ACQUISITION AND TRANSMISSION SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATIONS

(Not Applicable)

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH

(Not Applicable)

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention is directed generally to an aircraft flight data acquisition and transmission system and, more particularly, to an on-board cellular data transmission system.

### 2. Description of the Background

It is common for aircraft to generate records of data relating to flight and performance parameters for each flight of the aircraft. The data typically relate to parameters such as air speed, altitude, vertical acceleration, heading, time, etc. The data are utilized in the event of an accident or a near-accident and to assist in maintenance of the aircraft by detecting faulty components or gradual deterioration of a system or component, to assist in reviewing crew performance, and to assist in logistical planning activities such as scheduling and routing.

Aircraft data are typically gathered by a digital flight data acquisition unit (DFDAU). The DFDAU typically stores the data on magnetic or magnetic-optical media. When the aircraft lands, ground personnel board the aircraft, remove the media, and mail the media to a flight operations center (FOC). The manual removal and posting of the data adds a significant labor cost, yields less than desirable data delivery reliability, and results in a significant time delay before the data are useful for analysis.

It is known to use radio frequency (RF) transmissions to transmit data relating to an aircraft. Such teachings, however, require substantial investments to construct the RF transmission systems required for such a system to work. Furthermore, it is very expensive to create redundancy in such a system.

It is also known to transmit data relating to an aircraft via a telephone system located in a terminal. Such a system, however, requires that the aircraft be docked at the gate before transmission begins, thereby resulting in a substantial delay in the transmission. Furthermore, such a system requires an added step of transmitting the data from the aircraft to the terminal telephone system, increasing the cost of installing, operating, and maintaining such a system.

Thus, there is a need for an aircraft data transmission system that automatically transfers flight data from an aircraft to a flight operations center with little or no human involvement and which relies on a reliable wireless delivery system.

## SUMMARY OF THE INVENTION

The present invention is directed to an aircraft data transmission system used with an aircraft having a data acquisition unit. The system includes a communications unit located in the aircraft and in communication with the data acquisition unit. The system also includes a cellular infrastructure in communication with the data communications unit after the aircraft has landed. The system further includes a data reception unit in communication with the cellular infrastructure.

The present invention represents a substantial advance over prior aircraft data acquisition and transmission systems. For example, the present invention has the advantage that it requires little expense to implement because it uses well-known technology and the cellular infrastructure which is already in place. The present invention also has the advantage that it can transmit data over multiple parallel channels to achieve the necessary transmission bandwidth and achieve a low data transmission time. The present invention has the further advantage that it does not require a dedicated data link between the aircraft and the flight operations center and/or an airport terminal.

## BRIEF DESCRIPTION OF THE DRAWING

For the present invention to be clearly understood and readily practiced, the present invention will be described in conjunction with the following figures, wherein:

FIG. 1 illustrates an aircraft data acquisition and transmission system;

FIG. 2 is a block diagram illustrating a more detailed embodiment of the system illustrated in FIG. 1;

FIG. 3 is a block diagram illustrating data flow through the system illustrated in FIG. 2;

FIG. 4 is a flowchart illustrating a method carried out by the gatelink processor in the aircraft;

FIG. 5 is a flowchart illustrating a method of performing the start primary data thread step of FIG. 4;

FIG. 6 is a flowchart illustrating a method of performing the start secondary data threads step of FIG. 5;

FIG. 7 is a flowchart illustrating a method of operating the gatelink processor in the flight operations center;

FIG. 8 is a flowchart illustrating a method of performing the initialize session process step of FIG. 7;

FIG. 9 is a flowchart illustrating a method of performing the data message process step of FIG. 7;

FIG. 10 is a flowchart illustrating a method of performing the end session process step of FIG. 7; and

FIG. 11 is a block diagram illustrating another embodiment of the system illustrated in FIG. 1.

## DETAILED DESCRIPTION OF THE INVENTION

It is to be understood that the figures and descriptions of the present invention have been simplified to illustrate elements that are relevant for a clear understanding of the present invention, while eliminating, for purposes of clarity, other elements found in a typical communications system. It can be recognized that other elements are desirable and/or required to implement a device incorporating the present invention. For example, the details of the cellular communications infrastructure, the Internet, and the public-switched telephone network are not disclosed. However, because such elements are well known in the art, and because they do not facilitate a better understanding of the present invention, a discussion of such elements is not provided herein.

FIG. 1 illustrates an aircraft data acquisition and transmission system 10. An aircraft 12, which has stored flight data, is illustrated after landing. The aircraft 12 transmits flight data as cellular communications signals to a cellular infrastructure 14. The cellular infrastructure 14 acts as a

EXHIBIT A

US 6,181,990 B1

3

communications channel to the communications medium 16. A flight operations center 18 is connected to the medium 16 by any conventional connectivity medium such as, for example, a leased line. Once the cellular connections are made via the medium 16 data can flow bidirectionally from or to the aircraft.

