KIRKLAND & ELLIS LLP
Robert G. Krupka, P.C. (S.B.N. 196625)
rkrupka@kirkland.com
Luke L. Dauchot (S.B.N. 229829)
ldauchot@kirkland.com
Ephraim D. Starr (S.B.N. 186409)
estarr@kirkland.com
777 South Figueroa Street
Los Angeles, California 90017
Telephone:  (213) 680-8400
Facsimile:   (213) 680-8500

Attorneys for Defendant-Counterclaimant
HONEYWELL INTERNATIONAL INC.
and Counterclaimant HONEYWELL
INTELLECTUAL PROPERTIES INC.

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| TELEDYNE TECHNOLOGIES INC., a Delaware corporation, <br><br> Plaintiff, <br> vs. <br><br> HONEYWELL INTERNATIONAL INC., a Delaware corporation, <br><br> Defendant. | Case No. CV 06-06803 <br><br> Assigned to: Hon. Margaret M. Morrow <br><br> **HONEYWELL'S *MARKMAN* OPENING BRIEF** |
| HONEYWELL INTERNATIONAL INC. and HONEYWELL INTELLECTUAL PROPERTIES INC., a Delaware corporation, <br><br> Counterclaimants. <br> vs. <br><br> TELEDYNE TECHNOLOGIES INC., a Delaware corporation, <br><br> Counterdefendant. | Date:   January 28, 2008 <br> Time:   9:00 a.m. <br> Place:  Courtroom 780 |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................1

II.     LEGAL STANDARDS FOR CLAIM CONSTRUCTION ............................2

III.    CONSTRUCTION OF CLAIMS ...........................................................4

        A.      The '990 Patent ....................................................................4
                1.      "Landing," "When," "Upon," "Automatically" and "In
                        Response To" ..............................................................5
                2.      "Flight Data," "Data Acquisition Unit" and "Flight
                        Operations Center" Bear Particular Meanings To
                        Persons Skilled In the Art ............................................11
                3.      The Patent Expressly Defines Cellular Infrastructure ...........14
                4.      "Serial Card" and a "Plurality of Cell Channels in
                        Communication With Said Serial Card" Require
                        Multiple Cellular Modems ............................................15
                5.      "Means for Transmitting" ...........................................16
                6.      Claim 25 ("Threads") .................................................17

        B.      The '152 Patent ....................................................................19
                1.      First and Second Communication Mediums ........................20
                2.      Aeronautical Satellite System / Direct Broadcast Satellite ......20
                3.      Terms That Should Be Given Their Plain Meaning.................22

        C.      The '468 Patent ....................................................................22
                1.      "Vehicle Server" & "Component" ..................................22
                2.      Terms That Should Be Given Their Plain Meaning ...............24

IV.     CONCLUSION ...............................................................................25

HONEYWELL'S MARKMAN OPENING BRIEF

# TABLE OF AUTHORITIES

## CASES

*Agfa Corp. v. Creo Products Inc.*,
        451 F.3d 1366 (Fed. Cir. 2006) ............................................................. 4

*Biomedino, LLC v. Waters Techs. Corp.*,
        490 F.3d 946 (Fed. Cir. 2007) .......................................................... 6, 16

*CCS Fitness, Inc. v. Brunswick Corp.*,
        288 F.3d 1359 (Fed. Cir. 2002) ....................................................... 3, 15

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l*,
        214 F.3d 1302 (Fed. Cir. 2000) ............................................................. 8

*Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*,
        93 F.3d 1572 (Fed. Cir. 1996) ............................................................ 11

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
        64 F.3d 1553 (Fed. Cir. 1995) ............................................................ 11

*Harris Corp. v. Ericsson Inc.*,
        417 F.3d 1241 (Fed. Cir. 2005) ..................................................... 16, 17

*Ill. Tool Works, Inc. ex rel. Simco Div. v. Ion Systems, Inc.*,
        250 F.Supp.2d 477 (E.D. Pa., 2003) ................................................... 10

*KSR Int 'l Co. v. Teleflex Inc.*,
        127 S. Ct. 1727,167 L. Ed. 2d 705 (2007) ........................................... 5

*MercExchange, LLC v. eBay, Inc.*,
        401 F.3d 1323 (Fed. Cir. 2005) ........................................................... 10

*Netword LLC v. Centraal Corp.*,
        242 F.3d 1347 (Fed. Cir. 2001) ............................................................. 2

*Old Town Canoe Co. v. Confluence Holdings Corp.*,
        448 F.3d 1309 (Fed. Cir. 2006) ............................................................. 4

*Phillips v. AWH Corp.*,
        415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170, 126 S.
        Ct. 1332, 164 L. Ed. 2d 49 (2006) ............................................... 2, 3, 4

*PODS, Inc. v. Porta Stor, Inc.*,
        484 F.3d 1359 (Fed. Cir. 2007) ............................................................. 5

*Schoenhaus v. Genesco, Inc.*,
        440 F.3d 1354 (Fed. Cir. 2006) ........................................................... 11

*Southwall Techs., Inc. v. Cardinal IG Co.*,
        54 F.3d 1570 (Fed. Cir. 1995) ............................................................... 3

HONEYWELL'S MARKMAN OPENING BRIEF

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) .................................................................10

*Thomson Consumer Elecs., Inc. v. Innovatron, S.A.*,
    43 F. Supp.2d 26 (D. D.C. 1999) ...............................................................8

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ............................................................2, 8

*Union Pac. Res. Co. v. Chesapeake Energy Corp.*,
    236 F.3d 684 (2001) ..................................................................................18

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .............................................................2, 3

*White v. Dunbar*,
    119 U.S. 47, 7 S. Ct. 72, 30 L. Ed. 303 (1886) .......................................1

## OTHER AUTHORITIES

AVIATION ELECTRONICS GLOSSARY (2005) .................................................13

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY:  10th Ed., 1997.................................6

MICROSOFT PRESS COMPUTER DICTIONARY: 3rd Ed., 1997..........................................23

MODERN DICTIONARY OF ELECS:  7th Ed., 1999 ..................................................14, 16

THE ALLIEDSIGNAL GLOSSARY OF AVIONICS TERMS & ACRONYMS 1998...................12

THE AUTHORITATIVE DICTIONARY OF IEEE STANDARD TERMS 2000...................16, 23

THE IEEE DICTIONARY OF ELEC. AND ELEC. TERMS:  6th Ed., 1996 ..........................18

THE OXFORD ENGLISH DICTIONARY:  2nd Ed., 1989 ..........................................6, 8, 11

WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY, UNABRIDGED:  2nd
    Ed., 1979.........................................................................................19

