1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     Frederick A. Lorig (Bar No. 057645)
2    fredericklorig@quinnemanuel.com
     Steven M. Anderson (Bar No. 144014)
3    stevenanderson@quinnemanuel.com
     Joseph M. Paunovich (Bar No. 228222)
4    josephpaunovich@quinnemanuel.com
     Anthony P. Alden (Bar No. 232220)
5    anthonyalden@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
6  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
7  Facsimile:  (213) 443-3100

8  Attorneys for Plaintiff and Counter-Defendant
   Teledyne Technologies Incorporated

9

10                 UNITED STATES DISTRICT COURT

11               CENTRAL DISTRICT OF CALIFORNIA

12                     WESTERN DIVISION

| | |
|---|---|
| 13  TELEDYNE TECHNOLOGIES INCORPORATED, a Delaware 14  corporation, | CASE NO. CV 06-06803-MMM (SHx) |
| 15          Plaintiff, | PLAINTIFF AND COUNTER-DEFENDANT TELEDYNE TECHNOLOGIES INCORPORATED'S OPENING CLAIM CONSTRUCTION BRIEF |
| 16     vs. | |
| 17  HONEYWELL INTERNATIONAL, INC., a Delaware corporation, 18 | Appendix in support of Plaintiff and Counter-Defendant Teledyne Technologies Incorporated's Opening Claim Construction Brief lodged concurrently herewith |
| 18          Defendant. 19 | |
| 20  AND COUNTERCLAIM | Declaration of Joseph M. Paunovich in support of Plaintiff and Counter-Defendant Teledyne Technologies Incorporated's Opening Claim Construction Brief lodged concurrently herewith |
| 21 | |
| 22 | |
| 23 | |
| 24 | Hearing Date:  January 28, 2008 Time:              9:00 a.m. Courtroom:     780 |
| 25 | |
| 26 | Discovery Cut-off Date: June 6, 2008 Pre-trial Conference Date: Aug. 25, 2008 Trial Date: Sept. 23, 2008 |
| 27 | |
| 28 | |

# **<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

I.      INTRODUCTION AND BACKGROUND ................................................................ 1

II.     LEGAL STANDARDS FOR CLAIM CONSTRUCTION ..................................... 1

III.    THE COURT SHOULD ADOPT TELEDYNE'S CONSTRUCTIONS ................. 2

A.      The '990 Patent ......................................................................................... 2

1.      "Flight data": Claims 1, 8, 14, 15, 18, 19, and 33 ................................ 2

2.      "Data acquisition unit": Claims 1, 8, 14, 15, 18, 19, 25 and 33 .......... 3

3.      The "landing" elements: Claims 1, 8, 14, 18, 19, and 33 .................... 3

(a)     "Automatically": Claims 8 and 14 ............................................ 6

4.      "Cellular infrastructure"/ "cellular communications infrastructure": Claims 1, 2, 4, 8, 14, 15, 18, 19, 25 and 33 ................ 6

5.      "Serial card": Claims 8 and 14 ............................................................. 7

6.      "Cell channels": Claims 8 and 14 ........................................................ 8

7.      "Plurality of cell channels in communication with said serial card": Claims 8 and 14 ......................................................................... 8

8.      "Thread"/"Primary data thread"/"Threads are active": Claim 25 ......... 9

9.      "Flight operations center": Claims 20, 21 and 46 .............................. 10

10.     The mean-plus-function terms of claim 15 ........................................ 10

B.      The '152 Patent ....................................................................................... 13

1.      "Data source": Claims 1 and 10 ......................................................... 13

2.      "Network system": Claims 1, 4 and 10 ............................................... 13

3.      "Information request system": Claims 1, 4, and 10 ............................ 13

4.      "Transmission unit": Claims 1, 7 and 10 ............................................ 14

TELEDYNE'S OPENING CLAIM CONSTRUCTION BRIEF

5. "Satellite data unit": Claims 1, 4, 5, 7, 8 and 10.................................15

6. "Radio frequency unit": Claims 1, 4, 7, 8 and 10..............................16

7. "First communication medium": 1 and 10..........................................16

8. "Aeronautical satellite system": Claims 1 and 10..............................17

9. "Second communication medium": Claims 1 and 10.........................18

10. "Direct broadcast satellite": Claims 1 and 10; "Broadcasting": Claim 4..................................................................................................18

11. "Selecting": Claim 6..............................................................................20

12. The "Systems" ("Radio Frequency System"; "Wireless LAN System"; "Voice Channel System") of Claim 6 .................................20

C. The '468 Patent .................................................................................................21

1. "System Server":  Claims 1, 2, 7, 9, 12, 13 and 15...........................21

2. "Vehicle Server":  Claims 1, 2, 7, 9, 12, 13 and 15..........................21

3. "Data Connection":  Claims 1, 2, 7, 9, 12, 13 and 15.......................22

4. "Component":  Claims 1, 2 and 7 .......................................................22

5. "Loading," "Verifying" and "Receiving" Steps .................................23

   (a) "Loading Said Data Update From Said Vehicle Server Into A Component At Said Vehicle":  Claims 1, 2 and 7.........23

   (b) "Verifying From Said Vehicle Server To Said System Server Via Said Data Connection That Said Loading Step Completed Successfully":  Claims 1, 2 and 7 .........................23

   (c) "Receiving A Confirmation From Said Vehicle Server Via Said Data Connection When Said Data Update Is Successfully Loaded":  Claims 9, 12, 13 and 15.....................24

6. "Digital Storage Medium":  Claims 7, 13 and 15 ...............................24

7. "Operable To Execute The Method": Claims 7, 13 and 15 ...............25

8. "At A Pre-Determined Time":  Claims 9, 12, 13 and 15 ...................25

# TABLE OF AUTHORITIES

**Page**

## Cases

Biomedino, LLC v. Waters Techs. Corp.,
490 F.3d 946 (Fed. Cir. 2007) ................................................................. 13

CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG,
224 F.3d 1308 ........................................................................................... 21

Datamize LLC. v. Plumtree Software, Inc.,
417 F.3d 1342 (Fed. Cir. 2005) ............................................................... 23

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
381 F.3d 1111 (Fed. Cir. 2004) ...................................................... 6, 10, 16

Markman v. Westview Instruments, Inc.,
52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) ......................... 2

Med. Instr. & Diagnostics Corp. v. Elekta AB,
344 F.3d 1205 (Fed. Cir. 2003) ............................................................... 12

Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,
370 F.3d 1354 (Fed. Cir. 2004) ................................................................. 1

Micro Chem., Inc. v. Great Plains Chem. Co. Inc.,
194 F.3d 1250 (Fed. Cir. 1999) ............................................................... 13

NTP, Inc. v. Research In Motion, Ltd.,
418 F.3d 1282 (Fed. Cir. 2005) ................................................................. 8

Phillips v. AWH Corp.,
415 F.3d 1303 (Fed. Cir. 2005) .......................................................... passim

Raytheon Co. v. MCDATA Corp.,
2004 WL. 952284 (E.D. Tex. Feb. 10, 2004) ........................................... 14

TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.,
375 F.3d 1126 (Fed. Cir. 2004), cert. denied, 543 U.S. 1147 (2005) ......... 13

