KIRKLAND & ELLIS LLP
Robert G. Krupka, P.C. (S.B.N. 196625)
rkrupka@kirkland.com
Luke L. Dauchot (S.B.N. 229829)
ldauchot@kirkland.com
Ephraim D. Starr (S.B.N. 186409)
estarr@kirkland.com
777 South Figueroa Street
Los Angeles, California  90017
Telephone:   (213) 680-8400
Facsimile:    (213) 680-8500

Attorneys for Defendant-Counterclaimant
HONEYWELL INTERNATIONAL INC.
and Counterclaimant HONEYWELL
INTELLECTUAL PROPERTIES INC.

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| TELEDYNE TECHNOLOGIES INC., a Delaware corporation, | Case No. CV 06-06803 |
| Plaintiff, | Assigned to: Hon. Margaret M. Morrow |
| vs. | |
| HONEYWELL INTERNATIONAL INC., a Delaware corporation, | **HONEYWELL'S *MARKMAN* RESPONSIVE BRIEF (PUBLIC VERSION)** |
| Defendant. | |
| HONEYWELL INTERNATIONAL INC. and HONEYWELL INTELLECTUAL PROPERTIES INC., a Delaware corporation, | Date:   January 28, 2008<br>Time:   9:00 a.m.<br>Place:  Courtroom 780 |
| Counterclaimants. | |
| vs. | |
| TELEDYNE TECHNOLOGIES INC., a Delaware corporation, | **(CONFIDENTIAL VERSION FILED UNDER SEAL)** |
| Counterdefendant. | |

# TABLE OF CONTENTS

Page No.

I.  INTRODUCTION..........................................................................1

II.  RESPONSIVE LEGAL STANDARDS .........................................2

III.  THE '990 PATENT.....................................................................4

A.  '990 CLAIMS 1, 8, 14, 15, 18, 19 AND 33 DO NOT CAPTURE A SYSTEM THAT INITIATES COMMUNICATION AFTER, RATHER THAN UPON, LANDING...............................................................................4

1.  "Communication is initiated when at least the second sensor senses the landing" (claim 1) ................................................4

2.  "Cellular infrastructure is accessed in response to the signal" (claims 18, 19 and 33) ................................................................10

3.  "Initiated automatically upon landing" (claims 8 and 14) ................11

B.  THE MEANS-PLUS-FUNCTION LIMITATIONS (CLAIM 15) ...........................12

1.  "Sensing means for sensing a landing"................................13

2.  "Means for transmitting" / "Means for receiving" ...........................13

C.  THE REMAINING '990 TERMS ARE IDIOSYNCRATIC OR TECHNICAL ........14

1.  "Flight data" (all claims)..........................................................15

2.  "Data acquisition unit" (all claims).......................................16

3.  "Flight operations center ('FOC')" (dep. claims 20-21)...................16

4.  "Cellular infrastructure" (all claims).....................................17

5.  "Plurality of cell channels in communication with said serial card" (claims 8 and 14) ................................................................18

6.  "Data thread" (claim 25) ......................................................19

IV.  THE '152 AND '468 PATENTS ...............................................20

A.  THE SPECIFICATION AND PROSECUTION HISTORY DO NOT SUPPORT TELEDYNE'S PROPOSED CONSTRUCTIONS FOR THE '152 PATENT .............20

1.  First and second communication mediums....................20

2.  Aeronautical satellite system.............................................21

## TABLE OF CONTENTS (CONT'D)

Page

3.   Direct broadcast satellite (DBS)........................................................22

4.   "Network system" (claims 1, 4 and 10) ...........................................23

5.   "Transmission unit" (claims 1, 4, 7 and 10) ....................................23

**B.   THE SPECIFICATION EXPRESSLY DEFINES THE ONLY TERMS OF THE '468 PATENT THAT REQUIRE CONSTRUCTION .......................................24**

1.   "Vehicle server" (claims 1 and 9) .....................................................24

2.   "Component" (claim 1) ......................................................................24

**V.   CONCLUSION .......................................................................................................25**

1

# TABLE OF AUTHORITIES

2

Page No.

3

**CASES**

4

*Biomedino, LLC v. Waters Techs. Corp.*,
    490 F.3d 946 (Fed. Cir. 2007) ............................................................................3

5

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    296 F.3d 1106 (Fed. Cir. 2002) .........................................................................13

6

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002) ...........................................................................2

7

8

*Chimie v. PPG Indus., Inc.*,
    402 F.3d 1371 (Fed.Cir.2005) .............................................................................3

9

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005) .........................................................................13

10

11

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
    535 U.S. 722, 122 S. Ct. 1831, 152 L. Ed. 944 (2002) ........................................2

12

*Glaxo Wellcome, Inc. v. Impax Labs., Inc.*,
    356 F.3d 1348 (Fed. Cir. 2004) ...........................................................................9

13

14

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241 (2005) ........................................................................................13

15

*In re Freeman*,
    30 F.3d 1459 (Fed. Cir. 1994) ...........................................................................12

16

17

*In re Paulsen*,
    30 F.3d 1475 (Fed. Cir. 1994) ...........................................................................11

18

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*,
    381 F.3d 1111 (Fed. Cir. 2004) .........................................................................11

19

20

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed.Cir.1995) .................................................................................3

21

*Parker & Whipple Co. v. Yale Clock Co.*,
    123 U.S. 87, 8 S.Ct. 38, 31 L. Ed. 100, (1887) ...................................................9

22

23

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...........................................................................2

24

*Pickholtz v. Rainbow Techs., Inc.*,
    284 F.3d 1365 (Fed. Cir. 2002) .........................................................................10

25

26

*PODS, Inc. v. Porta Stor, Inc.*,
    484 F.3d 1359 (Fed. Cir. 2007) .........................................................................12

27

28

## TABLE OF AUTHORITIES (CONT'D)

Page(s)

*Quantum Corp. v. Rodime, PLC,*
   65 F.3d 1577 (Fed. Cir. 1995) ................................................................ 12

*Raytheon Co. v. McData Corp.,*
   No. 2:03-CV-013, 2004 WL 952284 (E.D. Tex. Feb. 10, 2004) ...................... 13

*Renishaw PLC v. Marposs Societa' per Azioni,*
   158 F.3d 1243 (Fed. Cir. 1998) ................................................................ 6

*Rheox, Inc. v. Entact, Inc.,*
   276 F.3d 1319 (Fed. Cir. 2002) ................................................................ 8

*SanDisk Corp. v. Memorex Prods., Inc.,*
   415 F.3d 1278 (Fed. Cir. 2005) ................................................................ 7

*Schering Corp. v. Amgen Inc.,*
   222 F.3d 1347 (Fed. Cir. 2000) ................................................................ 9

*Schriber-Schroth Co. v. Cleveland Trust Co.,*
   311 U.S. 211, 61 S. Ct. 235, 85 L. Ed. 132 (1940) .................................... 6

*Shoenhaus v. Genesco, Inc.,*
   440 F.3d 1354 (Fed. Cir. 2006) ................................................................ 6

*Southwall Techs., Inc. v. Cardinal IG Co.,*
   54 F.3d 1570 (Fed. Cir. 1995) ................................................................. 7