FIG. 2 is a block diagram illustrating a more detailed embodiment of the system 10 illustrated in FIG. 1. The aircraft 12 includes a data system 19 having a data acquisition unit 20. The data acquisition unit 20 includes a digital flight data acquisition unit (DFDAU) processor 22, which includes a storage media for storing flight data in a digital format. The DFDAU processor 22 receives signals from sensors 24 which sense parameters such as air speed, altitude, vertical acceleration, heading, time, etc. The flight data are transferred to a communications unit 26 via a bus 28. The bus 28 is connected to an I/O interface 30 in the communications unit 26. The I/O interface 30 can be a standard bus interface such as, for example, an ARINC 429 bus interface.

The I/O interface 30 is connected to a gatelink processor 32. The processor 32 can be a general purpose processor such as a personal computer, a microprocessor such as an Intel Pentium® processor, or a special purpose processor such as an application specific integrated circuit (ASIC) designed to operate in the system 10. The processor 32 is responsive to a weight-on-wheels signal, which acts as an interrupt signal to signal the processor 32 to initiate transmission or reception of the data when the aircraft 12 has landed. Upon receipt of the weight-on-wheels signal from the landing gear of the aircraft 12, the processor 32 prepares the flight data for transmission and transmits the data to a multi-port serial card 34. Each I/O port of the card 34 is attached to a cell channel which can open, sustain, and close a physical, over-the-air channel to the cellular infrastructure 14. The cell channels 36 can transmit simultaneously and can thus transmit data in parallel. Each cell channel 36 is connected to an antenna matching network and a post amplifier (not shown). An antenna 38 is installed in the aircraft 12 so as to optimize free space radiation to the cellular infrastructure 14.

The data are transmitted over a cellular airlink using the physical layer modulation of the cellular infrastructure 14. The cellular infrastructure 14 includes an antenna 40, which is within free-space radiating range of the aircraft 12. The antenna 40 is connected to a base station transceiver subsystem 42. The subsystem 42 is connected to a base station controller 44 which has a direct connection via a router (not shown) to the Internet 45. The flight data are transmitted via the Internet 45 to the flight operations center 18.

A local router 46 in a data reception unit 47 of the flight operations center 18 is connected to the Internet 45, such as via a connection to the backbone of the Internet 45. The router 46 connects a local area network 48 to the Internet 45. The local area network can be of any type of network such as, for example, a token ring network, an ATM network, or an Ethernet network. A gatelink processor 50 is connected to the network 48 and receives the flight data for storage in an attached storage unit 52. The storage unit 52 can be any type of unit capable of storing data such as, for example, a disk array or a tape drive. The storage unit 52 makes the flight data available to data analysis applications 54 which can analyze and/or report the flight data to a user.

Data transfer can also occur from the flight operations center 18 to the aircraft 12. The data are transmitted via the Internet 45 and the cellular infrastructure 14 and received by

4

the antenna 38. The serial card 34 receives the data from the cell channels 36 and the processor 32 outputs the data, via the I/O interface 30, to avionics 55.

FIG. 3 is a block diagram illustrating data flow through the system 10 illustrated in FIG. 2. The flight data is stored in the DFDAU processor 22 as a stored file 56. An application layer 58 of an operating system 60 of the gatelink processor 32 compresses, encrypts, and segments the data. The operating system 60 can be any type of operating system suitable such as, for example, UNIX. A typical stored file may be compressed from approximately 40 Mbytes to approximately 4 Mbytes. Compression may be done by any compression method such as, for example, the method embodied in the PKZIP® compression utility, manufactured by PKWARE, Inc. Encryption can be accomplished using any suitable asymmetric (public key) or symmetric encryption method such as, for example, the method embodied in Data Encryption Software (DES), manufactured by American Software Engineering or the methods in the RC2, RC4, or RC5 encryption software manufactured by RSA Data Security, Inc. During segmentation individual datagrams of, for example, 1024 bytes are formed and indexed for subsequent reassembly.

The operating system 60 passes the datagrams to a network layer 62 which constructs UDP/IP packets from the datagrams by adding message headers to the datagrams. The network layer 62 then routes the packets to one of up to 16 peer-to-peer protocol (PPP) threads running within the operating system 60 at a data link layer interface 64. The PPP threads convey the packets to the multi-port serial card 34 for transmission to the backbone 66 of the Internet 45 via the cell channels 36 to the cellular infrastructure 14. The packets are received from the Internet 45 by the local router 46 in the flight operations center 18. The network layer 62 receives acknowledgments of received packets from the gatelink processor 50 in the flight operations center 18. The network layer 62 also re-queues packets that are dropped before reaching the gatelink processor 50.

The local router 46 in the flight operations center 18 receives the packets and routes them to the gatelink processor 50. A local network interface 68 receives the packets and a data link layer interface 70 of an operating system 72 passes the packets to a network layer 74 of the operating system 72. The operating system 72 can be any type of suitable operating system such as, for example, UNIX. The network layer 74 sends acknowledgments of successful packet deliveries to the gatelink processor 32. The network layer 74 also removes the UDP/IP headers and passes the datagrams to an application layer 76. The application layer 76 reassembles, decrypts, and uncompresses the datagrams to restore the flight data to its original form. The application layer then passes the data to a stored file 78 in the storage unit 52. The functions performed by the aircraft 12 and the flight operations center 18 are similarly interchangeable when data is transferred from the flight operations center 18 to the aircraft 12.