## REGULATIONS

14 C.F.R. §§ 121.703(b), 135.415(b), 1415(b)(2007) ......................................6

35 U.S.C. § 112(6) .........................................................................................6

HONEYWELL'S MARKMAN OPENING BRIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

The words of the claims define the metes and bounds of a patent.  And it is a cardinal rule of claim construction that those boundaries may not be expanded by contorting the plain and unambiguous language of a claim.  As the United States Supreme Court held long ago:

> Some persons seem to suppose that a claim in a patent is like a
> nose of wax, which may be turned and twisted in any direction, by
> merely referring to the specification, so as to make it include
> something more than, or something different from, what its words
> express. The context may, undoubtedly, be resorted to, and often is
> resorted to, for the purpose of better understanding the meaning of
> the claim; but not for the purpose of changing it, and making it
> different from what it is. The claim is a statutory requirement,
> prescribed for the very purpose of making the patentee define
> precisely what his invention is; and it is unjust to the public, as
> well as an evasion of the law, to construe it in a manner different
> from the plain import of its terms.

*White v. Dunbar*, 119 U.S. 47, 51-52, 7 S. Ct. 72, 74-75, 30 L. Ed. 303, 305 (1886). True to this mandate and throughout the 38 asserted patent claims[1], when everyday words confront the parties, Honeywell proposes that no construction is necessary. Words such as "when," "upon," "automatically" and "landing" mean what they say: when, upon, automatically, and landing.[2]  Teledyne, on the other hand, urges the Court to graft onto these simple words meanings that violate established claim construction rules and plain English.  Thus, to Teledyne, "when" and "upon" should mean "*after*";

---

[1] Teledyne asserts '990 patent claims <u>1</u>, 2, 4, <u>8</u>, <u>14</u>, <u>15</u>, <u>18</u>, <u>19</u>, 20, 21, <u>25</u>, <u>33</u>, 34, 35, 37, 41, 44, 45, 46, 47 and 51 and Honeywell asserts '152 patent claims <u>1</u>, 2, 3, <u>4</u>, 5, 6, <u>7</u>, 8, <u>10</u> and 11 and '468 patent claims <u>1</u>, 2, 7, <u>9</u>, 12, 13 and 15 (underlined text denotes independent claims).

[2] Stipulated Joint Claim Construction Chart, Honeywell's Proposed Construction, Ex. A at 1-2, 4.

"automatically" should mean *semi-automatic*, involving a "little" "human involvement"; and "landing" should mean not just landing, but "*information associated with the aircraft having landed*."[3]  This is improper.  The boundaries of a patent cannot be altered by after-the-fact gyrations devised to capture territory that is nowhere within the patent's unambiguous claim language.

## II.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Claim construction defines, as a matter of law, the patented invention.  *Netword LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).  The process is one of law, for the Court to decide, *see id.* at 1350, and begins and ends with the language of the claims, *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170, 126 S. Ct. 1332, 164 L. Ed. 2d 49 (2006) (a "bedrock principle" of patent law is that "the claims of a patent define the invention to which the patentee is entitled the right to exclude"); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The words of a claim are generally given their ordinary and customary meaning, which is defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *See Phillips*, 415 F.3d at 1312-13.  However, where the proper scope and meaning of a particular claim term is clear and understandable to the jury without explanation, no claim construction is necessary and none should be given.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (holding that claim construction is required only "when the meaning or scope of technical terms and words of art is unclear **and** in dispute **and** requires resolution to determine" the issue before the court).[4]

There is a "'heavy presumption' that a claim term carries its ordinary and

---

[3] *E.g., id.,* Teledyne's Proposed Construction, Ex. A at 1-2, 4.

[4] Unless otherwise indicated, all emphasis appearing in this brief has been added.

customary meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). That presumption can only be overcome in the following four situations: (1) where the patentee expressly redefined a claim term in either the specification or prosecution history; (2) where the intrinsic record (*i.e.* the patent and its prosecution history) shows that the patentee expressly disclaimed the scope of an ordinary definition; (3) where the term chosen by the patentee has no ordinary meaning and so "deprive[s] the claim of clarity" as to require resort to the other intrinsic evidence for a definite meaning; and (4) where the patentee used means-plus-function format (that is, the means to accomplish a function is described in the claims, but the structure for the means is recited in the specification). *See id.* at 1366-67. It therefore follows that the person of ordinary skill in the art is deemed to read claims in the context of the "intrinsic evidence," which includes the other patent claims, specification, and prosecution history. *See Philips*, 415 F.3d at 1314-17.

Apart from the claim language itself, the patent specification is "the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics,* 90 F.3d at 1582). The patent's prosecution history should also be consulted as part of claim construction because it, too, may provide evidence of how the PTO and the inventor understood the patent, and it limits the interpretation of claim terms "so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995); *see Phillips*, 415 F.3d at 1317. Though claims are read in light of the intrinsic record, it is important to remember that the intrinsic record may not alter the plain and ordinary meaning of claim language absent one of the four reasons set forth above. *See CCS Fitness*, 288 F.3d at 1366 (accused infringer may not narrow claim term's ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history").

Finally, and if need be, a court may consult evidence outside the intrinsic record ("extrinsic evidence") to educate itself about the relevant art and what a person of

ordinary skill in the art would understand claim terms to mean.  *See Phillips*, 415 F.3d at 1319.  The Federal Circuit has approved the use of general and technical dictionaries to help determine the ordinary meaning of a term.  *See Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006) ("The ordinary meaning of some claim terms 'may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of widely accepted meaning of commonly understood words. . . . In such cases, general purpose dictionaries may be helpful.'") (citing *Phillips,* 415 F.3d at 1314-19); *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1316 (Fed. Cir. 2006) ("The district court's reference to the dictionary was not an improper attempt to find meaning in the abstract divorced from the context of the intrinsic record but properly was a starting point in its analysis").  That said, even when a court chooses to consult such evidence, it must remain true to the intrinsic record and, in particular, the claim language.  *See Phillips,* 415 F.3d at 1319.