Teleflex, Inc. v. Ficosa N. Am. Corp.,
299 F.3d 1313 (Fed. Cir. 2002) ................................................................. 2

## Statutes

35 U.S.C. § 112, ¶ 6 ................................................................................. 12

## Other Authorities

IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed. 1997) .............. 6, 7

iii

U.S. Patent. No. 5,550,738 (Bailey, et al., Aug. 19, 1994)....................................................7

TELEDYNE'S OPENING CLAIM CONSTRUCTION BRIEF

## I.    INTRODUCTION AND BACKGROUND

Plaintiff and counter-defendant Teledyne Technologies Incorporated ("Teledyne") is a leading provider of data communications equipment for airlines and business aircraft. At issue in this litigation is Honeywell's misappropriation of Teledyne's valuable trade secrets and its infringement of Teledyne's U.S. Patent No. 6,181,990 ("the '990 patent"), entitled "Aircraft Flight Data Acquisition and Transmission System."  Teledyne was awarded this patent on January 30, 2001, and a certificate of reexamination issued in 2006.  The patent is directed to a system and method for transmitting aircraft data from an aircraft to the ground using the pre-existing cellular infrastructure.  Teledyne markets the invention under its highly successful Wireless GroundLink® brand.

After Teledyne commenced this action, Honeywell counterclaimed for infringement of U.S. Patent Nos. 6,477,152 ("the '152 patent"), and 6,438,468 ("the '468 patent").  The '152 patent is directed to a system and method for sending information requests from a vehicle via a first communication medium, and receiving the requested information via a second communication medium composed of a direct broadcast satellite.  Honeywell has never sold a product embodying the '152 patent.  The '468 patent is directed to a method and apparatus for sending software updates from a ground server to a vehicle server via a datalink and receiving a verification of successful upload to an aircraft component via the same datalink.

## II.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Claim terms "are generally given their ordinary and customary meaning"—i.e., "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  But the claims do not stand alone.  If a claim term requires construction, and the claim language has been considered, "[t]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history." Id. at 1315 (emphasis added).

1    However, "one of the cardinal sins of patent law" is "reading a limitation from the

2    written description into the claims."  Id. at 1320 (quotations and citations omitted). "Only

3    when the prosecution history demonstrates that the inventor "limited the invention in the

4    course of prosecution," may the Court construe "the claim scope narrower than it would

5    otherwise be."  Id. at 1317.

6    Nonetheless, if an inventor gives a special definition to a claim term in the

7    specification, then the inventor's lexicography governs.  Id. at 1316.  Conversely, if an

8    inventor intentionally disclaims claim scope in the specification, then the inventor's

9    intention is regarded as dispositive.  Phillips, 415 F.3d at 1316.  Thus, the intrinsic record

10   "usually provides the technological and temporal context to enable the court to ascertain

11   the meaning of the claim to one of ordinary skill in the art at the time of the invention."

12   V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1310 (Fed. Cir. 2005).

13   In addition to intrinsic evidence, extrinsic evidence such as dictionaries, technical

14   articles, or expert testimony may be considered.  Extrinsic evidence, however, is "less

15   significant than the intrinsic record . . ."  Phillips, 415 F.3d at 1317.

16   **III.   THE COURT SHOULD ADOPT TELEDYNE'S CONSTRUCTIONS**

17   **A.   The '990 Patent**

18   1.    "Flight data": Claims 1, 8, 14, 15, 18, 19, and 33

19   **Teledyne's construction:** data relating to a flight or the performance of aircraft systems
20   or components during a flight.
     **Honeywell's construction:** flight parameters such as air speed, altitude, vertical
21   acceleration, heading, and time.

22   The specification explains that "it is common for aircraft to generate records of

23   data relating to flight or performance parameters for each flight of the aircraft . . . The

24   data are utilized . . . to assist in maintenance of the aircraft by detecting faulty

25   components or gradual deterioration of a system or component . . ."  (Ex. 1, 1:21-28).

26   Teledyne's proposed construction accords with the definition in the specification by

27   encompassing data relating both to a "flight" or "performance" of the aircraft during

28   flight.  In contrast, Honeywell's proposed construction ignores the broad definition of

1  "flight data" in the specification and improperly limits "flight data" only to "flight

2  parameters," artificially distinguishing data relating to performance of the aircraft during

3  such flight.

4        2.   <u>"Data acquisition unit": Claims 1, 8, 14, 15, 18, 19, 25 and 33</u>

| **Teledyne's construction:** requires no construction, but plain meaning is "a hardware device for use on an aircraft that acquires data." |
|---|
| **Honeywell's construction:** aircraft component known as the flight data acquisition unit (FDAU). |

8  The phrase "data acquisition unit" can be understood by reference to "the widely

9  accepted meaning of commonly understood words."  <u>Phillips</u>, 415 F.3d at 1314.  A "data

10  acquisition unit" is simply a unit that acquires data.  If the Court is inclined to construe

11  the term, however, Teledyne's proposed construction aligns with the specification:

12  "aircraft data are typically gathered by a digital flight data acquisition unit (DFDAU)."

13  (Ex. 1, 1:31-32).  The function of the "data acquisition unit" is, as its name implies, to

14  gather or "acquire" data.

15  Honeywell's proposed construction improperly incorporates a preferred

16  embodiment—a "FDAU"—and offers no clarity at all.  <u>Phillips</u>, 415 F.3d at 1317.  To

17  say a component is "known" is not to construe it.  Honeywell's "construction" is actually

18  no construction.

19        3.   <u>The "landing" elements: Claims 1, 8, 14, 18, 19, and 33</u>[1]

| "At least a second sensor configured to sense a landing of the aircraft" (Claim 1) | **Teledyne's construction:** at least a second sensor configured to sense information signaling the aircraft has landed. |
|---|---|
| | **Honeywell's construction:** at least a second sensor configured to sense a touching down of the aircraft. |
| "Communication is initiated when at least the second sensor senses the | **Teledyne's construction:** communication is initiated after at least a second sensor senses information signaling the aircraft has landed. |

[1] Teledyne has slightly modified its proposed constructions for some of these terms, having further considered the specification.

| landing of the aircraft" (Claim 1) | **Honeywell's construction:** communication is initiated at the time that at least a second sensor configured to sense a touching down of the aircraft. |
|---|---|
| "Initiated automatically upon landing of the aircraft" (Claims 8 and 14) | **Teledyne's construction:** initiated with little or no human involvement after the aircraft has landed. |
| | **Honeywell's construction:** initiated without human intervention upon touching down of the aircraft. |
| "transmission of the data is initiated when the sensing means sense the landing of the aircraft" (Claim 15) | **Teledyne's construction:** transmission of data is initiated after a sensor senses information signaling the aircraft has landed. |
| | **Honeywell's construction:** transmission of the data is initiated when the weight-on-wheels signal is generated. |
| "Receiving a signal indicating a landing of the aircraft from at least a [first]/[second] sensor" (Claims 18, 19, and 33) | **Teledyne's construction:**  receiving a signal indicating that the aircraft has landed from at least a [first]/[second] sensor. |
| | **Honeywell's construction:** receiving a signal indicating a touching down of the aircraft from at least a [first]/[second] sensor. |
| "Cellular communications infrastructure is accessed in response to the signal" (Claims 18, 19 and 33) | **Teledyne's construction:**  the cellular communications infrastructure is only accessed after receiving the signal. |
| | **Honeywell's construction:** the cellular communications infrastructure is accessed in response to the signal indicating that the aircraft is touching down. |

A central dispute between the parties, and one which runs throughout their constructions for each of the above terms, is whether transmission of the "flight data" must commence the very instant the aircraft touches the ground—as Honeywell proposes—or whether transmission can commence within a short time after the aircraft has landed, such as when the aircraft senses the spinning of the wheels or a reduced ground speed—as Teledyne proposes.  Teledyne's proposed construction naturally aligns with the specification, while Honeywell's is far narrower and wrongly attempts to limit the claim to the preferred embodiment in the specification.