*Standard Oil Co. v. Am. Cyanamid Co.,*
   774 F.2d 448 (Fed. Cir. 1985) ................................................................. 7

*Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n,*
   109 F.3d 726 (Fed. Cir. 1997) ................................................................. 16

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed.Cir.1996) ................................................................... 2

*WMS Gaming, Inc. v. Int'l Game Tech.,*
   184 F.3d 1339 (Fed. Cir. 1991) ................................................................ 14

**STATUTES**

35 U.S.C. § 112(6) ................................................................................. 13

35 U.S.C. § 132 ..................................................................................... 9

35 U.S.C. § 305 ..................................................................................... 12

## TABLE OF AUTHORITIES (CONT'D)

Page(s)

**OTHER AUTHORITIES**

1 THE OXFORD ENGLISH DICTIONARY 805 (2nd ed. 1989) ............................................ 11

3RD GENERATION PARTNERSHIP PROJECT, VERSION 3.0.0, TECHNICAL
    SPECIFICATION GROUP SERVICES AND SYSTEM ASPECTS;
        VOCABULARY FOR 3GPP SPECIFICATIONS (3G TR 21.905) (2000) ..................... 18

SAE DICTIONARY OF AEROSPACE ENGINEERING 679 (1992) ........................................ 13

## I.   __INTRODUCTION__

At the onset of this case, Teledyne characterized the '990 patent claim terms as straightforward:  "I don't believe your Honor is going to find serious claim interpretation issues in the parent '990 patent."[1]  Today, Teledyne urges that no less than *fifteen* '990 claim terms require construction beyond their plain meaning, including the six Landing Terms that form the "central dispute between the parties."[2]

Initially, Teledyne explained its invention as follows:  "What happens is *as soon as the plane lands*, the system provides that *the data is automatically downloaded* from the black box to the server."[3, 4]  But what Teledyne describes today is a system that downloads semi-automatically after—no matter how long after—the aircraft has landed.

To obtain foreign patent protection, Teledyne asserted that "the '990 patent does not teach, suggest or disclose receiving *maintenance and diagnostic data* from a plurality of *avionics and/or electronic engine control line replaceable units* and downloading such data … ."[5]  Today, Teledyne maintains that its '990 patent unambiguously *does* claim these things.[6]

Teledyne's inconsistent positions violate the public policy underlying patents:

The patent laws "promote the Progress of Science and useful Arts" by rewarding innovation with a temporary monopoly.  The

---

[1] Hr'g Tr. 19-20, May 7, 2007.

[2] Pl.'s Br. 4.

[3] Hr'g Tr. 4-5, May 7, 2007.

[4] Unless otherwise indicated, all emphasis appearing in this brief has been added.

[5] File History of U.K. Patent Application No. 0323990.2, Teledyne's 1/14/2006 Rsp. to the U.K. Patent Office Examination Report 2 (emphasis in original) (Def.'s Br, Starr Decl., Ex. E).

[6] *See* Teledyne's Supp. Preliminary Infringement Chart 5 (Starr Decl, Ex. M). ("Honeywell's ECTM-DD [Engine Condition Trend Monitoring Data Downloader] collects data relating to flight or performance of aircraft systems or components during flight from at least Honeywell's DEEC [Digital Electronic Engine Controller].").

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

> monopoly is a property right; and like any property right, its
> boundaries should be clear. … A patent holder should know what he
> owns, and the public should know what he does not.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 730, 122 S. Ct. 1831, 1837, 152 L. Ed. 944, 954 (2002) (quoting U.S. CONST. art. I, § 8, cl. 8.).

## II.   RESPONSIVE LEGAL STANDARDS

On the fundamentals, Honeywell and Teledyne agree:  "Claim terms 'are generally given their ordinary and customary meaning'"; "[i]f a claim term requires construction, and the claim language has been considered, '[t]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history'"; and "[o]nly when the prosecution history demonstrates that the inventor 'limited the invention in the course of prosecution,' may the Court construe 'the claim scope narrower than it would otherwise be.'"[7]  And, of course, claim terms need to be read in the context of the entire patent and its prosecution history.[8]

The Federal Circuit's *en banc Philips* decision and other cases provide the following approach for how, and whether, claim terms should be interpreted:

**1)**   What is the claim term's ordinary and customary meaning to a person of ordinary skill in the art ("POSITA")?[9]

---

[7] Pl.'s Br. 1-2 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13, 1315, 1317 (Fed. Cir. 2005) (emphasis omitted)).

[8] *See Phillips*, 415 F.3d at 1313 ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").

[9] *See Phillips*, 415 F.3d at 1312-113 ("the words of a claim 'are generally given their ordinary and customary meaning.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *see also Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the (Continued…)

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

> **a)** Is the ordinary meaning readily apparent even to lay persons?[10]
>
> **b)** If not, does the balance of the patent provide the meaning that a POSITA would recognize, whether alone or in combination with reliable extrinsic evidence (*e.g.*, technical treatises)?[11]

**2)** Is there any reason to depart from the "'heavy presumption' that [the] claim term carries its ordinary and customary meaning"?[12]

> **a)** Does an express definition in the patent trump the plain meaning?[13]
>
> **b)** Is the term a means-plus-function limitation?[14]
>
> **c)** Does the prosecution history limit the claim?[15]

---

invention, i.e., as of the effective filing date of the patent application.").

[10] *See Phillips*, 415 F.3d at 1313 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. . . . In such circumstances, general purpose dictionaries may be helpful.").

[11] *See id.* ("Although we have emphasized the importance of intrinsic evidence in claim construction, we have also authorized district courts to rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.") (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)).

[12] *CCS Fitness*, 288 F.3d at 1366.

[13] *See Phillips*, 415 F.3d at 1316 ("the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs.") (citing *CCS Fitness*, 288 F.3d at 1366).

[14] *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007) ("[I]n return for generic claiming ability, the applicant must indicate in the specification what structure constitutes the means.").

[15] *See Phillips*, 415 F.3d at 1317 ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (quoting *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed.Cir.2005) (internal quotations omitted)).

III.    **THE '990 PATENT**

A.      **'990 Claims 1, 8, 14, 15, 18, 19 And 33 Do Not Capture A System That Initiates Communication After, Rather Than Upon, Landing**

In addressing Honeywell's position on what Teledyne labels the "central dispute between the parties," Teledyne overlooks that the majority of Honeywell's proposed constructions begin with the statement, "***Honeywell believes this claim phrase does not require construction . . .*" [16]  With this omission at its roots, Teledyne's Opening Brief then sets up dueling constructions—not between Teledyne's proposed constructions and Honeywell's principal position that the claim language speaks for itself—but between Teledyne's proposed constructions and Honeywell's proposed *alternate* constructions, should the Court deem additional construction necessary.[17]  In this manner, Teledyne attempts to sidestep the question of why the plain meaning of these disputed terms should not apply.

1.      **"Communication is initiated when at least the second sensor senses the landing" (claim 1)**

Teledyne initially construed this phrase as "communication is initiated after at least a second sensor senses information *associated with the aircraft having landed.*"[18] When it filed its Opening Brief, it changed its mind.  To use Justice Bradley's metaphor, Teledyne twisted the "nose of wax" by changing the italicized portion to "*signaling the aircraft has landed.*" [19]  Undoubtedly, Teledyne perceived an advantage in the change.  But it makes no difference:  Teledyne's substitution of

---

[16] Stipulated Joint Claim Construction Chart, Honeywell's Proposed Construction, Ex. A *passim* (Doc. No. 30).