FIG. 4 is a flowchart illustrating a method carried out by the gatelink processor 32 in the aircraft. At step 82, the gatelink processor 32 receives a weight-on-wheels interrupt which signals that the aircraft has landed, and the data transfer is initiated. The application layer 58 compresses the flight data at step 84 and encrypts the data at step 86. At step 88, the data is segmented into datagrams and UDP/IP packets are constructed. The packets are then placed in a packet queue. The packets are then ready for transmission as a fixed number of threads, corresponding to the number of cell channels 36. At step 90, the primary data thread is

35

EXHIBIT  A

US 6,181,990 B1

5

started to make the initial call and open the communications channel to the flight operations center 18. A wait state at step 92 is invoked for a predetermined period of time (5 sec.) and at step 94, the processor 32 determines if any threads are active, i.e. if there are any packets that haven't been transmitted or have been transmitted and dropped. If there are no packets remaining, the method is completed at step 96. If there are packets remaining, the method enters the wait state at step 92 and subsequently determines if any threads are active at step 94.

FIG. 5 is a flowchart illustrating a method of performing the start primary data thread step 90 of FIG. 4. At step 98, the point-to-point protocol (PPP) connection is initiated for the primary data thread through one of the cell channels 36 and the gatelink session is initiated at step 100. The secondary data thread transmissions are started at step 102. At step 104, it is determined if any packets are left in the primary data thread to be transmitted. If so, the next packet in the primary data thread is transmitted at step 106. If no packets are left to transmit in the primary data thread as determined at step 104, it is determined if any of the secondary data threads are active at step 108. If so, the process returns to step 104 and repeats step 108 until no threads are active. If no threads are active, the gatelink session is ended at step 110 and the PPP connection for the primary data thread is closed at step 112. At step 114, the primary data thread step 90 is completed.

FIG. 6 is a flowchart illustrating a method of performing the start secondary data threads step 102 of FIG. 5. The method is carried out in parallel for each secondary data thread. At step 116, the thread is set to active so that the processor 32 can determine if any threads are active at step 108 of FIG. 5. The PPP connection for the secondary data thread being transmitted is initiated at step 118. At step 120, it is determined if any packets remain in the data thread. If so, the packet is transmitted at step 122. If no packets remain in the data thread, the PPP connection is closed at step 124 and the thread is set to inactive at step 126. The method is completed at step 128.

FIG. 7 is a flowchart illustrating a method of operating the gatelink processor 50 in the flight operations center 18. At step 130, a socket is opened to allow the operating system 72 in the processor 50 to receive and transport messages across the Internet 45. At step 132, the processor 50 waits for a message from the Internet 16. When a message is received, the processor 50 determines if the message is a session initialitialization message at step 134. If the message is a session initialization message, the processor 50 executes the session initialization process at step 136. If the message is not a session initialization message at step 134, the processor 50 determines if the message is a data message at step 138. If the message is a data message, the processor 50 executes the data message process at step 140. If the message is not a data message, the processor 50 determines if the message is an end session message at step 142. If the message is an end session message, the processor 50 executes the end session process at step 144 and then returns to step 132 to wait for additional messages..

FIG. 8 is a flowchart illustrating a method of performing the initialize session process step 136 of FIG. 7. The processor 50 allocates buffer space for subsequent data reception at step 146. The processor 50 then sends a session initialized data acknowledgment to the processor 32 at step 148. At step 150, the flow returns to step 132 of FIG. 7.

FIG. 9 is a flowchart illustrating a method of performing the data message process step 140 of FIG. 7. At step 152, the

6

received data message is copied to a buffer and an acknowledgment of the data received is sent at step 154. At step 156, the flow returns to step 132 of FIG. 7.

FIG. 10 is a flowchart illustrating the steps included in the end session process step 144 of FIG. 7. At step 158, the checksum is computed for the received data to check the integrity of the data. The checksum is checked at step 160 and, if it is correct, the processor 50 saves the buffer to a temporary file at step 162. The processor 50 then decrypts the file at step 164 and uncompresses the file at step 166. The processor 50 sends an end session acknowledge message to the processor 32 at step 168 and at step 170, the flow returns to step 132 of FIG. 7. If the checksum is not correct, the processor 50 sends an unsuccessful end session message, which notifies the processor 32 to resend the data.

FIG. 11 is a block diagram illustrating another embodiment of the system 10 illustrated in FIG. 1. The operation of the system 10 of FIG. 11 is similar to that described in conjunction with the system 10 of FIG. 2. However, the flight data is transmitted from the cellular infrastructure 14 to the flight operations center 18 via the public-switched telephone network 172. A modem bank 174 receives the data via the PSTN 172. The data is then routed by the router 46 to the processor 50 via the network 48. The modem bank 174 can have a modem dedicated to receive data transmitted by one of the cell channels 36.