## III.   CONSTRUCTION OF CLAIMS

### A.   <u>The '990 Patent</u> [5]

The '990 patent relates to the use of "well known technology and the cellular infrastructure which is already in place" to transmit flight data from an airplane automatically upon landing of the aircraft and "over multiple parallel channels to achieve the necessary transmission bandwidth and achieve a low data transmission time."  ('990 col.2 ll.6-12.)  Long before Teledyne's alleged invention, flight data acquisition was known, and so was the use of cellular systems to transmit acquired data automatically.  As such, both during prosecution of the original application and, for many of the claims, during reexamination prosecution, Teledyne amended the

---

[5] For the Court's convenience, Starr Decl., Exs. A and B are, respectively, a copy of the '990 patent with the disputed claim terms highlighted, and Honeywell's complete proposed claim constructions for the '990 patent with citations to the intrinsic record and to extrinsic evidence.

claims to overcome patentability rejections.  These amendments resulted in most of the terms at issue here.[6]   To present the disputed terms efficiently and in keeping with the Federal Circuit's presumption that claim terms should be construed consistently among the claims of a patent,[7] Honeywell addresses each claim term issue-by-issue rather than claim-by-claim.

### 1. "Landing," "When," "Upon," "Automatically" and "In Response To"

The claims of the '990 patent contain several variations of terms (hereinafter referred to as the "landing terms") that limit their scope to a system in which flight data is automatically downloaded as soon as the plane lands.  At the heart of the parties' dispute on the construction of the landing terms is the meaning of five words or phrases that define the timing and nature of the trigger for the cellular communication of flight data:  (1) *landing*, (2) *when*, (3) *upon*, (4) *automatically*, and (5) *in response to*.  Specifically:

- Claim 1 requires that cellular communication is "initiated ***when*** a second sensor senses the ***landing*** of the aircraft"

- Claims 8 and 14 require cellular communication to be "initiated ***automatically upon landing*** of the aircraft"

- Claim 15 requires that cellular data transfer is "initiated ***when*** the sensing means sense the ***landing*** of the aircraft"

- Claims 18, 19 and 33 require a cellular infrastructure to be accessed "***in response to*** a signal" "indicating ***a landing*** of the aircraft"

---

[6] It bears mention that the reexamined patent issued under an obviousness standard that has since been significantly relaxed by the United States Supreme Court in *KSR Int 'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1739, 167 L. Ed. 2d 705, 720 (2007) (holding that combination of "familiar elements according to known methods [to do] no more than yield predictable results" are obvious).

[7] *See PODS, Inc. v. Porta Stor, Inc.,* 484 F.3d 1359, 1366 (Fed. Cir. 2007).

1    None of these terms require construction.[8]  They mean what they say.

(a)    **Landing Means *Landing*, or "Touching Down"**

Teledyne urges that the "landing" of an aircraft means "information associated with the aircraft having landed."[9]  But that is not what the claim language states. Landing means landing.  Nothing in the '990 patent suggests, let alone dictates, the meaning urged by Teledyne.  On the contrary, it reinforces the common understanding of the word.  In particular, the patent explains that "a weight on wheels interrupt [signal] signals that the aircraft **has landed**."  ('990 col.3 ll.59-60.)  A "weight-on-wheels" interrupt signal is generated at the time that the wheels of the aircraft hit the ground and begin bearing the weight of the craft.  *See, e.g.,* THE NAT'L TRANSP. BD., *NTSB INCIDENT REPORT IDENTIFICATION: CHI03IA070* (2005), http://ntsb.gov.ntsb/brief.asp?ev_id =20030220X00241&key=1 ("[T]he aircraft touched down on a heading of 190 degrees at 124 knots . . . All three landing gear Weight-on-Wheels (WOW) switches changed from Air to Ground within 0.25 seconds of each other.").

Common dictionary definitions, as well, underscore that construction of "landing" is not needed:  landing means bringing to land, reaching the ground, or "touching down."  *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 654 (10th ed. 1997) ("An act or process of one that lands; esp: a going or bringing to a surface (as land or shore) after a voyage or flight"); 7 THE OXFORD ENGLISH DICTIONARY 622 (2nd ed. 1989) ("1. To bring to land; to set on shore; to disembark. . . . 7b.  ***To alight upon the ground  . . . Esp. of an aircraft*** *or spacecraft . . .* ***to alight upon or reach the ground***, or some other surface, after a flight."); *accord* 14 C.F.R. §§ 121.703(b), 135.415(b), 1415(b)(2007) ("during flight means the period from the moment the aircraft leaves the surface of the earth on takeoff until it ***touches down on landing***.")

_____

[8] Claim 15, as a whole, requires additional construction because Teledyne invokes 35 U.S.C. § 112(6).  *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007).

[9] Stipulated Joint Claim Construction Chart, Ex. A at 1.

Again, "landing" means landing.  Should the Court deem additional construction appropriate, Honeywell proposes that "landing" be construed as "touching down."

### (b)    "When" and "Upon" Need No Construction

The asserted claims of the '990 require that cellular communication be initiated *when* landing occurs.  For example:  claim 1 recites that communication is "*initiated when* at least the second sensor senses the landing"; claims 8 and 14 recite that communication "is *initiated automatically upon* landing"; claim 15 recites that "transmission of the data is *initiated when* the sensing means sense the landing"; and claims 18, 19, and 33 recite that the cellular "infrastructure is *accessed in response to* the signal" "indicating a landing."  These words mean what they plainly say, as underscored by the patent's specification and prosecution history.

The specification states that the invention improves over the prior art precisely because the prior art transferred data *after* the aircraft landed:

> It is also known to transmit data relating to an aircraft via a
> telephone system located in a terminal. Such a system, however,
> *requires that the aircraft be docked at the gate* before
> transmission begins, thereby *resulting in a substantial delay* in the
> transmission.

('990 patent col.1 ll.46-51.)  The specification's sole disclosure of the mechanism for triggering the communication—"a weight-on-wheels signal, which acts as an interrupt signal … to initiate transmission" also confirms that "when" the aircraft land means "when" and not "after."  ('990 col.3 ll.27-29.)

The prosecution history of the '990 patent further supports that "when" means when, not after:  Teledyne relinquished coverage for initiation of cellular transmission at some indiscriminate point after landing.  During prosecution, the Examiner rejected Teledyne's initial claims 1, 8, 14, 15, 18, 19 and 33, none of which contained the "upon landing" limitation for the initiation of cell transmission.  In citing prior art (the Bailey reference, which disclosed cellular transmission of truck engine performance

data) against these claims, the Examiner stated that "data transmission occurring ***after the aircraft has landed*** is in no way different from data transmission occurring in any other land vehicle.  An airplane is a land vehicle, traveling via wheels, once it is on the ground."[10]  To overcome these rejections, Teledyne inserted the phrase "wherein the communication is initiated ***automatically upon landing*** of the aircraft" immediately after the existing claim language, "after the aircraft has landed."[11]

This was an unmistakable surrender:  "After the aircraft has landed" spans a far greater temporal range than "upon landing," and Teledyne gave up attempting coverage of the former in exchange for coverage of the latter.  *See Elekta Instrument S.A. v. O.U.R. Scientific Int'l,* 214 F.3d 1302, 1308 (Fed. Cir. 2000) ("In view of these statements from the examiner, a person of skill in the art would understand that the term 'to' was changed to 'between' in order to respond to the examiner's statement and to distinguish the prior art by claiming exclusively the range of 30°-45°.  We therefore agree with OSI that claim 1 is susceptible of only one reasonable construction, and is limited to gamma units with radiation sources located exclusively between 30°-45°.").