The specification describes that ". . . the gatelink processor 32 receives a weight-on-wheels interrupt which signals that <u>the aircraft has landed</u>, and the data transfer is initiated."  (Ex. 1, 4:58-61) (emphasis added).  Similarly, "[t]he processor 32 is responsive to a weight-on-wheels signal . . . to initiate transmission or reception of the

4

1   data <u>when the aircraft 12 has landed</u>."  (Ex. 1, 3:26-30) (emphasis added).  (<u>See also</u>

2   Ex. 1, 1:66-67, 2:1, 64-65, (" . . . a cellular infrastructure in communication with the data

3   communications unit <u>after the aircraft has landed</u>."); ("An aircraft 12, which has stored

4   flight data, is illustrated <u>after landing</u>.") (emphasis added to all)).  And Figure 1 shows an

5   aircraft on the ground, as opposed to in the process of touching down.  (<u>See</u> Appx. A,

6   pgs. 6-16).

7       It is thus clear from the specification that the transmission trigger contemplated by

8   the patent is not limited to the aircraft actively touching down, but rather the aircraft

9   having landed, <u>i.e.</u>, sitting on the ground after flight.  <u>Phillips</u>, 415 F.3d at 1321

10  (specification is "the single best guide to the meaning of a disputed term.").  Teledyne's

11  construction aligns with this notion, while Honeywell's improperly departs from it.

12      Honeywell will no doubt point to the prosecution history to argue that the patent is

13  supposedly narrower than described in the claims and the specification.  The Federal

14  Circuit (sitting <u>en</u> <u>banc</u>) has held, however, that only when the prosecution history

15  demonstrates that the inventor "limited the invention in the course of prosecution," may

16  the Court construe "the claim scope narrower than it would otherwise be."  <u>Id</u>. at 1317.

17  Unlike Honeywell's '152 patent (discussed below), where the prosecution history clearly

18  reveals an intent to narrow by amendment, nothing in the '990 patent's prosecution

19  history demonstrates an intent by the inventors to limit the '990 patent to transmission

20  <u>immediately</u> upon touching down.

21      What is more, Honeywell's "touching down" construction renders claim language

22  superfluous.  By using the words "at least" a first or second sensor, claims 1, 18, 19, and

23  33 contemplate that there could be a third, fourth or even fifth sensor that senses "the

24  landing of the aircraft."  For example, the aircraft may sense weight-on-wheels and then a

25  rapid decrease in ground speed.  Under Honeywell's "touching down" constructions,

26  transmission must begin <u>immediately</u> upon the aircraft receiving the weight-on-wheels

27  signal, even if it is yet to receive the "speed decrease" signal.  Such a construction thus

28  renders the words "at least" superfluous because—even if there are additional sensors—

5

1  transmission must always be triggered by the "second sensor."  Teledyne's constructions

2  harmonize the claim language because transmission can begin after <u>all</u> sensors sense that

3  the aircraft has landed.  <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.</u>, 381

4  F.3d 1111, 1119 (Fed. Cir. 2004) ("all claim terms are presumed to have meaning in a

5  claim," the Court should adopt Teledyne's construction as correct.").

(a)    <u>"Automatically": Claims 8 and 14</u>

7      Honeywell also seeks to artificially narrow the meaning of the term "initiated

8  automatically upon landing of the aircraft" by construing "automatically" as "without

9  human intervention."  There is no intrinsic support for this construction.  The

10  specification explains that prior to Teledyne's invention, the gathering of aircraft data

11  required "ground personnel [to] board the aircraft, remove the media, and mail the media

12  to a flight operations center (FOC)."  (Ex. A, 1:34-36); (Appx. A, pgs. 6-16).  It was this

13  burdensome practice that the invention sought to obviate—"there is a need for an aircraft

14  data transmission system that <u>automatically</u> transfers flight data from an aircraft to flight

15  operation center <u>with little or no human involvement</u> . . ."  (Ex. 1, 1:55-58) (emphasis

16  added).  Thus, the patent was not directed to completely eradicating human intervention,

17  as Honeywell would have it, but rather substantially reducing human intervention.

18  Teledyne's construction reflects this purpose by adopting the definition in the

19  specification.

4.    <u>"Cellular infrastructure"/ "cellular communications infrastructure":</u>

<u>Claims 1, 2, 4, 8, 14, 15, 18, 19, 25 and 33</u>

**Teledyne's construction:** requires no construction, but plain meaning is "a cellular voice and/or data network that uses frequencies in the licensed frequency range."

**Honeywell's construction:** a voice/data network for mobile radio communication in a licensed frequency band, organized as a system of cells including a base station transceiver subsystem connected to a base station controller.

Teledyne's proposed constructions for these terms reflects the meaning given to

them in the file history:  "It is well known in the art of cellular communication that a

cellular infrastructure, such as a mobile telephone voice/data network, uses carrier

6

1  frequencies in the licensed frequency range."  (Ex. 3, pg. 10); <u>Phillips</u>, 415 F.3d at 1317.

2  In contrast, Honeywell relies on the preferred embodiments depicted in Figures 2 and 11

3  of the patent to import new limitations into the claim.  This is improper.  (See Appx. A,

4  pgs. 17-19).  Absent any language in the claims concerning a "base station transceiver

5  subsystem" or "base station controller," Honeywell's artificial narrowing construction

6  must be rejected[2].

7         5.     "Serial card": Claims 8 and 14[3]

8  | **Teledyne's construction:** an interface for the transfer of data in a sequence of bits. |
   | **Honeywell's construction:** a circuit board with I/O interfaces that each transmit data to or from a peripheral device one bit at a time. |

10        This is a commonly used phrase that is well understood by those skilled in the art.

11 The IEEE Standard Dictionary of Electrical and Electronics Terms (6th ed. 1997) defines

12 the term "serial" as "[p]ertaining to sequential transfer, occurrence, or processing of the

13 individual parts of a whole, such as the bits of a character, the characters of a word, etc.,

14 using the same facilities for successive parts."  (Ex. 4, pg. 970).  Teledyne's proposed

15 construction reflects this definition by incorporating the concept of a "sequence."

16 Honeywell's does not.

17        Also, Honeywell once again incorrectly attempts to read limitations from the

18 preferred embodiment into the claim.  <u>Phillips</u>, 415 F.3d at 1320.  The passage of the

19 specification on which Honeywell relies makes clear that it is discussing a "preferred

20 embodiment" of the system.  (Ex. 1, 6:27-30).  What is more, the passage is not even

21 talking about a "serial card," but rather a "multi-port serial card."  (<u>Id.</u> at 3:33).