[17] *Compare id. with* Pl.'s Br. 3-4, 13-18, 20-25.  The omission is inexplicable and Teledyne cannot justify it on the basis of a 25 page limitation.  Not only did Teledyne fail to allude to Honeywell's true constructions in so much as a footnote in its Opening Brief, but it even failed to include Honeywell's true constructions in its 84 page appendix.

[18] Stipulated Joint Claim Construction Chart, Teledyne's Proposed Construction, Ex. A at 2.

[19] *Compare Id. with* Pl.'s Br. 3.

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

1  "when" with "after," and "the landing of the aircraft" with "information signaling the

2  aircraft has landed," are flawed.

3  Applying established rules of claim construction, this claim phrase carries its

4  plain meaning and requires no further interpretation.  "When," "senses," and

5  "landing" are words whose meanings lay persons understand, and there is nothing in

6  the intrinsic record to justify departure from the heavy presumption that these words

7  carry their ordinary and customary meanings.  To the contrary, the prosecution history

8  contradicts the positions Teledyne now takes.  And none of Teledyne's three

9  explanations for such a departure overcome the heavy presumption that these words

10 mean what they say.

11 **#1      Teledyne cannot expand the Landing Terms by arguing that its**

12 **construction "naturally aligns with the specification." (Pl.'s Br. 4.)**

13 This argument fails for three reasons.  First, in the face of unambiguous claim

14 language that is plain to POSITAs and lay persons, and is not otherwise expressly

15 defined, the claim language controls, period.  Second, what Teledyne labels as

16 "aligning" is euphemistic for changing:  moving claim boundaries to capture territory

17 to which it is not entitled.  In trying to have its patent capture systems that initiate

18 communication after the plane has landed, Teledyne reads a temporal limitation out of

19 the claim.  "Initiated *when* at least the second sensor senses the landing" defines the

20 point when communication is triggered; "initiated *after*" doesn't.  Moreover, it begs

21 the question, *how long after* landing is the communication initiated?  Teledyne urges

22 that it can be as far away from landing as a point in time when the aircraft is "sitting

23 on the ground after a flight."[20]  But that position runs afoul of other parts of the

24 specification, which includes criticism of prior art that "requires that the aircraft be

25

26 _____

   [20] Pl.'s Br. 5.  Teledyne also points to the clip art aircraft picture in Figure 1 as supportive of

27 when cellular transmission is initiated.  Assuming that the depicted craft is indeed parked, the issue
   is not *whether data transmission can take place while the craft is parked*, the issue is *when is*

28 *transmission initiated*.

docked at the gate before transmission begins, thereby resulting in a substantial delay." ('990 col.1 ll.48-50) (Def.'s Br., Starr Decl., Ex. A.)  Grasping for some language to support its construction, Teledyne points to a specification passage that discloses a "cellular infrastructure in communication with the data communications unit after the aircraft has landed."  (Pl.'s Br. 5.)  But this provision says nothing about when communication with the cellular infrastructure is *initiated*—and cannot change the language of the claim in any event.  *See, e.g., Shoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1359 (Fed. Cir. 2006) ("[W]here a patent specification includes a description lacking a feature, but the claim recites that feature, the language of the claim controls.").

Finally, Teledyne's position conflicts with clear Federal Circuit precedent construing "when" to mean "at the time of, and not some appreciable time thereafter." *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1252 (Fed. Cir. 1998). *Renishaw* discusses the claim limitation "generating a trigger signal when said sensing tip contacts an object" in the context of a device where signaling delay is undesirable. *Id.* at 1246, 1253.  The '990 patent presents an analogous circumstance:  it expresses the undesirable delay of the prior art systems ('990 col.1 ll.33-39, 46-50), and expressly discloses as its sole embodiment a "weight-on-wheels signal, which acts as an interrupt signal to … initiate transmission."  (*Id.* at col.3 ll.27-29.)

**#2     Teledyne misrepresents the prosecution history in arguing that "nothing in the '990 patent's prosecution history demonstrates an intent by the inventors to limit the '990 patent to transmission immediately upon touching down." (Pl.'s Br. 5.)**

As the Supreme Court articulated in *Schriber-Schroth,* "[i]t is a rule of patent construction *consistently observed* that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and *the claims allowed cannot by construction be read to cover what was thus eliminated from the patent*."  *Schriber-Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 220-21, 61 S. Ct. 235, 239, 85 L. Ed. 132, 137 (1940).  The doctrine of "prosecution

1    disclaimer" precludes patentees "from recapturing through claim interpretation
2    specific meanings disclaimed during prosecution."  *SanDisk Corp. v. Memorex*
3    *Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005) (quoting *Omega Eng'g, Inc. v.*
4    *Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)); *see also Southwall Techs., Inc.*
5    *v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("[c]laims may not be
6    construed one way in order to obtain their allowance and in a different way against
7    accused infringers"); *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed.
8    Cir. 1985) (prosecution history "limits the interpretation of claims so as to exclude
9    any interpretation that may have been disclaimed or disavowed during prosecution in
10   order to obtain claim allowance").

11         In effort to get around the prior art, Teledyne amended the very terms at issue
12   not once, but twice.  During the original prosecution, the Examiner cited Bailey,
13   which disclosed a vehicle transmitting on the ground, and pointed out that "data
14   transmission occurring after the aircraft has landed is in no way different from data
15   transmission occurring in any other land vehicle."  (Def.'s Br. 7-8.)  In response,
16   Teledyne amended claim 1 by adding the "upon landing" limitation.  (*See id*.)  This
17   was a clear and unmistakable surrender.  And during reexamination, Teledyne
18   submitted the following amendment to avoid Wright and Ross:

19              1. (twice amended): An aircraft data transmission system … a
20         cellular infrastructure in communication with said communications
21         unit after the aircraft has landed, <u>wherein the cellular infrastructure</u>
22         <u>communicates said flight data, and</u> wherein the communication is
23         initiated [automatically upon] <u>when at least the second sensor senses</u>
24         the landing of the aircraft; …[21]

25   This was a second clear and unmistakable surrender of "initiation" "after the aircraft

---

[21] '990 Reexam. File History, 10/03/2005 Notice of Intent to Issue Ex Parte Reexam. Cert.,
Attachment to PTOL 476 (additions underlined and deletions in brackets) (Def.'s Br., Starr Decl.,
Ex. C).