While the present invention has been described in conjunction with preferred embodiments thereof, many modifications and variations will be apparent to those of ordinary skill in the art. For example, although the system has been described hereinabove as transferring data from the aircraft, the system can also be used to transfer data to the aircraft with no modifications in the system. Also, the system may be used to transmit data while the aircraft is in flight. Furthermore, the system may be used without encryption and without data compression prior to sending data. The foregoing description and the following claims are intended to cover all such modifications and variations.

What is claimed is:

1. An aircraft data transmission system, the aircraft having a data acquisition unit, comprising:

   a communications unit located in the aircraft and in communication with the data acquisition unit;

   a cellular infrastructure in communication with said communications unit after the aircraft has landed, wherein the communication is initiated automatically upon landing of the aircraft; and

   a data reception unit in communication with said cellular infrastructure.

2. The system of claim 1 wherein said data reception unit is in communication with said cellular infrastructure via the Internet.

3. The system of claim 1 wherein said data reception unit is in communication with said cellular infrastructure via the public switch telephone network.

4. The system of claim 1 wherein said communications unit has at least one modem in communication with said cellular infrastructure and said data reception unit has at least one modem in communication with said cellular infrastructure.

5. The system of claim 1 wherein said communications unit includes:

   a processor;

   a serial card in communication with said processor;

   at least one cell channel in communication with said serial card; and

EXHIBIT  A

7

at least one antenna in communication with said cell channel.

6. The system of claim 1 wherein said cellular infrastructure includes:

an antenna;

a transceiver subsystem in communication with said antenna; and

a controller in communication with said transceiver subsystem.

7. The system of claim 1 wherein said data reception unit includes:

a router; and

a processor in communication with said router, said processor having a storage unit.

8. A data system for an aircraft, comprising:

a digital flight data acquisition unit in communication with at least one sensor;

a processor in communication with said digital flight data acquisition unit;

a serial card in communication with said processor; and

a plurality of cell channels in communication with said serial card, said cell channels for transmitting data via a cellular infrastructure after the aircraft has landed, wherein the communication between the cell channels and the serial card is initiated automatically upon landing of the aircraft.

9. The system of claim 8 further comprising an antenna in communication with said cell channels.

10. The system of claim 8 wherein said processor includes a personal computer.

11. The system of claim 8 wherein said processor includes an ASIC.

12. The system of claim 8 wherein said processor includes a microprocessor.

13. The system of claim 8 wherein said processor has an I/O interface in communication with said digital flight data acquisition unit.

14. An aircraft, comprising:

a digital flight data acquisition unit in communication with at least one sensor; and

a communications unit in communication with said digital flight data acquisition unit, said communications unit including:

a processor in communication with said digital flight data acquisition unit;

a serial card in communication with said processor; and

a plurality of cell channels in communication with said serial card, said cell channels for transmitting data via a cellular infrastructure after the aircraft has landed, wherein the communication between the cell channels and the serial card is initiated automatically upon landing of the aircraft.

15. An aircraft data transmission system, the aircraft having a data acquisition unit, comprising:

means for transmitting data from the data acquisition unit via a cellular infrastructure after the aircraft has landed, wherein transmission of the data is initiated automatically upon landing of the aircraft; and

means for receiving said data from said cellular infrastructure.

16. The system of claim 15 wherein said means for transmitting data includes a processor.

17. The system of claim 15 wherein said means for receiving data includes a processor.

8

18. A method of transmitting aircraft flight data from an aircraft, comprising:

receiving flight data from a data acquisition unit;

transmitting said flight data via a cellular communications infrastructure after the aircraft has landed, wherein the cellular communications infrastructure is accessed automatically upon landing of the aircraft; and

receiving said transmitted flight data.

19. A computer-implemented method of transmitting aircraft flight data from an aircraft, comprising:

receiving flight data from a digital flight data acquisition unit;

processing said flight data to prepare said data for transmission; and

transmitting said processed data via a cellular infrastructure after the aircraft has landed, wherein the cellular infrastructure is accessed automatically upon landing of the aircraft.

20. The method of claim 19 further comprising receiving said transmitted data at a flight operations center.

21. The method of claim 20 further comprising receiving said transmitted data and transmitting said received data via the Internet before receiving said transmitted data at a flight operations center.

22. The method of claim 20 further comprising receiving said transmitted data and transmitting said received data via the public-switched telephone network before receiving said transmitted data at a flight operations center.

23. The method of claim 19 wherein said processing said flight data includes:

compressing said flight data;

encrypting said flight data;

segmenting said flight data; and

constructing packets of data from said segmented flight data.

24. The method of claim 19 wherein receiving said transmitted data includes:

acknowledging receipt of said transmitted data;

reassembling said received data;

decrypting said reassembled data;

uncompressing said decrypted data; and

storing said uncompressed data.