Again, dictionary definitions underscore that these common terms are plainly understandable and need no construction.  "When" means "at the (or a) time which; on the (or an) occasion which," and "The time at which something happens (or did or will happen)." 20 THE OXFORD ENGLISH DICTIONARY, *supra,* at 209 .  "Upon" means "on the occasion of,"  "immediately after; following on," "as soon as."  19 *id.* at 301; *see also Thomson Consumer Elecs., Inc. v. Innovatron, S.A.,* 43 F. Supp.2d 26, 36-38 (D. D.C. 1999) (construing both "when" and "upon" to mean "as soon as")

In sum, the plain meaning of the "when" and "upon" limitations are sufficiently clear that no construction is required under *U.S. Surgical,* 103 F.3d at 1568.  Should

---

[10] '990 File History, 2/9/2000 Office Action at 3-4 (Starr Decl., Ex. D).

[11] *Id.*, 7/10/2000 Amend. and Rsp. to Office Action at 1-5.

1   the Court decide that construction is needed, Honeywell proposes that "when" means

2   "at the time" and "upon" means "on or immediately thereafter."

3

4           (c)     **"Initiated Automatically" Means Initiated**

5                   **Automatically, Not With A "Little … Human**
                    **Involvement"**

6           In claims 8 and 14, the cellular communication is not only initiated "upon

7   landing," but "automatically upon landing."  This claim term needs no definition:

8   automatic means automatic.  Nonetheless, Teledyne urges this Court to construe

9   "automatic" not as automatic, but as semi-automatic:  "initiated with *little or no*

10  human involvement."[12]  The intrinsic record not only fails to support the dubious

11  proposition that "automatic" means *a "little … human involvement,"* but expressly

12  rejects it.  Though the specification refers to "little or no human involvement," this

13  passage of the specification does not refer to the automatic initiation of the flight data

14  transfer, but to the aircraft data transmission system:

15                  Thus, there is a need for an aircraft data transmission system that

16                  automatically transfers flight data from an aircraft to a flight

17                  operations center with little or no human involvement and which

18                  relies on a reliable wireless delivery system.

19  ('990 col. 1, ll.55-59.)[13]

20          Moreover, the prosecution history confirms—directly contrary to Teledyne's

21  proposal—that automatic does not mean with a "little human intervention."  Faced

22  with a prior art challenge (the Ross reference), Teledyne clearly and unmistakably

23  surrendered *human or manual activation* to overcome that challenge:

24                  Ross does teach communicating "altitude, air speed, and direction

25                  of the aircraft" from the aircraft to the flight control center 30 of

26  _____

    [12] Stipulated Joint Claim Construction Chart, Ex. A at 4-5.

27      [13] Moreover, if "little or no human involvement" were a substitute for "automatic," the term
28  "automatic" would be redundant.

1  Ross. This communication, however, takes place **when the pilot**

2  **manually activates** switch 15 of Ross in flight, **not,** "automatically

3  upon landing of the aircraft," as recited in claim 1. [14]

4  In short, "initiated automatically" requires no construction. Should the Court differ,

5  then Honeywell proposes that they be construed to mean "initiated without human

6  intervention."

7  The Federal Circuit has considered this term often and repeatedly confirmed

8  this definition. *See e.g., SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870,

9  891-93 (Fed. Cir. 2004) (affirming construction of phrase "automatically

10 electronically converting" as meaning "a change in form of the selected television

11 program listings by an electronic means without further involvement of the system's

12 user"); *Ill. Tool Works, Inc. ex rel. Simco Div. v. Ion Systems, Inc.*, 250 F. Supp. 2d

13 477, 490 (E.D. Pa. 2003) ("The term 'automatically adjusting' shall mean: 'changing

14 at least one of the high voltage power supplies in a manner independent of external

15 influence or control.'"); *see also MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323,

16 1338 (Fed. Cir. 2005) (claim limitations requiring actions by participants cannot be

17 "automatically performed," thus, e.g., claim step which requires that participants enter

18 their bids manually cannot occur automatically).

19 **(d)   "In Response To" Also Means What It Says**

20 "In response to" is yet another phrase that requires no construction: it means

21 "in response to." In context, this claim term requires that the cellular "***infrastructure***

22 ***is accessed in response*** to the signal." ('990 claims 18-19, 33.) Teledyne's proposed

23 construction—"cellular communications infrastructure is only accessed after receiving

24 the signal"[15]—offends the plain meaning of "in response to." "In response" is a

25 phrase that unambiguously imposes a ***causal*** limitation, which Teledyne is not free to

26 ───────────────

27 [14] '990 Reexamination File History, 7/26/2005 Amend. And Rsp. To Office Action In Ex Parte
Reexam. at 9 (Starr Decl., Ex. C).

28 [15] Stipulated Joint Claim Construction Chart, Ex. A at 2, 7.

read out of the claims.  *See, e.g., Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1358-59 (Fed. Cir. 2006) (rejecting argument to read limitation "rigid" out of claim); ; *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582-83 (Fed. Cir. 1996) (the patentee's infringement argument "invites us to read [a] limitation out of the claim. This we cannot do.") (citing *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995)).

Indeed, Teledyne's effort to rewrite "in response to" as "after" is at odds with English.  8 THE OXFORD ENGLISH DICTIONARY, *supra,* at 741 (response: "1.b. An action…which answers to some stimulus or influence; c. The way in which an apparatus responds to a stimulus.").

### 2. "Flight Data," "Data Acquisition Unit" and "Flight Operations Center" Bear Particular Meanings To Persons Skilled In the Art

All claims of the '990 patent require transmission of "flight data" and a "data acquisition unit."  These are terms of art in the field of avionics.  Honeywell's proposed construction of "flight data"—"flight parameters such as air speed, altitude, vertical acceleration, heading, and time"[16]—is consistent with how both the patent and one of ordinary skill in the art define the term.  In contrast, Teledyne's proposal—"data relating to flight or performance of aircraft systems or components during flight"[17]—not only conflicts with the patent and usage in the art, but also contradicts Teledyne's representations to the U.K. Patent Office concerning the '990 patent.  In prosecution of GB 2395634 B, a counterpart to Teledyne's U.S. Pat. No. 6,915,189, Teledyne represented:

> [I]n the '990 patent, the data acquisition unit is limited to acquiring **parametric data**. The '990 patent lacks any mention of or

---

[16] *Id.* at 1.