---

24     [2]   The parties respective constructions for "cellular telephone infrastructure" (claims
25 34, 41, 44, 45 and 51) mirror their constructions for the term "cellular infrastructure," but
   apply such constructions to telephones.  For the reasons discussed with respect to the
26 phrase "cellular infrastructure," Teledyne's proposed construction should be adopted.
27     [3]   After further consideration, Teledyne is willing to accept Honeywell's proposed
   construction for the term "modem," and hence does not address it herein.

1 Accordingly, not only does Honeywell's proposed construction improperly import

2 limitations into the claim, but these limitations are inapposite to the disputed term.

3         6.    "Cell channels": Claims 8 and 14

| |
|---|
| **Teledyne's construction:** communication paths in a cellular medium. |
| **Honeywell's construction:** physical, over-the-air channels to the cellular infrastructure that can transmit simultaneously and can thus transmit data in parallel. |

6       A person of ordinary skill in the art at the time of the invention would have

7 understood a "cell channel" to be a communication path in a cellular medium.  This is

8 supported by U.S. Patent. No. 5,550,738 (Bailey, et al., Aug. 19, 1994), cited by (and

9 thus intrinsic to) the '990 patent, which states:  "The cellular modem 43 . . . transfers the

10 data packets over preexisting cellular channels to a router 45 in the reporting system . . .

11 The cellular network utilizes channel-hopping to transmit the data packets during idle

12 time between cellular voice calls, . . ."  (Ex. 5, 4:17-22) (emphasis added).  The IEEE

13 Dictionary also defines a "channel" as a "path along which signals can be sent, for

14 example, a data channel, output channel."  (Ex. 4, pg. 146).  It is thus evident that a

15 person of ordinary skill in the art would have understood "cellular channels" to mean

16 paths within the "cellular network" used to transmit data.

17         7.    "Plurality of cell channels in communication with said serial card":

18               Claims 8 and 14

| |
|---|
| **Teledyne's construction:** requires no construction, but plain meaning is "more than one communication path in a cellular medium able to send information to or receive information from said serial card." |
| **Honeywell's construction:** more than one physical, over-the-air channels to the cellular infrastructure are each attached to an I/O port of said serial card, allowing the cell channels to transmit data simultaneously and in parallel. |

23       Teledyne does not believe that this lengthy phrase requires construction given the

24 parties' constructions of the constituent phrases "cell channel" and "serial card."

25 Nonetheless, if the Court is inclined to construe the phrase, Honeywell again commits

26 "one of the cardinal sins of patent law—reading a limitation from the written description

27 into the claims."  Id. at 1320.  As noted above, the specification's statement that "[e]ach

28

1  I/O port of the card is attached to a cell channel . . ."  (Ex. 1, 3:33-34) was made merely

2  in the context of a preferred embodiment.  (Appx. A, pgs. 23-24)

3         What is more, Honeywell's proposed construction substitutes a function ("in

4  communication with") with a structure (cell channels "are each attached to an I/O port of

5  said serial card").  Absent a "textual reference in the actual language of the claim," there

6  is no hook on which Honeywell may hang its new structural limitation.  <u>NTP, Inc. v.</u>

7  <u>Research In Motion, Ltd.,</u> 418 F.3d 1282, 1310 (Fed. Cir. 2005) (citations omitted).  Had

8  the patentee wanted to include a more specific structure it would have done so.

9             8.      <u>"Thread"/"Primary data thread"/"Threads are active": Claim 25</u>

| "Thread" | **Teledyne's construction**: part of a computer program that runs independently or along with other threads to accomplish a task. |
|---|---|
| | **Honeywell's construction:** a single sequential flow of control within a process for conveying data packets to the multi-port serial card for transmission via one of a fixed number of corresponding cell channels. |
| "Primary data thread" | **Teledyne's construction:** a thread that causes the initial call to be made to the cellular infrastructure.<br>**Honeywell's construction**:  a data thread that causes the initial call to be made via the cellular infrastructure to open the communications channel. |
| "Threads are active" | **Teledyne's construction:** if there are any data packets that have not been transmitted or have been transmitted and dropped.<br>**Honeywell's construction:** more than one data thread is active. |

20        Teledyne's proposed construction for the term "thread" describes in lay terms a

21  sequential flow of control: "part of a computer program that runs independently or along

22  with other threads to accomplish a task."  (Appx. A, pgs. 25-26).  But Honeywell

23  improperly then imports new limitations into the claim.  Absent any language in the

24  claims concerning a "conveying data packets to the multi-port serial card" or

25  "transmission via one of a fixed number of corresponding cell channels," Honeywell's

26  artificial narrowing construction must be rejected.

27        Teledyne's constructions for "primary data thread" and "threads are active" are

28  supported by the language of the specification.  (Ex. 1, 4:67, 5:1-2, 4-6, ("the primary

9

1  data thread is started to make the initial call and open the communications channel to the

2  flight operations center 18."); (". . .the processor determines if any threads are active, i.e.,

3  if there are any packets that haven't been transmitted or have been transmitted and

4  dropped.")).  In contrast, Honeywell's constructions incorporate its improper

5  constructions for "thread" and "cellular infrastructure" and should be rejected.

6      Honeywell also improperly imports the word "data" into the phrase "threads are

7  active."  But nothing in claim 25 refers to more than one "<u>data</u> thread."  The only

8  requirement of the claim is that a determination be made whether any "threads are

9  active."  Honeywell's construction thus ignores the plain language of the claim.

10          9.    <u>"Flight operations center": Claims 20, 21 and 46</u>

| **Teledyne's construction:**  requires no construction, but plain meaning is "a location housing and/or in communication with a data reception unit." |
| **Honeywell's construction**: base of operations for the airline or other aircraft operator. |

13      The phrase "flight operations center" requires no construction, and can be

14  understood by reference to "the widely accepted meaning of commonly understood

15  words."  <u>Phillips</u>, 415 F.3d at 1314; (Appx. A, pgs. 27-28).  To the extent that the Court is

16  inclined to construe the phrase, however, Teledyne's construction is correct. Figures 2

17  and 11 of the patent illustrate that the "flight operations center (18)" contains the "data

18  reception unit (47)."  On the other hand, neither the claims nor the specification make any

19  mention of a "base of operations for an airline or other aircraft operator."  In fact, neither

20  the claims nor the specification even use the words "base of operation," "airline" or

21  "aircraft operator."