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

has landed."  In further amending the claims as above, Teledyne told the USPTO that "neither U.S. Patent No. 5,351,194 to Ross et al. (Ross) nor U.S. Patent No. 6,047,165 to Wright, et al. (Wright) teaches or suggests, 'at least a second sensor configured to sense a landing of the aircraft,' as recited in amended claim 1."[22]  Yet Wright uses the phrase "has landed" in the same context that Teledyne now seeks to recapture through claim construction:  "Once an aircraft *has landed* and is within communication range of the ground subsystem, the wireless router receives flight performance data via the wireless ground data link from an aircraft's [ground data link] unit."[23]  The manner in which Teledyne distinguished Ross also shows a disclaimer of what Teledyne now seeks to regain through claim construction:  initiation of transmission after the aircraft has landed.  Ross discloses, "*After the aircraft has landed* the second switch 14 communicates with the controller 10 to cancel 58 the flight plan."[24]  The foregoing amounts to prosecution disclaimer, plain and simple.  *Standard Oil Co.*, 774 F.2d at 452; *Schriber-Schroth Co.*, 311 U.S. at 220-21, 61 S. Ct. at 239, 85 L. Ed. at 137. And assuming Teledyne could point to an embodiment in the specification that supports a departure from the plain language of the claim (which it cannot), the prosecution disclaimer of such an embodiment trumps the specification.  *See Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1326-27 (Fed. Cir. 2002) ("Reading the written description alone, this argument might be effective, but in light of the prosecution history, which was generated after the written description was drafted, it is apparent that Rheox relinquished any coverage of [the embodiment].").

**#3    Teledyne is also wrong that requiring initiation of transmission "when" or "upon" the landing event renders "at least" in "when _at least_ the second sensor senses the landing" superfluous because it does not allow for additional sensors to sense the landing of the aircraft.  (Pl.'s Br. 5-6.)**

---

[22] *Id.*, 9/21/2005 Supp. Amend. And Rsp. To Office Action In Ex Parte Reexam. 9.

[23] U.S. Patent No. 6,047,165 col.2 ll.57-60 (Starr Decl., Ex. N).

[24] U.S. Patent No. 5,351,194 col.5 ll.52-54 (Starr Decl., Ex. O).

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

1       This argument fails for four reasons.  First, it incorrectly presumes that "at least

2   the second sensor senses the landing of the aircraft" necessarily contemplates more

3   than one sensor sensing landing[25], rather than additional sensors undertaking tasks

4   other than detecting the landing.  As a point of context, the claim recites "at least a

5   first sensor" that gathers flight data.  Second, both the plain meaning of the phrase and

6   even Honeywell's alternate "touching down" construction allow for the use of more

7   than one weight-on-wheels signal, for example, "three landing gear Weight-on-

8   Wheels (WOW) switches" capable of "chang[ing] from Air to Ground within 0.25

9   seconds of each other."[26]  Third, as Teledyne itself argues, other sensors besides

10  weight-on-wheels could be used to sense the touching down of an aircraft—*e.g.*, "the

11  spinning of the wheels."  (Pl.'s Br. 4)  And fourth, the premise that claim construction

12  should not render claim language superfluous (which it does not do here in any event)

13  does not apply when the patent's context does not support it.  *Pickholtz v. Rainbow*

---

14      [25] In any case, construing the claims to cover such sensors invalidates the claims under 35 U.S.C.

15  § 132 ("[n]o amendment shall introduce new matter into the disclosure of the invention"), a matter
    that can be addressed on summary judgment unless the Court prefers to address it sooner.  "The new

16  matter doctrine prevents an applicant from adding new subject matter to the claims unless the
    specification shows that the inventor had support for the addition at the time of the original filing."

17  *Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1354 (Fed. Cir. 2004).  "[T]o avoid the
    new matter prohibition, an applicant must show that its original application supports the amended

18  matter."  *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1352 (Fed. Cir. 2000).  New matter is
    properly added by another patent application, not amendment to the specification or claims:

19

20          '[N]o new matter shall be introduced into the specification.' This prohibition is
            general, relating to all patents; and by 'new matter' we suppose to be meant

21          new substantive matter, such as would have the effect of changing the
            invention, or of ***introducing what might be the subject of another application***

22          ***for a patent***. … ***The legislature … was not willing to give him the right to***
            ***patch up his patent by the addition of other inventions***, which, though they

23          might be his, had not been applied for by him, or, if applied for, had been
            abandoned or waived. For such inventions he is required to make a new

24          application, subject to such rights as the public and other inventors may have
            acquired in the mean time.

25

26  *Parker & Whipple Co. v. Yale Clock Co.*, 123 U.S. 87, 100-01, 8 S.Ct. 38, 45, 31 L. Ed. 100, 106
    (1887).

27      [26] Def. Br.'s 6 (citation therein).

28

*Techs., Inc.,* 284 F.3d 1365, 1373 (Fed. Cir. 2002) ("Although we would typically be inclined to give meaning to the word 'system,' rather than regard it as surplusage, the patent in this case provides no indication that the two terms mean different things.") (citation omitted).

### 2. "Cellular infrastructure is accessed in response to the signal" (claims 18, 19 and 33)

This claim phrase, too, carries its plain meaning and requires no further construction.  The context in the claims is similar to that of claim 1:  "receiving a signal indicating a landing of the aircraft from at least a second sensor; ... and transmitting said processed data via a cellular infrastructure after the aircraft has landed, wherein the cellular infrastructure is accessed in response to the signal."  ('990 claims 18-19, 33.)[27]  Thus, while the processed data is transmitted after landing, the infrastructure is ***accessed in response to the signal indicating a landing of the aircraft***, or alternatively, "***in response to the signal indicating that the aircraft is touching down.***"[28]  "In response to," "signal," and "landing" are all terms whose meanings are readily apparent to lay persons (as underscored by the dictionary definitions)[29], and there is nothing in the intrinsic record to justify departure from the heavy presumption that these words carry their ordinary and customary meanings. (Pl.'s Br. 4-6.)  The specification is again in accord through its disclosure of a "weight-on-wheels signal" to trigger the transmission.  ('990 col.3 ll.27-29).

Teledyne, on the other hand, urges the Court to replace "***accessed in response to the signal***" with "***only accessed after receiving*** the signal."  This request to broaden the reach of its claims is improper and groundless.  *See, e.g.,* Def.'s Br. 10-11 (citing cases); *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d

---

[27] Claim 18 has minor differences that do not effect the analysis.

[28] Stipulated Joint Claim Construction Chart, Honeywell's Proposed Construction, Ex. A 9-13.

[29] *See* Def.'s Br. 11.

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

1111, 1119 (Fed. Cir. 2004) ("all claim terms are presumed to have meaning").
Moreover, as discussed under claim 1, Teledyne disclaimed unbounded coverage of
transmission "after the aircraft has landed."[30]

### 3.   <u>**"Initiated automatically upon landing" (claims 8 and 14)**</u>

#### (a)   **"Upon landing"**

As with all of the Landing Terms, this claim phrase carries its plain meaning
and requires no further construction.[31]  The claim context confirms that, quite apart
from whether communication remains ongoing after the aircraft has landed,
communication must be ***initiated upon landing***:  "wherein the communication
between the cell channels and the serial card is initiated automatically upon landing of
the aircraft."  ('990 claims 8, 14.)  And during prosecution Teledyne unmistakably
surrendered the construction it now seeks.  (Def.'s Br. 8 ("'After the aircraft has
landed' spans a far greater temporal range than 'upon landing.'") (citation therein).)

#### (b)   **"Automatically"**

Automatically requires no construction—the meaning is plain to a POSITA and
lay person.  *See e.g.*, 1 THE OXFORD ENGLISH DICTIONARY 805 (2nd ed. 1989)
(defining "automatic" as "self-acting under conditions fixed for it, going of itself").
Nonetheless, Teledyne argues that "automatically" includes a "little … human
involvement."  While the specification uses "automatically" in the same sentence as
"little or no human involvement," ('990 col.1 ll.55-59), the latter is not expressed as a
definition of the former.  *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994)
("Although an inventor is indeed free to define the specific terms used to describe his

---

[30] *See supra* pp. 6-8; *see also* Def.'s Br. 7-8.