25. A computer-implemented method of transmitting aircraft flight data from an aircraft, comprising:

receiving flight data from a digital flight data acquisition unit;

processing said flight data to prepare said data for transmission; and

transmitting said processed data via a cellular infrastructure after the aircraft has landed, wherein processing said flight data includes:

receiving a weight-on-wheels signal;

initiating a data transfer;

compressing said flight data;

encrypting said compressed data;

creating a packet queue;

starting a primary data thread;

waiting a predetermined period of time;

determining if any threads are active;

repeating, when threads are active, the steps of waiting a predetermined period of time and determining if any threads are active; and

exiting processing said flight data when no threads are active.

EXHIBIT   A

US 6,181,990 B1

9

**26.** The method of claim **25** wherein starting a primary data thread includes:

initiating a PPP connection;

initiating a transfer session;

~~starting at least one secondary data thread;~~

determining if data remains in the primary data thread;

sending said data when data remains in the primary data thread;

determining if data threads are active when no data remains in the primary data thread;

repeating, when said threads are active, the step of determining if data remains in the primary data thread;

ending said session when no threads are active;

closing said PPP connection; and

exiting starting a primary data thread.

**27.** The method of claim **26** wherein starting at least one secondary data thread includes:

(a) setting the secondary data thread to active;

(b) initiating a PPP connection;

(c) determining if data remains in the secondary data thread;

(d) sending a data packet when data remains;

(e) repeating step c when data remains;

(f) closing said PPP connection when no data remains;

(g) setting the secondary data thread to inactive;

(h) exiting starting at least one secondary data thread; and

(i) repeating steps a through h for each secondary data thread.

**28.** The method of claim **27** wherein repeating steps a through h includes repeating steps a through h in parallel for each said secondary data thread.

**29.** A computer-implemented method of transmitting aircraft flight data from an aircraft, comprising:

receiving flight data from a digital flight data acquisition unit;

processing said flight data to prepare said data for transmission; and

transmitting said processed data via a cellular infrastructure after the aircraft has landed; and

receiving said transmitted data at a flight operations center, wherein receiving said transmitted data includes:

creating a socket;

receiving a message;

10

determining if said message is an initialization message;

initiating a session when said message is an initialization message;

determining if said message is a data message when said message is not an initialization message;

processing said message when said message is a data message;

determining if said message is an end session when said message is not a data message;

processing said message when said message is an end session; and

repeating, when said message is not an end session message, the step of receiving a message.

**30.** The method of claim **29** wherein initializing a session includes:

allocating buffer space;

sending an initiation session acknowledgment; and

returning to receiving a message.

**31.** The method of claim **29** wherein processing said message when said message is a data message includes:

copying said message to a buffer;

sending a data message acknowledgment; and

returning to receiving a message.

**32.** The method of claim **29** wherein processing said message when said message is not an end session includes:

computing a checksum;

determining if said checksum is valid;

saving a buffer to a temporary file;

decrypting said temporary file;

uncompressing said temporary file;

sending an end session acknowledgment; and

returning to receiving a message.

**33.** A computer readable medium having stored thereon instructions which when executed by a processor, cause the processor to perform the steps of:

receiving flight data from a digital flight data acquisition unit in an aircraft;

processing said flight data to prepare said data for transmission; and

transmitting said processed data via a cellular infrastructure when said aircraft has landed, wherein the cellular infrastructure is accessed automatically upon landing of the aircraft.

*   *   *   *   *

38

EXHIBIT   A

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5393rd)

# United States Patent
Grabowsky et al.

(10) **Number:** US 6,181,990 C1
(45) **Certificate Issued:** Jun. 6, 2006

(54) **AIRCRAFT FLIGHT DATA ACQUISITION AND TRANSMISSION SYSTEM**

(75) Inventors: **John Francis Grabowsky**, Camarillo, CA (US); **David Ray Stevens**, Simi Valley, CA (US)

(73) Assignee: **Teledyne Technologies Incorporated**, Los Angeles, CA (US)

Reexamination Request:
No. 90/006,742, Aug. 12, 2003

Reexamination Certificate for:
Patent No.: 6,181,990
Issued: Jan. 30, 2001
Appl. No.: 09/126,156
Filed: Jul. 30, 1998

(51) Int. Cl.
*H04B 7/00* (2006.01)
*G06F 13/00* (2006.01)

(52) **U.S. Cl.** .............................. 701/14; 701/35; 701/16; 455/431; 342/33; 73/178 T