[17] *Id.* at 1.

reference to acquiring **maintenance and diagnostic data** from internal equipment (other than data acquisition units). Moreover, in the '990 patent, the parametric data – not maintenance and diagnostic data - is transmitted.  Clearly, the '990 patent does not teach, suggest or disclose receiving **maintenance and diagnostic data** from a plurality of **avionics and/or electronic engine control line replaceable units** and downloading such data …[18]

The above representations accord with the '990 specification, which notes that the patent is directed to the acquisition and transmission of "flight data." ('990 col.1 l.16.) It explains, "It is common for aircraft to generate records of data relating to flight and performance parameters for each flight of the aircraft.  The data typically relate to parameters such as air speed, altitude, vertical acceleration, heading, time, etc."  ('990 col.1 ll.21-25.)  Again, in Teledyne's words, "[c]learly, the '990 patent does not teach, suggest or disclose" anything but Honeywell's proposed construction; in view of Teledyne's representations, it certainly does not envision that "flight data" can be construed to include maintenance and diagnostic data.

Teledyne's proposed construction of "data acquisition unit"—"plain meaning or a hardware device for use on an aircraft that acquires data"[19]—similarly expands upon the meaning of this term of art in contradiction to the patent specification.  In avionics, a "data acquisition unit" is a particular piece of equipment used to condition flight data so that it can be stored in the aircraft's mandatory "black box" recorder.  This piece of equipment is one and the same as a "flight data acquisition unit"—FDAU.[20] *See* THE ALLIEDSIGNAL GLOSSARY OF AVIONICS TERMS & ACRONYMS 23 (1998) ("The DFDAU samples, conditions and digitizes the flight data."); AVIATION ELECS.

[18] File History of U.K. Patent Application No. 0323990.2, Teledyne's 1/4/2006 Rsp. to the U.K. Patent Office Examination Report at 2 (emphasis in original) (Starr Decl., Ex. E).

[19] Stipulated Joint Claim Construction Chart, Ex. A at 1.

[20] *See* Decl. of C. Wargo at ¶ 7 (Starr Decl., Ex. F).

GLOSSARY 31 (2005) (same).  Hence, Honeywell proposes to construe this term as "the aircraft component known as the flight data acquisition unit."[21]  The '990 specification supports Honeywell's constructions.  In addition to repeatedly describing "flight data" as a particular set of parameters, it refers to a "data acquisition unit" as including a "DFDAU" processor:

> The **data acquisition unit 20 includes a digital flight data acquisition unit (DFDAU) processor** 22, which includes a storage media for storing flight data in a digital format. The **DFDAU processor 22 receives signals from sensors 24 which sense parameters such as air speed, altitude, vertical acceleration, heading, time, etc.**

('990 col.3 ll.10-15.)  Teledyne also recognized the proper meaning of "data acquisition unit" in its representations to the U.K. Patent Office; contrary to the definition it now poses, "data acquisition unit" cannot encompass "avionics and/or electronic engine control line replaceable units."[22]

"Flight operations center"[23] is also a term of art, referring to the base of flight operations for the airline or aircraft operator.[24]  Teledyne's use of this term in the industry supports Honeywell's construction.  Thus, touting the alleged reduction to practice of the '990 patent, Teledyne stated that "GroundLink allows aircraft to **immediately transmit flight data information to an _airline's home base_ when**

---

[21] Stipulated Joint Claim Construction Chart, Ex. A at 1.

[22] File History of U.K. Patent Application No. 0323990.2, *supra,* note 19 at 2

[23] '990 claims 20-21, 46-47.

[24] *See* Starr Decl., Ex. F at ¶ 8; *see also* Dept. of the Army, Army Reg. 95-2 at 56 (August 10, 1990) (defining Air Traffic Control Facility as "A facility (including personnel, equipment, and structures) that provides ATC service. Included are ATC tower, Army approach control, Army radar approach control ground controlled approach, **flight operations center**, flight coordination center, or fixed base flight following.").

***touching down*** at virtually any airport."[25]  Teledyne's alternate construction[26], contrary to this clear usage in the art—including its own non-litigation usage of this term—improperly seeks to expand upon that meaning by defining the term to encompass ***any*** location that contains or communicates with a data reception unit.

### 3.   <u>The Patent Expressly Defines Cellular Infrastructure[27]</u>

"Cellular infrastructure" is also a technical term requiring construction. Honeywell proposes the following:  "a voice/data network for mobile radio communication in a licensed frequency band, organized as a system of cells including a base station transceiver subsystem connected to a base station controller."[28]  The '990 specification expressly and clearly articulates this definition:

> The cellular infrastructure 14 includes an antenna 40, which is within free-space radiating range of the aircraft 12. The antenna 40 is connected to a base station transceiver subsystem 42. The subsystem 42 is connected to a base station controller 44… .

('990 col.3 ll.42-50.)  Figures 2 and 11—the only figures depicting the "cellular infrastructure"—likewise define it as a box circumscribing the antenna 40, base station transceiver subsystem 42, and base station controller 44.

Technical dictionaries also support Honeywell's construction.  *See, e.g.*, MODERN DICTIONARY OF ELECS. 145 (7th ed. 1999) (defining cellular system as a "mobile telephone system that divides large service areas into small cells, each with its own low power transmitter.  A telephone call is switched by computers from one transmitter to the next . . . as a vehicle moves from cell to cell.")

---

[25] Teledyne Techs. Inc., *Teledyne Controls Announces Successful Launch of Wireless Groundlink*, Sept. 5, 2001, http://www.teledyne.com/news/groundlink.asp (Starr Decl. Ex. G); *see also* Starr Decl., Ex. G at ¶ 8.

[26] Stipulated Joint Claim Construction Chart, Ex. A at 11.

[27] '990 all independent claims (claim 18 uses "cellular communications infrastructure").

[28] Stipulated Joint Claim Construction Chart, Ex. A at 2.