22          10.    <u>The mean-plus-function terms of claim 15</u>

| "sensing means" | **Teledyne's proposed structure:** a sensor capable of sending, or causing to be sent, an electrical signal, and all equivalents thereof. |
| | **Honeywell's proposed structure:** the weight-on-wheels signal from the landing gear of the aircraft. |
| "means for transmitting" | **Teledyne's proposed structure:** a communications unit, including a computer processor, serial card, cell channel and antenna, and all equivalents thereof. |

| | |
|---|---|
| | **Honeywell's proposed structure:** Each I/O port of a multiport serial card is attached to a cell channel which can open, sustain, and close a physical, over-the-air channel to the cellular infrastructure. The cell channels can transmit simultaneously and can thus transmit data in parallel.  The flight data is segmented into datagrams and UDP/IP packets, which are transmitted as a fixed number of threads corresponding to the number of cell channels. |
| "means for receiving" | **Teledyne's proposed structure:** a data reception unit, including a router, local network, computer processor, and storage unit, and all equivalents thereof. |
| | **Honeywell's proposed structure:** a flight operations center processor running software that performs the operations detailed in the '990 patent at col. 4 ll. 32-53 and col. 5 l. 41 through col. 6 l. 26. |

In construing claim elements subject to 35 U.S.C. § 112, ¶ 6, the court applies a two-step analysis: "The first step in the construction of a means-plus-function claim element is to identify the particular claimed function. The second step in the analysis is to look to the specification and identify the corresponding structure for that function." Med. Instr. & Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (citations omitted).  The first step is not controversial, as the claim language defines the functions performed.  The parties agree that the function of "sensing means" is to "sense a landing of the aircraft" (Ex. 2, 1:51); the function of "means for transmitting" is "transmitting flight data" (Ex. 2, 1:52); and the function of "means for receiving" is "receiving flight data from the cellular infrastructure."  (Ex. 2, 1:57).

The second step is to identify the corresponding structures for the functions in the specification.  Med. Instr., 344 F.3d at 1210.  Honeywell contends that the corresponding structure for "sensing means" is "the weight-on-wheels signal from the landing gear of the aircraft."  This is legally wrong.  It is well-settled law that a corresponding structure incorporates only those elements necessary to carry out the function.  See, e.g., TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C., 375 F.3d 1126, 1135 (Fed. Cir. 2004), cert. denied, 543 U.S. 1147 (2005) (a claim limitation did not include "elements that are

11

1  not necessary for performing the recited function."); see also Micro Chem., Inc. v. Great

2  Plains Chem. Co. Inc., 194 F.3d 1250, 1258 (Fed. Cir. 1999).

3          The specification recites that "[t]he processor is responsive to a weight-on-wheels

4  signal, which acts as an interrupt signal to signal the processor 32 to initiate transmission

5  or reception of the data when the aircraft 12 has landed."  (Ex. 1, 3:26-30).  The

6  minimum structure necessary to "sense a landing of the aircraft" is not the "weight-on-

7  wheels" signal, but rather a "signal to signal the processor 32."  A person of ordinary skill

8  in the art would know that a signal to "sense a landing of the aircraft" is generated by a

9  sensor.  Biomedino, LLC v. Waters Techs. Corp., 490 F.3d 946, 953 (Fed. Cir. 2007)

10  ("The inquiry is whether one of skill in the art would understand the specification itself to

11  disclose a structure. . .") (citation omitted).

12          Honeywell's approach to the term "means for transmitting" is similarly misguided.

13  The specification discloses that the corresponding structure is the "communications unit."

14  (Ex. 1, 1:66-67, 2:1) ("The system also includes a cellular infrastructure in

15  communication with the data communications unit after the aircraft has landed.").

16  Figures 2 and 11 illustrate that "Communications Unit 26" transmits the flight data to the

17  cellular infrastructure.

18          The most egregious example of Honeywell's strategy to avoid infringement of

19  claim 15 is its proposed structure for the term "means for receiving," which runs to

20  almost two-and-half columns of the specification.  Such an extreme construction that

21  imports every sub-component of a corresponding structure "goes beyond what the means-

22  plus-function statute requires . . . [and] would be a perverse application of the means-

23  plus-function statute.  Raytheon Co. v. MCDATA Corp., 2004 WL 952284, at *6 (E.D.

24  Tex. Feb. 10, 2004).

25          Rather than the two-and-a half columns identified by Honeywell, the structure

26  corresponding to the term "means for receiving" is a "data reception unit," including a

27  "router," "local area network," "processor" and "storage unit."  (Ex. 1, 3:52-60, ("A local

28  router 46 in a data reception unit 47 of the flight operations center 18 is connected to the

12

1  Internet 45 . . .The router 46 connects a <u>local area network</u> 48 to the Internet 45. . . . A

2  gatelink <u>processor</u> 50 is connected to the network 48 and receives the flight data for

3  storage in an attached <u>storage unit</u> 52.") (emphasis added)).

### B.   The '152 Patent

#### 1.   "Data source": Claims 1 and 10

| Teledyne's construction: a source of data remote from the vehicle, which stores or channels information, receives requests for information from the information request system and transmits the requested data to the receiver. |
| --- |
| Honeywell's construction: a source of data |

The phrase "data source" is defined by the specification:  "Data source 104 stores or channels information, . . . receives requests for information from the information request system 102, and transmits the requested data to the receiver 106."  (Ex. 6, 2:59-64).  Moreover, both the claims and specification indicate that the "data source" must be remote from the vehicle.  (See, e.g., Ex. 6, 1:6-8, ("The present invention relates to . . . systems for requesting and receiving data from a <u>remote</u> data source."); and Appx. A, pgs. 31-34).  Indeed, there would be no need for an "aeronautical satellite system," for example, if the "data source" was on the vehicle itself.

#### 2.   "Network system": Claims 1, 4 and 10

| Teledyne's construction: a system remote from the vehicle configured to transmit data or voice communications between various communication systems. |
| --- |
| Honeywell's construction: a network that communicates requests to the data source. |

Teledyne's construction of the term "network system" adheres to the definition in specification: "Network 314 preferably comprises a general network system configured to transmit data or voice communications between various communication systems, . . ." (Ex. 6, 8:56-58).  Also, the claims plainly state that the "data source compris[es] a network system."  Because, as explained above, the data source is remote from the vehicle, it follows that the "network system" must be as well.

#### 3.   "Information request system": Claims 1, 4, and 10

| Teledyne's construction: a dedicated system configured to enable a system user to request information via the first communication medium from the data source. |
| --- |

---

13

> **Honeywell's construction:** a system configured to enable a system user to request information.

Both parties base their proposed constructions on the same passage from the specification: "The <u>information request system</u> 102 is configured to enable a system user, . . . to request information from the data source 104 via the first communication medium 208." (Ex. 6, 5:32-35) (emphasis added).  While Teledyne's construction is virtually identical to this passage, Honeywell's construction ignores the second half of the sentence, <u>i.e.</u>, "via the first communication medium 208."

More importantly, the claims and the specification distinguish between a "data communications system" and the "information request system.  (<u>See</u> Ex. 6, claims 1, 3, 10-11; <u>see</u> <u>also</u> Ex. 6, abstract, ("The data communications system may be carried out in one form by a data communications system having a data source, <u>an information request system</u> coupled to the data source . . ."); and Appx. A, pgs. 39-41).  The "data communications system" can both send requests via the "information request system" <u>and</u> receive information via the "second communication medium."  If the "information request system" could also receive data, there would be no need for the patent to distinguish between the "data communications system" and the "information request system."

Finally, if the "information request system" were also able to receive data, why do claims 1, 4, and 10 include both an "information request system" and a "receiver"?  Honeywell's proposed construction thus also fails for rendering a later claim element superfluous.  <u>Innova/Pure</u>, 381 F.3d at 1119.