[31] "*Honeywell believes this claim phrase does not require construction, but if the Court is
inclined to construe the phrase, its plain meaning is* 'initiated without human intervention upon
touching down of the aircraft.'"  Stipulated Joint Claim Construction Chart, Honeywell's Proposed
Construction, Ex. A 4 (italics showing portion omitted in Pl.'s Br. 4).  In an effort to dodge the fact
that there is no reason to depart from the plain meaning, Teledyne again addresses only Honeywell's
back-up construction in advocating semi-automatic initiation after landing.

1   or her invention, this must be done with reasonable clarity, deliberateness, and

2   precision.")  Moreover, if Teledyne wanted to cover push of buttons or other manual

3   actions to initiate transmission—as it appears to in this case[32]—it could have worded

4   the claims without the word "automatically."  Teledyne not only did not do so, but in

5   fact surrendered anything other than automatic transmission when it amended the

6   claims to overcome Bailey, and then again to overcome Ross.[33]  (Def.'s Br. 8-9.)[34]

7   **B.    The Means-Plus-Function Limitations (claim 15)[35]**

8   Three limitations of Claim 15 are written in means-plus-function format and

---

[32] *Compare* Teledyne's Supp. Preliminary Infringement Chart 6 ("With little or no human involvement, Honeywell's Zing [ECTM-DD] creates a high-speed information connection between an aircraft and an airlines facility after the aircraft has landed… .") (Starr Decl., Ex. M) *with* Letter from Luke Dauchot to Frederick Lorig (Oct. 31, 2007) ("The layout of the control panel unit for the ECTM-DD could not make it any more plain that the unit initiates the data transmission using a 'Push To Initiate' manual button.") (Starr Decl., Ex. P).

[33] Although Teledyne was discussing claim 1 rather than 8 and 14 in the latter amendment, "arguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary." *Southwall Techs.*, 54 F.3d at 1579.

[34] Teledyne also impermissibly broadened '990 claims 1, 15, 18, 19 and 33 during reexamination when it deleted the words "automatically upon landing" from the claims.  35 U.S.C. § 305 ("No proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding … ."); *see also Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed. Cir. 1995) ("A claim that is broader in ***any*** respect is considered to be broader than the original claims even though it may be narrower in other respects." ) (quoting *In re Freeman*, 30 F.3d 1459, 1464 (Fed. Cir. 1994)).  Claims enlarged during reexamination violate the Patent Act and are invalid—they cannot stand and courts cannot redraft them.  *See id.* at 1584 ("Although we construe claims, if possible, so as to sustain their validity, it is well settled that no matter how great the temptations of fairness or policy making, ***courts do not redraft claims***.") (citations omitted).  Although impermissible broadening during reexamination presents a question of law related to claim construction, summary judgment is the proper posture in which to address it.  *See, e.g., Quantum* at 1584 ("[V]iolation of 35 U.S.C. § 305 is an invalidity defense … and therefore the district court, upon finding correctly that the claims at issue were improperly broadened during reexamination … properly granted Quantum's motion for summary judgment.").

[35] The remaining terms in Claim 15 should be interpreted consistently with the same terms appearing in the other claims.  *See PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007) ("We apply a 'presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.") (quotations omitted).

must be construed "to cover the corresponding structure, material, or acts described in the specification." 35 U.S.C. § 112(6).  Teledyne agrees, (Pl.'s Br. 11), but urges the Court to over-generalize the structures for the claimed functions.

### 1.   "Sensing means for sensing a landing"

Teledyne argues that "[t]he minimum structure necessary to 'sense a landing of the aircraft' is not the 'weight-on-wheels' signal, but rather a 'signal to signal the processor 32.'" (Pl.'s Br. 12.)  That position conflicts with the law.  First, a "signal" is not a structure.[36]  Second, if (as here) "there is only one embodiment described in the specification … there is no basis on which to extend the limitation to cover alternative, non-disclosed structure not shown to be structurally equivalent."  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1304 (Fed. Cir. 2005) (citations omitted).  Thus, "means for sensing a landing" is limited to the specification's sole embodiment, "the weight-on-wheels signal from the landing gear of the aircraft."  ('990 col.3 ll.31-32.)

### 2.   "Means for transmitting" / "Means for receiving"

With respect to these limitations, Teledyne misapplies the law, relying solely on an unreported district court case that does not apply the controlling Federal Circuit law regarding computer implemented functions.[37]  As noted in Honeywell's Opening Brief, such functions are strictly limited to the algorithm disclosed in the specification.  *See Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (2005) (finding limitations "implemented by a microprocessor" to be computer-implemented).  Here, the

---

[36] *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1114 (Fed. Cir. 2002) ("Although it remains true that we will construe claims to preserve validity, if possible, where the specification fails to disclose structure corresponding to the claimed function, it is impossible. As in this case, the claims are invalid.") (citation omitted); *see also, e.g.,* SAE DICTIONARY OF AEROSPACE ENGINEERING 679 (1992) ("Signal:  1. A measure or quantity of the medium used to communicate a condition, effect, or other desired intelligence from one point in the system to another. .... 2. Information conveyed from one point a transmission system to another.").

[37] *See* Pl.'s Br. 12 (citing *Raytheon Co. v. McData Corp.*, No. 2:03-CV-013, 2004 WL 952284, at *6 (E.D. Tex. Feb. 10, 2004)).

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

1    transmitting and receiving functions are computer-implemented:  "The I/O interface

2    30 is connected to a gatelink *processor … .*  [T]*he processor 32 prepares the flight*

3    *data for transmission and transmits the data* to a multi-port serial card 34."  ('990

4    col.3 ll.21-33.)  The means for transmitting is thus limited to the algorithm (or process

5    steps) of the specification:  transmission through a "multi-port serial card" which

6    provides for "the simultaneous parallel transmission of data over a multiple cellular

7    channels."  (*Id.* at col.3 ll. 33-37.)

8         For the means for receiving, the specification recites two computer-

9    implemented embodiments, both involving receipt of data from multiple cell channels:

10        [O]ne of up to 16 peer-to-peer protocol (PPP) threads … *convey the*

11        *packets to the multi-port serial card* 34 for transmission to the backbone

12        66 of the Internet 45 via the cell channels 36 to the cellular infrastructure

13        14. The *packets are received* from the Internet 45 by the local router 46

14        in the flight operations center 18.  The network layer 62 receives

15        acknowledgments of received packets from the gatelink *processor* … .

16   ('990 col.4 ll.27-36; *see also id.* at col.6 ll.16-26 ("A *modem bank 174 receives* the

17   data via the PSTN 172.").)  While Teledyne complains about the length of the

18   algorithm Honeywell identifies as corresponding to the receiving means, Teledyne

19   drafted the algorithm and claim language, and there is no authority for the proposition

20   that "almost two-and-half columns" of structure, (Pl.'s Br. 12), creates an exception to

21   requirements of *Harris.  See Harris*, 417 F.3d at 1253*; see also WMS Gaming, Inc. v.*

22   *Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1991) ("the disclosed structure is not

23   the general purpose computer, but rather the special purpose computer programmed to

24   perform the disclosed algorithm…illustrated in Figure 6.").