(58) **Field of Classification Search** .................... 701/3, 701/14, 16; 340/945, 947, 948, 951, 960; 73/178 T; 342/33
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,642,775 A | 2/1987 | Cline et al. |
| 4,872,182 A | 10/1989 | McRae et al. |
| 4,939,652 A | 7/1990 | Steiner |
| 5,351,194 A | 9/1994 | Ross et al. ................. 364/449 |
| 5,359,446 A | 10/1994 | Johnson et al. |
| 5,445,347 A | 8/1995 | Ng |
| 5,463,656 A | 10/1995 | Polivka et al. ......... 375/200 |
| 5,652,717 A | 7/1997 | Miller et al. ................ 364/578 |
| 5,761,625 A | 6/1998 | Honcik et al. |
| 5,943,399 A | 8/1999 | Bannister et al. ........ 379/88.17 |
| 6,047,165 A | 4/2000 | Wright et al. ................. 455/66 |
| 6,104,914 A | 8/2000 | Wright et al. ................. 455/66 |
| 6,108,523 A | 8/2000 | Wright et al. ................. 455/66 |
| 6,154,637 A | 11/2000 | Wright et al. ................. 455/66 |
| 6,308,045 B1 | 10/2001 | Wright et al. ................. 455/66 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 407 179 A1 | 1/1991 |
| EP | 0 774 274 B1 | 5/1997 |
| EP | 0 408 094 B1 | 7/1997 |
| GB | 2 276 006 A | 9/1994 |

OTHER PUBLICATIONS

Airlines Electronic Engineering Committee, ARINC Characteristic 751, "Gate-Aircraft Terminal Environment Link (Gatelink)-Aircraft Side", Published Jan. 1, 1994.

Airlines Electronic Engineering Committee, Specification 632, "Gate-Aircraft Terminal Environment Link (Gatelink)-Ground Side", Published Dec. 30, 1994.

*Primary Examiner*—Y. Beaulieu

(57) **ABSTRACT**

An aircraft data transmission system used with an aircraft having a data acquisition unit. The system includes a communications unit located in the aircraft and in communication with the data acquisition unit. The system also includes a cellular infrastructure in communication with the data communications unit after the aircraft has landed. The system further includes a data reception unit in communication with the cellular infrastructure.



EXHIBIT A

US 6,181,990 C1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**EX PARTE**
**REEXAMINATION CERTIFICATE**
**ISSUED UNDER 35 U.S.C. 307**

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims 8–14 and 25–32 is confirmed.

Claims 1, 15, 18, 19 and 33 are determined to be patent-
able as amended.

Claims 2–7, 16, 17 and 20–24, dependent on an amended
claim, are determined to be patentable.

New claims 34–51 are added and determined to be
patentable.

**1.** An aircraft data transmission system, the aircraft having
a data acquisition unit, *and the aircraft including a data
storage medium having stored thereon flight data gathered
in-flight by at least a first sensor on the aircraft,* comprising:
   a communications unit located in the aircraft and in
      communication with the data acquisition unit;
   *at least a second sensor configured to sense a landing of
      the aircraft;*
   a cellular infrastructure in communication with said com-
      munications unit after the aircraft has landed, *wherein
      the cellular infrastructure communicates said flight
      data, and* wherein the communication is initiated [auto-
      matically upon] *when at least the second sensor senses
      the* landing of the aircraft; [and]
   a data reception unit in communication with said cellular
      infrastructure; *and*
   *wherein said flight data includes time, airspeed, altitude,
      vertical acceleration, and heading data relating to a
      flight of the aircraft.*

**15.** An aircraft data transmission system, the aircraft
having a data acquisition unit, *the aircraft including a data
storage medium having stored thereon flight data gathered
in-flight by at least one sensor on the aircraft,* comprising:
   *sensing means for sensing a landing of the aircraft;*
   means for transmitting *said flight* data from the data
      acquisition unit, via a cellular infrastructure after the
      aircraft has landed, wherein transmission of the data is
      initiated [automatically upon] *when the sensing means
      sense the* landing of the aircraft; [and]
   means for receiving said *flight* data from said cellular
      infrastructure; *and*
   *wherein said flight data includes time, airspeed, altitude,
      vertical acceleration, and heading data relating to a
      flight of the aircraft.*

**18.** A method of transmitting aircraft flight data from an
aircraft, comprising:
   receiving flight data from a data acquisition unit;
   *receiving a signal indicating a landing of the aircraft from
      at least a first sensor;*

transmitting said flight data via a cellular communications
   infrastructure after the aircraft has landed, wherein the
   cellular communications infrastructure is accessed
   [automatically upon landing of the aircraft] *in response
   to the signal;* [and]
receiving said transmitted flight data; *and*
*wherein said flight data is gathered in-flight by at least a
   second sensor on the aircraft, and includes time,
   airspeed, altitude, vertical acceleration, and heading
   data relating to a flight of the aircraft.*

**19.** A computer-implemented method of transmitting air-
craft flight data from an aircraft, comprising:
   receiving flight data from a digital flight data acquisition
      unit, *wherein said flight data is gathered in-flight by at
      least a first sensor on the aircraft, and includes time,
      airspeed, altitude, vertical acceleration, and heading
      data relating to a flight of the aircraft;*
   *receiving a signal indicating a landing of the aircraft from
      at least a second sensor;*
   processing said flight data to prepare said data for trans-
      mission; and
   transmitting said processed data via a cellular infrastruc-
      ture after the aircraft has landed, wherein the cellular
      infrastructure is accessed [automatically upon landing
      of the aircraft] *in response to the signal.*