-14-

1    Teledyne's proposed alternative definition—"a cellular voice and/or data

2  network that uses carrier frequencies in the licensed frequency range"[29]—begs the

3  question by incorporating "cellular" into the definition.  "Cellular" is the very word

4  that has no ordinary meaning and so "deprive[s] the claim of clarity" as to require

5  resort to the other intrinsic evidence for a definite meaning.  *CCS Fitness, Inc.*, 288

6  F.3d at 1366.

7          **4.    "Serial Card" and a "Plurality of Cell Channels in
                   Communication With Said Serial Card" Require Multiple
8                  Cellular Modems[30]

9

10   "Serial card" and "plurality of cell channels in communication with said serial

11  card" are also technical terms that require definition.   Specifically, "serial card"

12  should be defined as "a circuit board with I/O interfaces that each transmit data to or

13  from a peripheral device one bit at a time."[31]  "Plurality of cell channels in

14  communication with said serial card" should be defined such that "more than one

15  physical, over-the-air channels to the cellular infrastructure are each attached to an I/O

16  port of said serial card, allowing the cell channels to transmit data simultaneously and

17  thus in parallel."[32]  The claim language itself supports these definitions, for it confirms

18  that the serial card must provide the ability to transmit on multiple cellular channels:

19  "a plurality of cell channels in communication with said serial card, said cell channels

20  for transmitting data. . ."  ('990 claim 8.)

21          The specification, too, supports these definitions.  According to it, a purported

22  advantage of the claimed invention was the ability to "transmit data over multiple

23  parallel channels to achieve the ***necessary transmission bandwidth and achieve a low***

---

25  [29] *Id.*

26  [30] '990 claims 8, 14.

27  [31] Stipulated Joint Claim Construction Chart, Ex. A at 3.

28  [32] *Id.* at 4.

*data transmission time*." ('990 col.2 ll.9-12.)  Moreover, the use of a multi-port serial card is the only method the '990 patent discloses to accomplish this:

> Each I/O port of the card 34 is attached to a cell channel which can open, sustain, and close a physical, over-the-air channel *to the cellular infrastructure* 14. The cell channels 36 can *transmit simultaneously* and can thus *transmit data in parallel*.

('990 col.3 ll.33-37.)

The relevant technical dictionaries also support Honeywell's proposed constructions. *See, e.g.*, THE AUTHORITATIVE DICTIONARY OF IEEE STANDARD TERMS 144, 1029 (2000) (defines *serial interface* as "[a]n interface that transmits data bit by bit rather than in whole bytes" and *card* as "a generic term used for a circuit board."); *accord*, MODERN DICTIONARY OF ELECS., *supra*, at 98, 681.

### 5.    "Means for Transmitting" [33]

This means-plus-function claim term is used in claim 15 to describe transmission of data over multiple parallel cell channels and should be construed accordingly.  "Means" claim language presumptively indicates a means-plus-function-format, with the disclosed structure in the specification that is required to perform the recited means for achieving the claimed function (in this case, transmitting), and its equivalent, becoming part of the literal claim scope.  *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007).  Here, there is no basis to deviate from the means-plus-function presumption, particularly given that the claim itself recites no structure for performing the transmission function.  Moreover, because transmission of flight data from a data acquisition unit via a cellular infrastructure is a computer-implemented function, ('990 col.3 ll.22-41), the corresponding structure is the algorithm disclosed in the specification.  *See Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005) ("the corresponding structure for a § 112 ¶ 6 claim

---

[33] '990 claim 15.

for a computer-implemented function is the algorithm disclosed in the specification.")

The function of claim 15 should be defined as:  transmitting flight data from the data acquisition unit via a cellular infrastructure after the aircraft has landed.  The corresponding structure and algorithm are:

> Upon receipt of the weight-on-wheels signal from the landing gear of the aircraft 12, the processor 32 prepares the flight data for transmission and transmits the data to a multi-port serial card 34. Each I/0 port of the card 34 is attached to a cell channel which can open, sustain, and close a physical, over-the-air channel to the cellular infrastructure 14. The cell channels 36 can transmit simultaneously and can thus transmit data in parallel.

('990 col.3, ll.31-42.)  The Court should reject Teledyne's proposed identification of a bare bones structure because it disregards the disclosure's sole embodiment of this function ("a multi-port serial card" in which "[e]ach I/O port of the card is attached to a cell channel…," (*Id.*), and does not include the disclosure's algorithm for data transmission (creation of data threads; simultaneous, parallel transmission of threads over multiple cell channels, (*Id.* at col.4 l.57 - col.5 l.40).  These structures and steps are part of the literal claim scope.  *See Harris*, 417 F.3d at 1249.

### 6.   Claim 25 ("Threads")

Claim 25 is a multi-step method claim where the step of "processing said flight data to prepare said data for transmission" includes ten computer processing sub-steps. ('990 col.8 ll.45-67.)  This claim presents two construction issues:  first, whether the claim is indefinite and second, what are the meanings of "data thread" and "threads are active."  Regarding the first issue, the claim is indefinite because sub-step 6 ("starting a primary data thread"—a "transmitting" step by Teledyne's own admission) cannot be reconciled with the "processing" sub-steps of which it is a part. "Data thread" (as distinct from "thread") is not a term that bears particular meaning to one skilled in the art, and the '990 specification uses it to describe the transmitting (as

-17-

distinct from processing) step: "The packets are then placed in a packet queue. The packets are then ready for ***transmission as a fixed number of threads***, corresponding to the number of cell channels 36." ('990 col.4 ll.64-67.) Indiscriminately mixing the "processing" and "transmitting" steps results in the transmission of data in the "transmitting" step that has already been transmitted in the "processing" step, and cannot be understood by one skilled in the art. *See, e.g.*, *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (2001) (in method for determining location of borehole relative to strata, step of "comparing" certain information held indefinite because patent does not explain that "comparing" refers to a complex "correlation" step, and "'comparing' could undoubtedly have other meanings to a person of skill in the art"); *compare* '990 col.8 ll.50-51 *with id.* at col.8 ll.52-53.

Regarding the second issue, Honeywell's proposed constructions embrace the claim language, specification, and understanding of one skilled in the art as to the meanings of "data thread" and "threads are active." In the art of computer processing (e.g., for use in avionics), the word "thread" is an abstract construct used to describe not data, but a "sequential control of flow within a process." The IEEE DICTIONARY OF ELEC. AND ELEC. TERMS 1108 (6th Ed. 1996) ("Thread ... (4) A single sequential flow of control within a process.") On the other hand, because the claim phrase "data thread" does not have meaning to a person skilled in the art, it must be construed as describing a thread in the particular context disclosed in the specification. Thus, "data thread" is "a single sequential flow of control within a process for conveying data packets to the multi-port serial card for transmission via one of a fixed number of corresponding cell channels,"[34] as disclosed in the specification. Teledyne has not provided Honeywell with a proposed construction for this claim phrase.