      4.    <u>"Transmission unit": Claims 1, 7 and 10</u>

> **Teledyne's construction:** a unit on an aircraft that transmits a request for data to the data source via the first communication medium.
>
> **Honeywell's construction:** a component through which information requests to the data source are transmitted.  In addition, the transmission unit may act as a receiver and receive signals from the data source.

1  Teledyne's construction of the term "transmission unit" is consistent with the

2  specification: "Information requests are transmitted to the data source 104 by the

3  transmission unit 206 via first communication medium."  (Ex. 6, 6:14-16).  In contrast,

4  Honeywell's construction simply ignores the second half of the sentence—"via first

5  communication medium."  It is also artificially broad.  Honeywell's construction

6  encompasses all "components" through which requests are transmitted.  Thus, according

7  to Honeywell, a cable might be a "transmission unit."  Clearly, this is not what was

8  intended.  Figures 2 through 5 show the "transmission unit""—206, 306, 406, and 506,

9  respectively—as being the unit from which the request is transmitted.

10  Finally, Honeywell's construction seeks to insert a new element into the term, i.e.,

11  that "the transmission unit may act as a receiver . . ."  As a threshold matter, Honeywell's

12  new element finds no support in the claims.  To the contrary, the claims call out the

13  "transmission unit" and a "receiver" as separate elements.  And, Honeywell's new

14  element undermines the distinction between the first and second communication media—

15  a distinction which, as discussed below, was critical in distinguishing the patent over the

16  prior art.

17  ### 5.   "Satellite data unit": Claims 1, 4, 5, 7, 8 and 10

18  **Teledyne's construction:** satellite transmitter unit that receives a request from the

19  information request system and generates a corresponding signal to be transmitted via satellite to the data source.

20  **Honeywell's construction:** a communications unit that facilitates communications via

21  satellite.

22  The plain language of the claims show that the "satellite data unit" does not merely

23  "facilitate[] communications via satellite," as Honeywell contends, but actually transmits

24  the request.  (Appx. A, pgs. 45-47).  Honeywell's construction also side-steps the

25  specification. Under the heading "SDU," the specification states that the "SDU receives

26  the request and generates a corresponding signal to be transmitted according to any

27  suitable satellite communication technique."  (Ex. 6, 6:67, 7:1-2).  Similarly, figure 8

28  (602) refers to the "satellite data unit" as the "satellite transmitter unit."

15

6.     <u>"Radio frequency unit": Claims 1, 4, 7, 8 and 10</u>

| |
|---|
| **Teledyne's construction:** a unit for providing conventional radio transmission signals to a ground station. |
| **Honeywell's construction:** a radio frequency communications unit. |

It is clear from each of the claims that the "radio frequency unit" is used for providing radio transmission signals to a ground station. (Appx, A, pgs. 48-51). The specification also shows that the "radio frequency unit" transmits conventional radio signals, as opposed to radio signals used, for example, in cellular, satellite or WiFi communication. (<u>See</u> Ex. 6, 4:1-4, ("the receiver 106 may be compatible with any appropriate communication medium, including radio, wireless LAN communications, satellite communications, or any other medium."); and Appx. A, pgs. 48-51).

7.     <u>"First communication medium": 1 and 10</u>

| Teledyne's construction: | *For claim 1*: a manner of communication defined in the third element of claim 1 (sub-paragraphs one and two) that is different from the second communication medium. *For claim 10:* a manner of communication defined in the third element of claim 10 (sub-paragraphs one to three) that is different from the second communication medium. |
|---|---|
| Honeywell's construction: | Any suitable media or combination of media for transmitting data requests from transmission unit to the data source. |

Teledyne's proposed construction of "<u>first communication medium</u>" adopts the definition given to the term by the claims themselves. The claims expressly define the term "<u>first communication medium</u>" as comprising "an aeronautical satellite system and a ground station . . . and a radio ground station. . ." (Ex. 6, 10:59-66). The claims also differentiate between a "first communication medium" and a "second communication medium." Moreover, numerous passages within the specification demonstrate that the "first" and "second" communication media must be different. (Appx. A, pgs. 52-54).

In fact, it was on the basis of Honeywell's amendment to include <u>two communication media</u> that the Examiner allowed the patent. The Examiner originally held that each as-filed claim of the '152 was anticipated by U.S. Patent No. 6,201, 797. (Ex. 7, Office Action, Feb. 6, 2002, p. 2). Honeywell overcame the rejection by

1  amending the claims to include "a <u>first communication medium</u> having both an

2  aeronautical satellite system and a radio ground station, [and] a <u>second communication</u>

3  <u>medium</u> comprising a direct broadcast satellite . . ."  (Ex. 8, Response to Office Action,

4  May 13, 2002, pp. 10, 17) (emphasis added).  It was because of this amendment that the

5  Examiner allowed the claims.  (Ex. 9, Reasons for Allowance, p. 2).

6       Ignoring all of this—the claim language, the specification and the file history—

7  Honeywell contends that the "<u>first communication medium</u>" can be "any suitable media

8  or combination of media."  However, the specification was not amended to reflect the

9  amended claims, Honeywell's arguments to the Examiner, and the Examiner's reasons for

10  allowance.  Accordingly, Teledyne's construction properly reflects the amended claims

11  and the prosecution history of the patent.

12       8.    "Aeronautical satellite system": Claims 1 and 10

| |
|---|
| **Teledyne's construction:** at least one satellite that is not a direct broadcast satellite, which is configured to receive data request signals from a transmission unit and forward or transmit the signals to a ground earth station. |
| **Honeywell's construction:** at least one satellite configured to receive data request signals from the transmission unit and forward or transmit the signals to a ground earth station. |

17       The parties' disagree as to whether an "aeronautical satellite system" can include a

18  "direct broadcast satellite."  The specification definitively distinguishes between an

19  "aeronautical satellite system" and a "direct broadcast satellite."  (Ex. 6, Fig. 3).  Indeed,

20  it is clear from figures 310 and 318 of Figure 3 that the patentee considered an

21  "aeronautical satellite system" and a "DBS satellite" to be different systems.  (<u>See</u> Appx.

22  A, pgs. 55-57).  In fact, it was only after Honeywell amended the claims to reflect this

23  difference that that the Examiner allowed the patent.  (Ex. 9, Reasons for Allowance, p.

24  2).

25        Additionally, to construe "aeronautical satellite system" as encompassing a "direct

26  broadcast satellite" would mean that the first and second communication media could be

27  the same.  This is because the claims expressly define the "second communication

28

1  medium [as] comprising a direct broadcast satellite." (Ex. 6, 11:4-5). For the reasons

2  discussed above, the first and second communication media must be different media.

> 9.     "Second communication medium": Claims 1 and 10

| **Teledyne's construction:** a method of communication defined in the fourth element of claim 1 that is different from the first communication medium. |
| **Honeywell's construction:** any medium, plurality or combination of media capable of transmitting information from the data source to the receiver. The first and second communication media may be the same or different media, or separate channels of the same medium. |

8       Teledyne's construction of "second communication medium" adopts the definition

9  given by the claims themselves, i.e., "a direct broadcast satellite." Phillips,

10  415 F.3d at 1312. And, for the reasons discussed above, Teledyne's construction

11  conforms to the specification and file history, wherein Honeywell categorically

12  distinguished between an "aeronautical satellite system" and a "direct broadcast satellite,"

13  and amended the claims to explicitly distinguish between the "first communication

14  medium" and the "second communication medium."