25        **C.    The Remaining '990 Terms Are Idiosyncratic Or Technical**

26        As *Phillips* noted, certain claim terms require construction, either because the

27   meaning to a POSITA is not readily apparent, or because "patentees frequently use

28   terms idiosyncratically"; in such cases, "the court looks to … 'the words of the claims

-14-

themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'"  *Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water*, 381 F.3d at 1116).

### 1.   **"Flight data" (all claims)**

While the meaning of this term is not readily apparent from its use in the claims, the balance of the '990 patent provides meaning to a POSITA:  "parameters such as air speed, altitude, vertical acceleration, heading, time."  ('990 col.1 ll.23-4, col.3 ll.14-15.)  In urging the Court to construe "flight data" as "data relating to the flight *or* the performance of aircraft systems or components during flight," Teledyne acknowledges that data about "flight" is different than that about "performance of aircraft systems or components."  On that much, Teledyne and Honeywell agree.  But in urging that the latter be part of the claim scope, Teledyne ignores that "performance of aircraft systems or components" appears nowhere in the claims.

To justify its position, Teledyne "quotes" the specification, but using ellipses in place of the language actually appearing in the patent, shown in italics here:

> "it is common for aircraft to generate records of data relating to flight or
> performance parameters for each flight of the aircraft.  ***The data typically
> relate to parameters such as air speed, altitude, vertical acceleration,
> heading, time, etc.***  The data are utilized ***in the event of an accident or a
> near-accident and*** to assist in maintenance of the aircraft by detecting
> faulty components or gradual deterioration of a system or component***, to
> assist in reviewing crew performance, and to assist in logistical
> planning activities such as scheduling and routing***."

(Pl.'s Br. 2; '990 col.1 ll.21-30.)  Thus, not only is the phrase "performance of aircraft systems or components" not in the claim language, but the specification's use of "performance" relates to ***crew*** performance, not that of systems or components.

Moreover, Teledyne has publicly represented that the '990 patent does not

disclose or refer to aircraft maintenance and diagnostic data:

> Unlike the Applicants' invention, ***neither the [unrelated patent] nor
> the '990 patent discusses or refers to the downloading of
> maintenance and diagnostic data***. More specifically, … ***the '990
> patent discusses flight data***. … ***[M]aintenance and diagnostic data
> is … different from flight data***. ***In particular, maintenance and
> diagnostic data is used to repair an aircraft. On the other hand, …
> flight data is used to evaluate the aircraft's flight performance.***[38]

Thus, Teledyne acknowledged, at least until now, that "flight data" excludes
"maintenance and diagnostic data."  *See Tanabe Seiyaku Co. v. U.S. Int'l Trade
Comm'n*, 109 F.3d 726, 733 (Fed. Cir. 1997) ("In evaluating infringement under the
doctrine of equivalents, representations to foreign patent offices should be considered
when they comprise relevant evidence.") (internal quotation omitted).

### 2. "Data acquisition unit" (all claims)

A data acquisition unit onboard an aircraft has a special meaning to a
POSITA.[39]  Teledyne's argument—that "Honeywell's 'construction' is actually no
construction"—overlooks this fact, which is apparent from the '990 specification:
"aircraft data are typically gathered by a ***digital flight data acquisition unit
(DFDAU)***."  (Pl.'s Br. 3.)  Thus, "data acquisition unit" is not just any "hardware
device for use on an aircraft that acquires data," as Teledyne proposes.[40]  (That
construction would encompass the passengers' cell phones and blackberries!)  Rather,
"data acquisition unit" is the component commonly known as the FDAU or DFDAU.

### 3. "Flight operations center ('FOC')" (dep. claims 20-21)

This term, abbreviated "FOC" in the '990 specification, also has a special

---

[38] File History of U.K. Patent Application No. 0323990.2, Teledyne's 9/30/2005 Rsp. to the U.K. Patent Office Examination Report 3 (emphasis in original) (Starr Decl., Ex. Q).

[39] *See, e.g.*, Decl. of C. Wargo ¶ 7 (Def.'s Br., Starr Decl., Ex. F).

[40] *See* Pl.'s Br. 3.

meaning to a POSITA.[41]  Teledyne's position that FOC either "does not require construction" or means "a location housing and/or in communication with a data reception unit"[42] ignores this fact.  Moreover, Teledyne's proposed alternate construction is so far from the plain meaning of the three constituent words that Teledyne's citation to *Phillips* lacks credibility.  Under that construction, ***anywhere*** the data is sent, even an equipment shed with a receiver or a passenger with a blackberry, would be a "flight operations center."  While Teledyne claims to use the "widely accepted meaning" of the three words, it offers no dictionary definitions.  Teledyne also neglects to mention that the specification ties the flight operations center to the "***aircraft***" and "***ground personnel***" (who presumably work for the airline or other aircraft operator):  "When the aircraft lands, ground personnel board the aircraft, remove the media, and mail the media to a flight operations center (FOC)." ('990 col.1 ll.33-36.)  Thus, FOC refers to a "base of flight operations for the airline or other aircraft operator."[43]

### 4.  "Cellular infrastructure" (all claims)

There is no common understanding of what devices the term "cellular infrastructure" would encompass, but the '990 specification provides sufficient context for a POSITA to gather its meaning as used in the claims.  It depicts the "cellular infrastructure" as comprising a "base station transceiver subsystem" connected to a "base station controller."  ('990 Figs. 2, 11.)  And it states, "[t]he cellular infrastructure 14 includes an antenna 40, which is…connected to a base station transceiver subsystem 42. The subsystem 42 is connected to a base station controller 44 … ."  ('990 col.3 ll.44-48.)

Teledyne's proposed construction is circular, (Def.'s Br. 15), casting doubt on

---

[41] '990 col.1 ll.35-36; *see also* Decl. of C. Wargo ¶ 8.

[42] Stipulated Joint Claim Construction Chart, Teledyne's Proposed Construction, Ex. A 11.

[43] *Id.*, Honeywell's Proposed Construction, Ex. A 11.

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

1   Teledyne's position that the term requires no construction.  And its definition of

2   "cellular infrastructure" by a single characteristic, use of a licensed frequency, (Pl.'s

3   Br. 6-7), ignores both the actual "infrastructure" and its "cellular" nature.

5.   **"Plurality of cell channels in communication with said serial card" (claims 8 and 14)**

6   Neither "serial card" nor "cell channels" has an ordinary meaning to a lay

7   person, but both represent technical jargon requiring construction.  And while "serial

8   card" has ordinary meaning to a POSITA, (Def's Br. 15-16), "cell channels" does not.

9   For example, "cell channels" can refer to control channels, common channels, logical

10  channels, physical channels, traffic channels, and transport channels.[44]  Thus, it is

11  necessary to look to the balance of the '990 patent to provide meaning for the claim

12  phrase "plurality of cell channels in communication with said serial card."

13  The specification clearly describes the "cell channels" as physical channels that

14  can each be opened, sustained, and closed by an associated port. ('990 col.3 ll.33-37.)