**33.** A computer readable medium having stored thereon
instructions which when executed by a processor, cause the
processor to perform the steps of:
   receiving flight data from a digital flight data acquisition
      unit in an aircraft, *wherein said flight data is gathered
      in-flight by at least a first sensor on the aircraft, and
      includes time, airspeed, altitude, vertical acceleration,
      and heading data relating to a flight of the aircraft;*
   *receiving a signal indicating a landing of the aircraft from
      at least a second sensor;*
   processing said flight data to prepare said data for trans-
      mission; and
   transmitting said processed data via a cellular infrastruc-
      ture when said aircraft has landed, wherein the cellular
      infrastructure is accessed [automatically upon landing
      of the aircraft] *in response to the signal.*

*34. The system of claim 1, wherein the cellular infrastruc-
ture is a cellular telephone infrastructure.*

*35. The system of claim 34, wherein said data reception
unit is in communication with said cellular infrastructure via
the Internet.*

*36. The system of claim 34, wherein said data reception
unit is in communication with said cellular infrastructure via
the public switch telephone network.*

*37. The system of claim 34, wherein said data communi-
cations unit has at least one modem in communication with
said cellular infrastructure and said data reception unit has
at least one modem in communication with said cellular
infrastructure.*

*38. The system of claim 34, wherein said communications
unit includes:*
   *a processor;*
   *a serial card in communication with said processor;*
   *at least one cell channel in communication with said
      serial card; and*
   *at least one antenna in communication with said cell
      channel.*

*39. The system of claim 34, wherein said cellular infra-
structure includes:*
   *an antenna;*

40

EXHIBIT    A

## US 6,181,990 C1

**3**

a transceiver subsystem in communication with said antenna; and

a controller in communication with said transceiver subsystem.

40. The system of claim 34, wherein said data reception unit includes:

a router; and

a processor in communication with said router, said processor having a storage unit.

41. The system of claim 15, wherein the cellular infrastructure is a cellular telephone infrastructure.

42. The system of claim 41, wherein said means for transmitting data includes a processor.

43. The system of claim 41, wherein said means for receiving data includes a processor.

44. The method of claim 18, wherein the cellular communications infrastructure is a cellular telephone infrastructure.

45. The method of claim 19, wherein the cellular infrastructure is a cellular telephone infrastructure.

46. The method of claim 45 further comprising receiving said transmitted data at a flight operations center.

47. The method of claim 46 further comprising receiving said transmitted data and transmitting said received data via

**4**

the Internet before receiving said transmitted data at a flight operations center.

48. The method of claim 46 further comprising receiving said transmitted data and transmitting said received data via the public-switched telephone network before receiving said transmitted data at a flight operations center.

49. The method of claim 45 wherein processing said flight data includes:

compressing said flight data;

encrypting said flight data;

segmenting said flight data; and

constructing packets of data from said segmented flight data.

50. The method of claim 45 wherein receiving said transmitted data includes:

acknowledging receipt of said transmitted data;

reassembling said received data;

decrypting said reassembled data;

uncompressing said decrypted data; and

storing said uncompressed data.

51. The method of claim 33, wherein the cellular infrastructure is a cellular telephone infrastructure.

\* \* \* \* \*

EXHIBIT A

## CONFIDENTIAL DISCLOSURE AGREEMENT

THIS AGREEMENT is made by and between Teledyne Controls, having a principal office at 12333 West Olympic Boulevard Los Angeles, California 90064 U.S.A. (hereinafter "COMPANY"), and Honeywell International Inc., a Delaware corporation acting through Honeywell Engines, Systems and Services, having a principal place of business at 111 South 34th Street, Phoenix, Arizona 85034 ("HONEYWELL").

WHEREAS, COMPANY is a manufacturer of Wireless Ground Link and possesses certain information, data, and experience relating thereto (hereinafter "INFORMATION" as applied to COMPANY) which it considers to be confidential, proprietary, and a valuable commercial asset of COMPANY;

WHEREAS, HONEYWELL represents that it possesses certain experience relating to Business Aviation Aircraft powered by Honeywell TFE731 and AS900 engines (hereinafter "INFORMATION" as applied to HONEYWELL) which it considers to be confidential, proprietary, and a valuable commercial asset of HONEYWELL; and

WHEREAS, COMPANY and HONEYWELL (hereinafter "PARTIES"), desire to facilitate discussion between the PARTIES, COMPANY is willing to disclose its INFORMATION to HONEYWELL, to the extent COMPANY considers reasonably necessary, and HONEYWELL is willing to disclose its INFORMATION to COMPANY, to the extent HONEYWELL considers reasonably necessary, to enable the PARTIES to technically evaluate the other's INFORMATION for the purpose of discussing possible application of the Wireless Ground Link product to transmit engine data for processing and of furthering the business relationship between the PARTIES, and both COMPANY and HONEYWELL are willing to receive respective INFORMATION subject to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the undertakings hereunder, both PARTIES, intending to be legally bound, hereby agree as follows:

1.     It is understood and agreed that each PARTY shall treat all INFORMATION hereafter received or acquired, directly or indirectly, from the other as confidential and with the same degree of care with which it treats and protects its own proprietary information of similar character to prevent disclosure. Honeywell Engines, System and Services, located at 111 South 34th Street, Phoenix, Arizona 85034, shall not disclose INFORMATION to other than its officers and employees who need to receive such INFORMATION for purposes of discussion, and who are informed of the obligations of this Agreement. Teledyne Controls, located at 12333 West Olympic Boulevard, Los Angeles, California 90064, shall not disclose INFORMATION to other than its officers and employees who need to receive such INFORMATION for purposes of discussion, and who are informed of the obligations of this Agreement. The receiving PARTY shall not use any of the INFORMATION of the other except as contemplated by this Agreement. Such INFORMATION directly disclosed to the other may be supplied orally, visually, or in written or other tangible form and may include drawings and specifications. Such INFORMATION shall be either in tangible form

43

Exhibit B

marked as confidential at the time of disclosure or later identified in writing as confidential within thirty (30) days thereafter.

Information shall be considered as Confidential Information by the Recipient only if such information is conspicuously designated as "Confidential", "Proprietary", or a similar legend. Information disclosed orally shall be considered Proprietary Information if it is (a) identified as confidential, proprietary, or the like at the time of disclosure, and (b) confirmed in writing within thirty (30) days of first disclosure.

Each PARTY will designate in writing one or more individuals within their own organizations as the only person(s) authorized to receive INFORMATION pursuant to this Agreement. Such persons are:

COMPANY                              HONEYWELL

_____                  _____
Tamas Igloi                          Carl Kotlarz

Each PARTY may change its designation by written notice to the other. However, all properly marked INFORMATION shall be protected as required by this Agreement even if not furnished to the designated points of contact listed above.

     2.    It shall be understood that the obligations of Paragraph 1 shall not apply to information which either COMPANY or HONEYWELL can establish:

    (a)    by documented records is known to the receiving PARTY prior to receipt from the other; or

    (b)    is or becomes available to the public generally other than by or through acts or omissions in breach of this Agreement by the receiving PARTY; or

    (c)    is rightfully obtained by the receiving PARTY without restriction from sources, other than the disclosing PARTY, who are rightfully in possession of such information, and who are not known to be under any obligation of confidentiality to the disclosing PARTY; or

    (d)    was disclosed with the COMPANY'S written consent, or, was disclosed to HONEYWELL by the COMPANY without any identification that it was confidential or proprietary.

    (e)    is independently developed by or for one PARTY without recourse to any INFORMATION of the disclosing PARTY.

    For purposes of Paragraph 2, it is understood and agreed that specific technical information which the receiving PARTY may obtain hereunder shall not be free of such obligations merely because individual features or parts of the INFORMATION are embraced within the scope of

Exhibit B

44

more general information known to that PARTY, available to the public generally, obtained from other sources, or independently developed.

3. Both PARTIES agree that all tangible embodiments of INFORMATION made ~~or obtained by the receiving PARTY shall be and remain the property of the disclosing PARTY, may~~ not be reproduced by the receiving PARTY without written consent of the other, and shall be returned to the disclosing PARTY promptly upon written request made by the disclosing PARTY.

4. Except as provided herein, it is understood and agreed that no right or license is granted or implied by this Agreement to a PARTY under any patents or patent applications, proprietary information or other intellectual property right owned or controlled by the other PARTY.

5. INFORMATION may be disclosed to each PARTY under this Agreement for a period of one (1) year from the date last signed below, unless earlier terminated by either PARTY upon thirty (30) days' prior written notice to the other. Both PARTIES' obligations of confidentiality, nondisclosure, and nonuse shall terminate at the expiration of three (3) years from the last date of disclosure hereunder.

6. Both PARTIES will adhere to all U.S. applicable laws, regulations and rules relating to the export of technical data and products and shall not export or re-export any technical data, any products received from the other, or the direct product of such technical data to any proscribed country listed in such applicable laws, regulations and rules, unless properly authorized.

7. This Agreement is under the laws of the State of California, USA. It may not be amended or modified except in writing signed by both PARTIES. It is the entire agreement between the parties regarding the subject matter hereof and supersedes any prior agreement, understanding, or discussion on said subject matter. A waiver of, or failure to enforce any provision or right hereunder shall not be effective or charged against a party unless in writing and signed by the waiving party; shall not be deemed a waiver of any other or subsequent breach of this Agreement; and shall not prevent subsequent enforcement of the provision or right.

Honeywell Engines, Systems and Services

By: _____

Typed Name: _Steve Hargis_

Title: _Customer Support Program Manager_

Date: _22 November 2002_


TELEDYNE CONTROLS

By: _____

Typed Name: David A. Frieden

Title: Director of Contracts & Pricing

Date: _21 November 2002_

45

**Exhibit B**