"Threads are active" uses the plural form of "thread" ("determining if ***any threads are active***") and should therefore be construed as "more than one thread is

---

[34] Starr Decl., Ex. B at 21-22.

active."[35]  *See* WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY, UNABRIDGED 83 (2nd ed. 1979) (defining "any" as "1. one (no matter which) ***of more than two***; as *any* boy may go. 2. some (no matter how much, how many, or what kind); as, do you have ***any apples***?").  Moreover, the patentee understood how to choose between the singular and plural forms of "thread" and chose to use the plural form in claim 25. (*Compare* '990 col.4 l.67 - col.5 l.1 ("data thread is started") *with id.* at col.5 ll.4-5 ("threads are active").)  Teledyne's proposal—"if there are any data packets that have not been transmitted or have been transmitted and dropped"[36]—cannot be correct because it equates "threads" with "packets" when the '990 patent makes it clear that threads are not packets, but ***convey*** packets:  the peer-to-peer protocol "threads convey the packets to the multi-port serial card 34 for transmission to the backbone 66 of the Internet 45 via the cell channels."  ('990 col.4 ll.30-32.)

## B.    The '152 Patent[37]

Honeywell's '152 patent is directed to a system that selects among various communication mediums used to request and retrieve data information from a ground source while aboard a vehicle, such as an aircraft.  For every disputed term of the '152 patent, Teledyne proposes definitions that unduly narrow the claim terms, adding limitations that are not even found in the specification, much less in the claims.  As discussed below, in each instance the specification actually contradicts rather than supports Teledyne's attempts to impose additional limitations on Honeywell's claims. Teledyne's proposed definitions should thus be rejected in favor of Honeywell's.

---

[35] Starr Decl., Ex. B at 23.

[36] Starr Decl., Ex. H (11/7/2007 Letter from J. Paunovich to E. Starr confirming Teledyne's decision to assert claim 25 after the parties held their final meet-and-confer to prepare the Stipulated Joint Claim Construction Chart).

[37] *See supra note 1,* (listing the asserted claims of the '152 patent).  Starr Decl., Exs. I and J contain, respectively, the '152 patent with the disputed claim terms highlighted and Honeywell's proposed claim constructions for the '152 patent with citations to the intrinsic record and to extrinsic evidence.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.   First and Second Communication Mediums[38]

These general terms broadly refer, respectively, to the communications mediums used to transmit (1) data requests to the data source, and (2) the requested data to the receiver.  They do not require definition beyond their plain meaning.  As the specification makes clear, the communications mediums may comprise any suitable media for transmitting data requests from transmission unit to the data source:

> [T]he first communication medium [ ] may comprise **any** suitable medium. . . [and] may comprise multiple media, which may be used individually or in any appropriate combination to transfer requests to the data source.  …  [S]econd communication medium 210 may comprise **any** medium, plurality or combination of media capable of transmitting information from the data source 102 to the receiver.

('152 col.8 ll.4-6; *see id.* at col.3 ll.17-19).  Moreover, the patentee clearly defined the first and second communication mediums as **not** being mutually exclusive.  ('152 col.2 ll.37-38 ("the first and second communication media 208, 210 **may be the same or different media, or separate channels of the same medium**.").)  On the other hand, Teledyne's proposed construction—"a manner of communication defined in the third [/fourth] element of claim 1 (sub-paragraphs one and two) that is different from the second [/first] communication medium"[39]—disregards the specification's explanation of these terms by requiring that the two mediums be different.

### 2.   Aeronautical Satellite System[40] / Direct Broadcast Satellite[41]

"Aeronautical satellite system" should be defined as "at least one satellite

---

[38] '152 claims 1, 10.

[39] Stipulated Joint Claim Construction Chart, Ex. A at 17-18.

[40] '152 claims 1, 5-7, 10-11.

[41] The related terms "direct broadcast satellite," "direct broadcasting satellite," and "broadcast" appear in all of the independent claims of the '152 patent.

HONEYWELL'S MARKMAN OPENING BRIEF

configured to received data request signals from the transmission unit and forward or transmit the signals to a ground earth station."  "Direct Broadcast Satellite" or "DBS" should be defined as "a satellite that facilitates access to greater bandwidth than reliance solely on the telephone system and affords relatively high data rates from the data source to the receiver."

As with the first and second communication mediums (which are closely related to the "aeronautical satellite system" and the DBS, respectively), the satellite systems defined by these terms are not mutually exclusive.  For example, the specification teaches that the *"aeronautical satellite system"* may be "*any* [] suitable satellite communication system. . ." that is "adapted to transmit data information requests from said satellite data unit to said ground station" which may be the downlink function of the "first communications medium."  ('152 claim 1 & col.8 ll.25-33.)  The specification defines *"direct broadcast satellite"* as well, notably, in terms of the uplink function of the "second communications medium":

> Preferably, receiver 106 is configured to receive information
> signals  from a satellite system, such as, for example, a direct
> broadcast satellite (DBS) system 318, extract the relevant
> information from the received signal, and route the information to
> the appropriate user. Accordingly, by broadcasting requested
> information to the receiver 106 via satellite system 318, a high data
> transfer rate, e.g., 30 Mbps, that is significantly cheaper than
> conventional techniques may be realized.

('152 col.4 ll.18-26.)  The specification therefore does not preclude an "aeronautical satellite system" from being a DBS.  To the contrary, the specification makes clear that the DBS systems are a subset of the larger "aeronautical satellite system," with the key attribute of affording a relatively high data transfer rates from the data source to the receiver.  ('152 col.3 ll.11-12.)  Thus, Teledyne's proposed construction—"a satellite that is not an aeronautical satellite, which broadcasts the same transmissions

directly to all end-users and cannot receive transmissions from end-users"[42]—is directly at odds with the specification and should be rejected.

### 3. Terms That Should Be Given Their Plain Meaning[43]

Teledyne has identified several additional terms for construction that Honeywell contends should be given their plain and ordinary meanings.  These terms include: "data source," "information request system," "satellite data unit," "radio frequency unit," "selecting," "selection system," "wireless LAN system," "radio frequency system," and "voice channel system." For each of these, the Court should reject Teledyne's improper attempts to add nonexistent limitations to the claim terms.[44]

### C. The '468 Patent [45]

The '468 patent is directed to providing and verifying the successful loading of data updates to aircraft components, such as a navigation database, via a system server and a vehicle server.  Teledyne seeks to construe ten terms throughout the asserted claims, while Honeywell would accord all but two of these their ordinary meanings. The claim language is clear, the plain meanings would be known by one of skill in the art, and the specification and prosecution history do not alter these meanings.

### 1. "Vehicle Server" & "Component" [46]

Honeywell's proposed construction of "vehicle server"—" any hardware or software device that is capable of receiving data updates from the system server and

---

[42] Stipulated Joint Claim Construction Chart, Ex. A at 18-19.