> 10.     "Direct broadcast satellite": Claims 1 and 10; "Broadcasting": Claim 4

| "Direct broadcast satellite"[4] | **Teledyne's construction:** a satellite that is not an aeronautical satellite, which broadcasts the same transmissions directly to all end-users and cannot receive transmissions from end-users. |
| | **Honeywell's construction:** a satellite that facilitates access to greater bandwidth than reliance solely on the telephone system and affords relatively high data transfer rates from the data source to the receiver. |
| "Broadcasting" | **Teledyne's construction:** requires no construction, but plain meaning is "sending the same transmissions to all." |
| | **Honeywell's construction:** transmitting. |

As discussed above, Honeywell amended the claims to distinguish between a "first

communication medium" and a "second communication medium," and defines an

_____

[4] The parties' constructions for the term "direct broadcast[ing] system" mirror their respective constructions for the term "direct broadcast satellite." Thus, the Court's

(footnote continued)

TELEDYNE'S OPENING CLAIM CONSTRUCTION BRIEF

"aeronautical satellite system" and a "direct broadcast system" differently in the specification. Teledyne's construction of "direct broadcast satellite" reflects this distinction, while Honeywell's does not. Under Honeywell's construction, the same satellite could be the first communication medium, the second communication medium, an aeronautical satellite system, and a direct broadcast system. Honeywell cannot regain by expansive construction what it surrendered by narrowing amendment and disclaimer in its specification.

Teledyne's construction also addresses the words "direct" and "broadcast" in "direct broadcast satellite," while Honeywell's does not. The references cited during prosecution (and which are therefore intrinsic evidence) illustrate that "direct" in this context means directly to all end-users, as opposed to being routed through a network. (Appx. A, pgs. 61-64). The same references also show that "broadcast" means that the same transmissions are sent to all end-users, as opposed to each end-user being sent a specially customized transmission. (Appx. A, pgs. 61-64).

This is also supported by the claims' and the specification's consistent use of the term "broadcast" with respect to "direct broadcast satellite," as opposed to the term "transmit" with respect to an "aeronautical satellite." (See Appx. A, pgs. 61-64). CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("we must presume that the use of . . . different terms in the claims connotes different meanings."). Here, the claims' differentiation between "broadcast" and "transmit" leads to a presumption that they have different meanings.

Moreover, it is evident from the prior art references cited during the prosecution (and which are therefore intrinsic evidence) that a person of ordinary skill at the art at the time of invention would have believed that a "direct broadcast satellite" could provide only one-way service, i.e., could not receive transmissions from end-users. For example,

---

construction of the term "direct broadcast satellite," above, will also resolve the parties'
    (footnote continued)

1  the Leuca reference provides that "broadband satellite systems, such as the Geo-

2  synchronous Earth Orbit (GEO) Digital Broadcast Satellite (DBS), are envisioned as

3  providing a <u>one-way</u> data service as the primary service. . ."  (Ex. 12, 4:49-52, 5:57-58;

4  <u>see also</u> Figure 2).

5       Honeywell's construction ignores all of this.  Not only does it conflate the

6  fundamental distinction between an "aeronautical satellite system" and a "direct broadcast

7  system," it fails to incorporate any notion of "directness" or "broadcasting."  Instead,

8  Honeywell once again relies on a passage from the specification that was not revised to

9  reflect the amended claims.  Indeed, the relevant passage (Ex. 6, 3:29) is directed to a

10  "satellite link," not a "direct broadcast satellite."

11       Honeywell also commits "one of the cardinal sins of patent law" by reading the

12  specification into the claims.  <u>Phillips</u>, 415 F.3d at 1320.  Nowhere do the claims mention

13  "access to greater bandwidth than reliance solely on the telephone system" or "relatively

14  high data transfer rates."

15           11.    <u>"Selecting": Claim 6</u>

16  | **Teledyne's construction:** selecting is done by the information request system. |
17  | **Honeywell's construction:** choosing. |

18       The parties' dispute with respect to this term is whether "selecting" must be done

19  by the information request system.  The specification defines that it must: "the

20  information request system 102 may select an appropriate transmission mechanism 510

21  for submitting requests to the data source . . ."  (Ex. 6, 10:13-15) .  Accordingly, the

22  Court should accept Teledyne's construction.

23           12.    <u>The "Systems" ("Radio Frequency System"; "Wireless LAN System";</u>

24                  <u>"Voice Channel System") of Claim 6</u>

25

26  _____

27  dispute over the term "direct broadcast[ing] system."

28

TELEDYNE'S OPENING CLAIM CONSTRUCTION BRIEF

1    The "systems" elements of claim 6 are indefinite and not susceptible to

2    construction.  Datamize LLC. v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir.

3    2005).  Nowhere in the specification does the inventor describe such systems, and a

4    person of ordinary skill in the art would thus have no idea what these "system" are

5    intended to include.  Alternatively, were the Court were to attempt to construe any of

6    these claim phrases, it is inherent that each of the "systems" would incorporate more than

7    one constituent part.  But as shown in the parties' joint chart, Honeywell's constructions

8    do not explain what each "system" is, and should be rejected.

9    **C.    The '468 Patent**

10        1.    "System Server":  Claims 1, 2, 7, 9, 12, 13 and 15

| |
|---|
| **Teledyne's construction:** a remote hardware storage device that obtains and stores data updates and sends data updates to a vehicle server via a data connection. |
| **Honeywell's construction:** a device or computer system or software that includes an administrative application/program, a database and an interface application. |

14    The asserted claims of the '468 patent are directed to "a method of providing a data

15    update to a vehicle," wherein the update is sent from a system server to a vehicle server.

16    (Ex. 13, 10:35-36).  This implies that the two servers are located in disparate locations,

17    with the vehicle server being in the vehicle and the system server being located remote

18    from the vehicle.  Figure 1 supports this construction, depicting the "system server 102"

19    remotely from the vehicle.  (Ex. 13, Fig. 1).  The plain language of the claims also

20    requires that the system server be capable of "obtain and storing" data updates and

21    "sending" data updates to a vehicle server "via a data connection."  (Ex. 13, 10:37, 39,

22    7:35).

23    By contrast, Honeywell's construction should be rejected because it improperly

24    incorporates details from the preferred embodiment, including "an administrative

25    application/program 106, a database 104 and an interface application 108," without any

26    support in the claims  (Ex. 13, 3:57-64, 4:38-43).  Phillips, 415 F.3d at 1320.

27        2.    "Vehicle Server":  Claims 1, 2, 7, 9, 12, 13 and 15

| |
|---|
| **Teledyne's construction:** a hardware storage device for use in a vehicle that is capable |

TELEDYNE'S OPENING CLAIM CONSTRUCTION BRIEF

> of receiving data updates from the system server and loading the data updates in a component that is separate from the vehicle server.
>
> **Honeywell's construction:** any hardware or software device that is capable of receiving data updates from the system server and loading the updates in a component.