15  It also states that *each port of the multi-port serial card attaches to a physical cell*

16  *channel*, (*id.*), which provides "the advantage that [the system] can transmit data over

17  multiple parallel channels to achieve the necessary transmission bandwidth," (*id*. col.2

18  11.9-12).  Further, the only serial card disclosed in the patent and its file history is a

19  multi-port serial card.  Thus, Honeywell's construction is proper.  (Def.'s Br. 15.)

20  Teledyne's construction, on the other hand, nebulously defines "cell channels"

21  as "communication paths in a cellular medium," (Pl.'s Br. 8), and squarely contradicts

22  Teledyne's own words evidencing the meaning of the phrase.  For example, outside

23  the context of this litigation, Teledyne understands "plurality of cell channels in

24  communication with said serial card" to mean *serially connected cell phones*.  Thus,

25  Teledyne's own documents reflect that, due to low data rates in 1998, Teledyne could

---

[44] *See* 3RD GENERATION PARTNERSHIP PROJECT, VERSION 3.0.0, TECHNICAL SPECIFICATION GROUP SERVICES AND SYSTEM ASPECTS; VOCABULARY FOR 3GPP SPECIFICATIONS (3G TR 21.905) 9, 13, 17, 23 (2000).

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

1   only enable its alleged invention by linking twelve or more cell phones together.[45]

2   More recently, during prosecution of the '990 reexamination, Teledyne recognized

3   that the "serial card" limitation provides coverage only for

4   "                                                  "[46]  And even as recently as the outset

5   of this case, Teledyne recognized that the alleged invention was directed to serially

6   connected cell phones.  As it expressed this to the Court, "the Teledyne engineers

7   were able to take what amounts to a lot of very complex data and squeeze it through a

8   very narrow pipe, the cell phone."[47]  The only disclosure in the '990 patent for

9   squeezing a lot of data through a narrow pipe is, again, a multi-port serial card with

10  each I/O port attached to a physical cell channel that "can transmit simultaneously and

11  can thus transmit data in parallel." ('990 col.3 ll.33-37.)

### 6.   **"Data thread" (claim 25)**

13          While the term "thread" has meaning to a POSITA, the claim phrase "data

14  thread" lacks meaning to lay persons and POSITAs alike.  Thus, the Court must turn

15  to the specification for guidance.  The specification describes, as its sole embodiment,

16  data threads that facilitate the transmission of multiple parallel channels of data.  ('990

17  col.4 ll.65-67 ("The packets are then ready for transmission as a fixed number of

18  threads, corresponding to the number of cell channels.").)  Honeywell's construction

---

[45] *See, e.g.,* '990 Figs. 2, 11 (showing 15 cell channels attached to a multi-port serial cart);
TDY0003057 (                                              ) (Starr Decl., Ex. R);
TDY0003054
(

                                                                                    ) (Starr
Decl., Ex. S).

[46] TYD0085552 (email re "Groundlink patent reexamination" and attachments) (Starr Decl., Ex.
T).  Honeywell has made repeated requests for the attachments to this email; Teledyne has not
produced them but has agreed to continue its searches for them. (Starr Decl. ¶ 9.)

[47] Hr'g Tr. 4-5, May 7, 2007.

1  reflects this.  (Pl.'s Br. 9.)

2          Where Honeywell construes the phrase that needs construction, Teledyne

3  conspicuously construes only the word "thread."[48]  "Primary data thread" is the first

4  use of "thread" in Claim 25.  While the rest of the claim refers to "thread" by itself,

5  Teledyne makes no effort to rebut the presumption of *PODS* that "the same terms

6  appearing in different portions of the claims should be given the same meaning."

7  *PODS*, 484 F.3d at 1366; *see also supra note* 35.  Hence, Teledyne's construction of

8  "thread" should be rejected.

9

10  **IV.    THE '152 AND '468 PATENTS**

11          The '152 and '468 patent claims predominantly use terms that the jury will

12  understand.  Again, Teledyne ignores in its Opening Brief that Honeywell presents the

13  vast majority of these terms as needing no construction.

14      **A.    The Specification and Prosecution History Do Not Support**
           **Teledyne's Proposed Constructions for the '152 Patent**
15

16          **1.    First and second communication mediums**

17          These claim terms have an ordinary meaning to a POSITA that would also be

18  apparent to a lay person.  Further, the specification and prosecution history do not

19  support departure from the heavy presumption of plain meaning.  Teledyne argues that

20  these terms are mutually exclusive.  (Pl.'s Br. 16-19.)  But the specification expressly

21  rejects that argument.[49]  And contrary to Teledyne's statements, Honeywell did not

22  redefine the ***first or second communications mediums*** or the ***aeronautical satellite***

23  ***system or direct broadcast satellite*** during prosecution.

24          Teledyne argues that Honeywell's May 13, 2002 Response To Office Action

25  ────────────────

26          [48] Teledyne also omitted from its Opening Brief that Honeywell alleges the term "primary data thread" as used in claim 25 to be indefinite.

27          [49] '152 col.2 ll.45-47 ("The first and second communication media, 208, 210 may be the same or different media, or separate channels of the same medium").

28

And Amendment trumps the specification and requires that the first communication medium must be different than the second communication medium.  But Teledyne mischaracterizes the amendment and response.  Honeywell did not argue that the first and second communications mediums were different, but instead distinguished the prior art on the basis that the first communication medium comprises "both an aeronautical satellite system and a radio ground station," and that "the information request system is configured to select" one of the satellite system or radio ground station from the first communication medium.[50]  In fact, the prior art Honeywell distinguished also had two different communication mediums, including a low bandwidth request transfer and high bandwidth data transfer.[51]  Thus, the amendment simply added the ***selection*** of the satellite system or radio ground station within the first communication medium, and did not, as Teledyne argues, render the second communication medium separate from the first.

### 2.    Aeronautical satellite system

Consistent with its meaning to a POSITA, the specification describes "aeronautical satellite system" as preferably comprising "a satellite unit configured to receive data request signals from transmission unit 306 and forward or transmit the signals to ground earth station."  ('152 col.8 ll.25-28) (Def.'s Br., Starr Decl., Ex. I.) Teledyne's proposed construction of this phrase is identical to Honeywell's alternate construction, with one exception.  Teledyne prefaces it with "not a direct broadcast satellite."  Teledyne's narrowing preface finds no support in the specification.  To the contrary, it is inconsistent with the specification's further description that the aeronautical satellite system may be "any other suitable satellite communication system."  (*Id.* at col.8 ll.30-33).  To graft its limitation onto the claim term, Teledyne misreads the prosecution history's Reasons For Allowance ("RFA") to state that the

---

[50] '152 File History, 5/13/2002 Rsp. to Office Action 10-11 (Starr Decl., Ex. U).

[51] *See id.* at 9.

1   aeronautical satellite system must be distinct from the direct broadcast satellite

2   ("DBS"), discussed below.  But the RFA simply copies each of the independent

3   claims and states that the prior art of record does not teach such systems or methods.