[43] '152 claims 1, 3, 10 and 11 ("data source"); claims 1, 3, 4, 5, 6, 10 and 11 ("information request system"); claims 1, 4, 7, 8 and 10 ("satellite data unit" and "radio frequency unit"); claim 6 ("selecting," "wireless LAN system," "radio frequency system" and "voice channel system") and claim 11 (selection system).

[44] Stipulated Joint Claim Construction Chart, Ex. A at 16-26; Starr Decl. Ex. J.

[45] *See supra* note 1 (listing the asserted claims of the '468 patent); Starr Decl., Exs. K and L contain, respectively, the '468 patent with the disputed claim terms highlighted and Honeywell's proposed claim constructions for the '468 patent with citations to the intrinsic record and to extrinsic evidence

[46] '468 claims 1, 9 (vehicle server), 1 (component).

loading the updates in a component"[47]—is how the patent defines the term:  "Vehicle server 116 is *any hardware or software device* that is capable of receiving data updates from system server 102 and loading the updates in component."  ('469 col.5 ll.19-22.)  It is also consistent with how the term is understood by one of ordinary skill in the art.  *See* THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS 1031 (7th ed. 2000) (defining "server" as "[t]he software component on one device that provides services for use by clients on the same or another device."); MICROSOFT PRESS COMPUTER DICTIONARY 404 (3rd ed. 1997) (defining "server" as "[o]n the Internet or other network, a computer or program that responds to commands from a client.").  In contrast, Teledyne's proposed definition—"*a hardware storage device* for use in a vehicle that is capable of receiving data updates from the system server and loading the data updates in a *component that is separate from the vehicle server*"[48]—attempts to insert artificial limitations into a plainly defined and understood term.

Honeywell's proposed construction of "component" as "any avionics or other aircraft device such as a flight management computer, flight management system, global positioning system, navigation computer or the like"[49] is also consistent with how the patent defines the term:  "any avionics or other aircraft device such as a flight management computer (FMC), flight management system (FMS), global positioning system (GPS), navigation computer or the like."  ('468 col.5 ll.46 – 49.)  In contrast, Teledyne's proposed construction—"a vehicle hardware device that is separate from the vehicle server and that receives data updates from the vehicle server and uses the data updates to perform a function[50]—unduly limits the "component" to separate

---

[47] Stipulated Joint Claim Construction Chart, Ex. A at 29.

[48] *Id.*

[49] *Id.* at 30.

[50] *Id.*

HONEYWELL'S MARKMAN OPENING BRIEF

1   hardware devices performing particular functions, a limitation that is no where in the

2   claim and directly contradicted by the specification's clear description of the

3   component as including "any avionics or other aircraft device."

4           **2.   <u>Terms That Should Be Given Their Plain Meaning</u>** [51]

5           Honeywell contends that the following terms from the '468 patent do not

6   require construction:  "system server," "data connection," "loading said data update

7   from said vehicle server into a component at said vehicle," "verifying from said

8   vehicle server to said system server via said data connection that said loading step

9   completed successfully," "receiving a confirmation from said vehicle server via said

10  data connection when said data update is successfully loaded," "digital storage

11  medium," "operable to execute the method," and "at a pre-determined time."  For each

12  of the above terms, Teledyne's effort to add limitations to the claim language should

13  be rejected.  A few of these warrant specific mention.

14          The '468 specification contradicts Teledyne's effort to impose a limitation in

15  the "verifying" and "receiving" steps of claims 1 and 9, respectively, that only "the

16  vehicle server determines whether the load was successful."[52]  According to the

17  specification, "When the load is complete, a . . . check . . . is executed by component

18  118 *or* vehicle server 116, as appropriate, to verify that the data update was properly

19  loaded."  ('468 col.9 ll.22-25.)  Similarly, the plain meaning of "system server"

20  accords with the specification's use of this term.  *See e.g.*, '468 col.5 ll.25-29 ("The

21  ARINC 763 network server system (NSS) description includes a common file server,

22  data processing, mass storage and interface capabilities to a number of terminals

23  connected via an onboard aircraft Local Area Network (LAN)").  But in its proposal,

24

25

26  ⸻⸻⸻⸻⸻
        [51] '468 claims 1 and 9 ("system server"); claims 1, 2, 9 and 12 ("data connection"); claim 1
27  ("loading…" and "verifying…"); claim 9 ("receiving" and "at a pre-determined time"); claims 7, 13,
        and 15 ("digital storage medium" and "operable to execute the method").

28      [52] Stipulated Joint Claim Construction Chart, Ex. A at 30, 32.

Teledyne adds the artificial limitation that it is a "remote hardware device."[53]

Finally, Teledyne's construction of "at a pre-determined time" attempts to restrict this limitation to an update that is scheduled in at a specific time in advance[54] rather than, for example, based on a pre-determined condition or rule.  But the specification states, "[t]ime of distribution to a particular vehicle may be determined by administrative program 106 in accordance with pre-determined rules based upon user inputs and data in database 104, for example, ***or according to any other scheme***." ('468 col.6 ll.12-16.)  Thus, Teledyne's effort to narrow this term, too, should be rejected, and it should be accorded its plain meaning.

## IV.    CONCLUSION

For all of the foregoing reasons, Honeywell respectfully request that the Court enter an Order construing the disputed claim terms as indicated herein and in Honeywell's portion of the Stipulated Joint Claim Construction Chart.


DATED:  November 19, 2007            KIRKLAND & ELLIS LLP


                                     By: /s/ Ephraim D. Starr
                                     Robert G. Krupka, P.C. (S.B.N. 196625)
                                     Luke L. Dauchot (S.B.N. 229829)
                                     Ephraim D. Starr (S.B.N. 186409)
                                     777 South Figueroa Street
                                     Los Angeles, California  90017
                                     Telephone:  (213) 680-8400
                                     Facsimile:   (213) 680-8500

                                     Attorneys for Defendant-Counterclaimant
                                     HONEYWELL INTERNATIONAL INC.
                                     and Counterclaimant
                                     HONEYWELL INTELLECTUAL
                                     PROPERTIES INC.

---

[53] *Id.* at 29.

[54] *Id.* at 32.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing documents entitled **HONEYWELL'S *MARKMAN* OPENING BRIEF and [PROPOSED] ORDER** were filed electronically in compliance with Local Rule 5-4.  As such, this notice was served on all counsel who have consented to electronic service pursuant to Local Rule 5-4.


   /s/ Ephraim D. Starr   
Ephraim D. Starr