The only dispute between the parties' concerning "vehicle server" is whether the "component" into which it loads updates must be separate from the vehicle server. The plain language of the claims makes clear that it must be, because if the "vehicle server" is also the "component," then the "system server" would be the hardware device performing the loading and verifying steps of the claim. But, the third element of claim 1, for example, states that the <u>vehicle</u> server performs the loading step, not the <u>system</u> server: "loading said data update <u>from said vehicle server into a component</u> <u>at said vehicle</u>." (Ex. 13, 10:41-42) (emphasis added). This language cannot be ignored. Teledyne's construction is also supported by the specification, which describes and depicts the "vehicle server" and "component" as separate devices. (Ex. 13, 5:18-22, 5:29-31, Fig. 1).

### 3. "Data Connection": Claims 1, 2, 7, 9, 12, 13 and 15

> **Teledyne's construction:** a digital communication medium for transferring data updates.
>
> **Honeywell's construction:** any type of wireless, optical or electrical data connection.

A potential reading of Honeywell's proffered construction may encompass the prior art "data connection" that is disclaimed in the specification of the '468 patent. (Ex. 13, 1:50-2:12). Indeed, Honeywell has suggested that the '468 patent may cover one prior art "electrical data connection" involving the use of a USB thumb drive to "manually load the data update." Accordingly, the Court should reject Honeywell's construction in favor of Teledyne's. <u>Phillips</u>, 415 F.3d at 1316 ("the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.").

### 4. "Component": Claims 1, 2 and 7

> **Teledyne's construction:** a vehicle hardware device that is separate from the vehicle server and that receives data updates from the vehicle server and uses the data updates to perform a function.
>
> **Honeywell's construction:** any avionics or other aircraft device such as a flight

management computer, flight management system, global positioning system, navigation computer or the like.

The parties dispute two aspects of the construction for this term.  First, the parties dispute whether the "component" is <u>separate</u> from the vehicle server.  As explained above with respect to the claim term "vehicle server," the claim language and specification make clear that the "component" is <u>separate</u> from the vehicle server.  (Ex. 13, 5:18-22, 5:29-31, Fig. 1).  Second, the parties dispute whether the "component" must "<u>use</u> the data updates to perform a function."  The specification clearly requires that the "component" use data updates to perform a function:  the "[c]omponent 118 . . . suitably uses data upgrades from data source 101 to perform a function."  (Ex. 13, 5:45-54).  Indeed, it is nonsensical to suggest that the "component" is a mere storage vessel for data.

### 5. "Loading," "Verifying" and "Receiving" Steps

(a) "Loading Said Data Update From Said Vehicle Server Into A Component At Said Vehicle":  Claims 1, 2 and 7

**Teledyne's construction:** a vehicle server extracts, processes, and saves a data update in a component for further processing and use by the component.

**Honeywell's construction:** loading the data update from the vehicle server into the vehicle component.

The plain language of the claims requires the vehicle server "load" a data update into a component.  Taken in the context of the claim, it is inherent that "loading" requires more than merely transferring data from a vehicle server to a component.  Rather, the plain meaning of the "loading" step requires the vehicle server to extract, process and save data updates in a component, and consistent with Teledyne's proposed construction of "component," the data updates must be processed and used by the component.  These details are supported by the specification.  (Appx. A, pgs. 76-77).

(b) "Verifying From Said Vehicle Server To Said System Server Via Said Data Connection That Said Loading Step Completed Successfully":  Claims 1, 2 and 7

**Teledyne's construction:** after the data update is loaded into the appropriate

TELEDYNE'S OPENING CLAIM CONSTRUCTION BRIEF

| |
|---|
| component, the vehicle server determines whether the load was successful and sends the result of this check to the system server via the same data connection used to transmit the data update to the vehicle server in the second element of claim 1. |
| **Honeywell's construction:** transmitting a signal from the vehicle server to the system server via a data connection indicating that the loading step completed successfully. |

The parties dispute two aspects of the construction for this phrase. First, the parties dispute whether the "vehicle server" itself is required to perform the check for successful load. Second, the parties dispute whether the result of the check must be sent to the system server using the <u>same</u> data connection that was used to transmit the data update to the vehicle server in the second element of claim 1. The plain language of the claims supports Teledyne's proposed construction. Indeed, the "verifying" step of claim 1 originates "<u>from said vehicle server</u>," and uses "<u>said data connection</u>" to transmit the check to the system server. (Ex. 13, 10:43-44) (emphasis added). This construction is also supported by the specification. (Appx. A, pgs. 76-77).

      (c)    "Receiving A Confirmation From Said Vehicle Server Via Said Data Connection When Said Data Update Is Successfully Loaded": Claims 9, 12, 13 and 15

| |
|---|
| **Teledyne's construction:** after the data update is loaded into the appropriate component, the vehicle server determines whether the load was successful and sends the result of this check to the system server via the same data connection used to transmit the data update to the vehicle server in the second element of claim 9. |
| **Honeywell's construction:** receiving a signal from the vehicle server to the system server via the data connection indicating that the loading step completed successfully. |

Both parties' constructions for this phrase are essentially the same as their construction for the "verifying" step discussed above. Accordingly, as explained above, the Court should adopt Teledyne's construction because it is consistent with the plain language of the claims and is supported by the specification.

      6.   <u>"Digital Storage Medium": Claims 7, 13 and 15</u>

| |
|---|
| **Teledyne's construction:** a remote hardware device on which computer-executable instructions can be stored. |
| **Honeywell's construction:** a medium that can store digital information. |

TELEDYNE'S OPENING CLAIM CONSTRUCTION BRIEF

As explained above with respect to the phrase "system server," each of the claims of the '468 patent generally describe a <u>remote</u> "system server" that provides data updates to a vehicle.  Consistent with that analysis, the proper construction for the term "digital storage medium" in the context of the claims is "a <u>remote</u> hardware device on which computer-executable instructions can be stored."

### 7. <u>"Operable To Execute The Method": Claims 7, 13 and 15</u>

| **Teledyne's construction:** must execute each step of the method. |
| **Honeywell's construction:** able to cause one or more applications, processes, processors or devices to perform the steps. |

The "digital storage medium" has computer-executable instructions that are "operable to execute the method" of the '468 patent.  Accordingly, the plain language of the claims makes clear that this device must execute each and every step of the method.  No other construction is suggested by the plain language of the claims.

### 8. <u>"At A Pre-Determined Time":  Claims 9, 12, 13 and 15</u>

| **Teledyne's construction:** scheduled in advance. |
| **Honeywell's construction:** at a time that is determined in advance, or that is determined by a program in accordance with pre-determined rules based on user inputs and/or data in a database. |

The parties do not dispute that the plain language of these claims requires the system server to transmit a data update at a specific time that is scheduled in advance.  Honeywell's construction, however, unnecessarily incorporates details from the specification into its construction, including "or that is determined by a program in accordance with pre-determined rules based on user inputs and/or data in a database." (Ex. 13, 6:13-15).

DATED:  November 19, 2007      QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

                                         /s/ Steven M. Anderson
                                     Steven M. Anderson
                                     Attorneys for Plaintiff and Counter-Defendant
                                     Teledyne Technologies, Incorporated