4   On closer inspection of the prosecution history, as discussed above, Honeywell did

5   not distinguish the prior art on the basis of *distinct aeronautical satellite and DBS*

6   *systems*.  It did so on the basis of an "information request system [] configured to

7   select" between the two systems comprising the *first* communication medium—i.e.,

8   the aeronautical satellite system and the radio ground station.[52]

### 3.   <u>Direct broadcast satellite (DBS)</u>

10          The '152 specification also uses DBS consistently with its meaning to a

11   POSITA.  Honeywell's claim construction captures this usage.[53]  Teledyne's

12   construction inserts three limitations that are both absent from, and at odds with, the

13   specification's description of DBS.  First, Teledyne's construction would exclude

14   DBS as a subset of the aeronautical satellite system.  Second, Teledyne would limit

15   DBS to a satellite that "broadcasts the same transmissions directly to all end users and

16   cannot receive transmissions from end users."  (Pl.'s Br. 18.)  These limitations are

17   nowhere in the '152 specification and contravene the very purpose of Honeywell's

18   invention.  The '152 patent provides, for example, for "business and personal

19   communications" such as email and internet, and replaces air-to-ground phones on

20   aircraft.  ('152 col.1 ll.13-37.)  These applications by their nature involve broadcasting

21   information to the requesting user, not "to all."  And third, Teledyne's attempt to limit

22   DBS to a satellite that cannot receive transmissions likewise finds no support in the

23   specification or prosecution history.

---

[52] '152 File History, 5/13/2002 Rsp. to Office Action 11 ("[T]he Examiner acknowledges that Leuca does not teach an information request system further comprising a radio frequency unit."); *see also id.*, 6/17/2002 Reasons for Allowance 2-3 (Starr Decl., Ex. U).

[53] Stipulated Joint Claim Construction Chart, Honeywell's Proposed Construction, Ex. A 18-19 ("A satellite that facilitates access to greater bandwidth than reliance solely on the telephone system and affords relatively high data transfer rates from the data source to the receiver.")

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

###### 4.    <u>"Network system" (claims 1, 4 and 10)</u>

The parties agree that the specification defines the term "network system." (Pl.'s Br. 13.)  The specification expressly states this definition:  "network system 314 can be a private network or a public network, such as a telephone network or television cable network, or ***any other suitable system for communicating the request to the data source*** 104."  ('152 col.8 ll.60-64.)  This is thus the correct construction under *In re Paulsen.*  30 F.3d at 1480 (the inventor is "free to define the specific terms used to describe his or her invention," as long as this is "done with reasonable clarity, deliberateness, and precision.").  In contrast, Teledyne's construction erroneously quotes not the patent's express definition, but an ***optional*** embodiment, (Pl.'s Br. 13), and should therefore be rejected.

###### 5.    <u>"Transmission unit" (claims 1, 4, 7 and 10)</u>

As with "network system," the '152 patent expressly defines "transmission unit."  (152 col.6 ll. 13-21.)  For example, the specification states that the transmission unit may be "configured as a transceiver to receive data signals," which Honeywell but not Teledyne's construction reflects.  And according to the claims, an information request system is "compris[ed]" of "a transmission unit coupled to said data source" and is "adapted to request the data information from said data source."  ('152 col.10 ll.50-52.)  Teledyne's proposal that the "transmission unit" must be located on an aircraft and transmit requests via the first communication medium is thus not consistent with the claim language or specification, which instead support Honeywell's construction of  "transmission unit" as:  "A component through which information requests to the data source are transmitted.  In addition, the transmission unit may act as a receiver and receive signals from the data source."[54]

---

[54] *Id.* at 16.

HONEYWELL'S MARKMAN RESPONSIVE BRIEF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.** **The Specification Expressly Defines the Only Terms of the '468 Patent That Require Construction**

**1.** **"Vehicle server" (claims 1 and 9)**

Although a POSITA would understand the words "vehicle" and "server" independently, the '468 patent specially defines them as a claim term:  "Vehicle server 116 is any hardware or software device that is capable of receiving data updates from system server 102 and loading the updates in component 118."  ('468 col.5 ll.19-22) (Def.'s Br., Starr Decl., Ex. K.)  Technical dictionaries further support that servers are not limited to "hardware storage devices," but may instead comprise software.  (Def.'s Br. 23 (quoting dictionaries).)  The plain meaning of the words, let alone the claim term's special definition, thus reject Teledyne's attempt to limit "vehicle server" to a hardware storage device that is separate from the "component."

In urging its construction, Teledyne relies on claim 1's phrase, "loading said data update from said vehicle server into a component at said vehicle."  But this phrase simply does not specify that the vehicle server and component must be separate devices.  ('468 col.10 ll.40-42.)  Teledyne further cites Figure 1, which is a "***block diagram*** of an ***exemplary*** system." (*Id.* at col.2 l.40.)  Again, Teledyne misses the mark.  Mere citation to embodiments is inadequate to import limitations into the claims.  *See Phillips*, 415 F.3d at 1323 (cautioning against importing limitations from the specification into the claims).

**2.** **"Component" (claim 1)**

While this claim term, too, may have meaning to a POSITA, the specification trumps it with an express and expansive definition:  "***Component 118 is any avionics or other aircraft device*** … ." ('468 col.5 ll.46-56.)  *In re Paulsen*, 30 F.3d at 1480. As above, neither language from claim 1 nor Figure 1 support Teledyne's desire to limit "component" to something separate from "vehicle server."  Nor do the claim or specification support Teledyne's effort to limit the component to a "hardware device … that uses data updates to perform a function."  In support of this attempt to import a

-24-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

limitation into the claim, Teledyne cites language discussing not an express definition, sole embodiment or even preferred embodiment, but merely "various embodiments." ('468 col.5 ll.51-53.)  This runs contrary to *Phillips* and *In re Paulsen* and should be rejected.  *See Phillips*, 415 F.3d at 1323; *In re Paulsen*, 30 F.3d at 1480.

**V.     CONCLUSION**

　　　　For all of the reasons set forth in Honeywell's Opening Brief and this Responsive Brief, Honeywell respectfully requests that the Court enter an Order construing the disputed claim terms as indicated herein and in Honeywell's portion of the Stipulated Joint Claim Construction Chart or its Proposed Order.

DATED:  December 17, 2007　　　　　KIRKLAND & ELLIS LLP

　　　　　　　　　　　　　　　　By: /s/ Luke L. Dauchot_____
　　　　　　　　　　　　　　　　Robert G. Krupka, P.C. (S.B.N. 196625)
　　　　　　　　　　　　　　　　Luke L. Dauchot (S.B.N. 229829)
　　　　　　　　　　　　　　　　Ephraim D. Starr (S.B.N. 186409)
　　　　　　　　　　　　　　　　estarr@kirkland.com
　　　　　　　　　　　　　　　　777 South Figueroa Street
　　　　　　　　　　　　　　　　Los Angeles, California  90017
　　　　　　　　　　　　　　　　Telephone:  (213) 680-8400
　　　　　　　　　　　　　　　　Facsimile:  (213) 680-8500

　　　　　　　　　　　　　　　　Attorneys for Defendant-Counterclaimant
　　　　　　　　　　　　　　　　HONEYWELL INTERNATIONAL INC.
　　　　　　　　　　　　　　　　and Counterclaimant
　　　　　　　　　　　　　　　　HONEYWELL INTELLECTUAL
　　　　　　　　　　　　　　　　PROPERTIES INC.