QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Frederick A. Lorig (Bar No. 057645)
  fredericklorig@quinnemanuel.com
  Steven M. Anderson (Bar No. 144014)
  stevenanderson@quinnemanuel.com
  Joseph M. Paunovich (Bar No. 228222)
  joepaunovich@quinnemanuel.com
  Anthony P. Alden (Bar No. 232220)
  anthonyalden@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Plaintiff and Counter-Defendant
Teledyne Technologies Incorporated

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| TELEDYNE TECHNOLOGIES, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>HONEYWELL INTERNATIONAL, INC., a Delaware corporation,<br><br>    Defendant.<br><br>AND COUNTERCLAIM | CASE NO. CV 06-06803-MMM (SHx)<br><br>PLAINTIFF AND COUNTER-DEFENDANT TELEDYNE TECHNOLOGIES INCORPORATED'S RESPONSIVE CLAIM CONSTRUCTION BRIEF<br><br>[Declaration of Anthony P. Alden filed concurrently herewith]<br><br>Hearing Date:  January 28, 2008<br>Time:              9:00 a.m.<br>Courtroom:     780<br><br>Discovery Cut-off Date: June 6, 2008<br>Pre-trial Conference Date: Aug. 25, 2008<br>Trial Date: Sept. 23, 2008 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ...................................................................................... 1

II.  HONEYWELL MISINTERPRETS AND MISAPPLIES *PHILLIPS* .............. 3

III.  TELEDYNE'S '990 PATENT ............................................................... 4

    A.  "Landing Elements" ................................................................ 4

        1.  Honeywell's Construction Improperly Imports a Preferred Embodiment Into the Claims ................................ 4

        2.  Nothing In the File History Suggests That Teledyne Limited "Landing" to "Touching Down" ........................... 5

        3.  The '990 Specification Refers to the Transmission of Flight Data After the Aircraft Has Landed ....................... 6

        4.  Leading Aeronautical Texts Also Demonstrate That "Landing" Is Not Limited to "Touching Down" ................ 8

    B.  "When" and "upon" ................................................................ 9

    C.  "Automatically" .................................................................... 10

    D.  "In Response To" .................................................................. 12

    E.  "Flight Data" ....................................................................... 13

        1.  There Is Nothing In the Specification Or The File History That Limits "Flight Data" As Honeywell Proposes .......... 13

        2.  The Term "Flight Data" Includes Far More Than Honeywell's Five Parameters ........................................ 14

    F.  "Data Acquisition Unit" ....................................................... 15

    G.  "Cellular Infrastructure/Cellular Communications Infrastructure/Cellular Telephone Infrastructure" .................. 16

    H.  "Serial Card" ....................................................................... 17

    I.  "Flight Operation Center" ..................................................... 18

    J.  Claim 25 ("Threads"/"Primary Data Thread"/"Threads Are Active") ............................................................................. 19

        1.  Honeywell's Indefiniteness Argument Is Meritless .................. 19

2.   Honeywell's Construction of the Term "Data Thread" Improperly Imports the Preferred Embodiment from the Specification...................................................................... 19

K.   Claim 15: "Means-Plus-Function" ....................................................... 20

IV.   HONEYWELL'S '152 PATENT.................................................................... 22

V.   HONEYWELL'S '468 PATENT.................................................................... 24

A.   "Vehicle Server" and "Component" ...................................................... 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>Cases</u>

Apple Computer, Inc. v. Articulate Sys., Inc.,
   234 F.3d 14 (Fed. Cir. 2000) ................................................................23

Autogiro Co. of Am. v. U.S.,
   384 F.2d 391 (Ct. Cl. 1967) ................................................................25

CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG,
   224 F.3d 1308 (Fed. Cir. 2000)...........................................................23

Comark Comm. Inc. v. Harris Corp.,
   156 F.3d 1182 (Fed. Cir. 1998)....................................................15, 17

Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.,
   257 F.3d 1364 (Fed. Cir. 2001) (emphasis in original) .......................7

Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,
   381 F.3d 1111 (Fed. Cir. 2004)................................................1, 8, 13

Med. Instrumentation & Diagnostics Corp. v. Elekta AB,
   344 F.3d 1205 (Fed. Cir. 2003), <u>cert. denied</u>, 124 S.Ct. 1715 (2004)................21

Medrad, Inc. v. MRI Devices Corp.,
   401 F.3d 1313 (Fed. Cir. 2005).........................................................12

Odetics, Inc. v. Storage Technology Corp.,
   185 F.3d 1259 (Fed. Cir. 1999).........................................................21

Panduit Corp. v. Dennison Mfg. Co.,
   810 F.2d 1561 (Fed. Cir. 1987).........................................................25

Pfizer, Inc. v. Ranbaxy Labs., Ltd.,
   457 F.3d 1284 (Fed. Cir. 2006).........................................................15

Phillips v. AWH Corp.,
   415 F.3d 1303 (Fed. Cir. 2005)...................................................passim

PolyVision Corp. v. Smart Tech. Inc.,
   501 F. Supp. 2d 1042 (W.D. Mich. 2007).........................................21

SanDisk Corp. v. Memorex Products, Inc.,
   415 F.3d 1278 (Fed. Cir. 2005).........................................................14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Schoenhaus v. Genesco, Inc.</u>,
   440 F.3d 1354 (Fed. Cir. 2006).............................................................................23

<u>SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.</u>,
   242 F.3d 1337 (Fed. Cir. 2001)...............................................................................5

<u>Union Pacific Resources Company v. Chesapeake Energy Corporation</u>,
   236 F.3d 684 (Fed. Cir. 2001)...............................................................................19

-iv-

## I.     INTRODUCTION

In urging artificially narrow definitions for Teledyne's '990 patent, Honeywell ignores both the Examiner's stated reasons for allowance and the teachings of the *en banc* Federal Circuit in <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303 (Fed. Cir. 2005).  In allowing the '990 patent, the Examiner made clear that a weight-on-wheels transmission trigger had nothing to do with the patent's validity.  And, the Federal Circuit in <u>Phillips</u> prescribed that claim interpretation must be found in "the words of the claims themselves, the remainder of the specification, the prosecution history, and the extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  <u>Id.</u> at 1314 (citing <u>Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.</u>, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  In particular, the Federal Circuit warned against artificially narrowing the scope of patent claims by importing the limitations of the preferred embodiment from the specification, as Honeywell now advocates:

> It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." . . . [A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments . . . In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment . . . That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.

<u>Phillips</u>, 415 F.3d at 1312, 1323 (citations omitted).

1    Two years after the '990 patent issued, it was forced into reexamination by

2  Honeywell's licensor, Harris Corporation.  Harris claimed that the '990 patent was

3  invalid, but the Patent Office disagreed.  In allowing the '990 patent for a second

4  time, the Examiner provided the following summary of the Teledyne arguments

5  upon which he relied and with which he agreed:

6          As argued by the Patent Owner, the art of record fail [sic] to teach

7          an aircraft data transmission system and method comprising,

8          among other limitations, at least one first sensor on the aircraft

9          which gathers in-flight data and at least one second sensor

10         configured to sense a landing of the aircraft, wherein

11         communication is initiated via a cellular infrastructure in response

12         to the second sensor sensing the landing of the aircraft.

13  (Declaration of Anthony P. Alden ("Alden Decl."), Ex. A at 33) (emphasis added).

14    The Examiner thereby made clear to anyone reading the File History that, for

15  purposes of validity, the PTO interpreted the patent as covering any "second sensor

16  sensing the landing of the aircraft," if part of the patented system.  This would

17  include, not only the preferred embodiment of weight-on-wheels, but any sensor that

18  could "sense a landing of the aircraft," such as sensing a decrease in ground speed of

19  the tires, the opening of a cabin door, or the application of the brakes.  This is

20  because, contrary to Honeywell's contention, to one skilled in the art, "landing" does

21  not simply mean touching-down:

22          The landing process must never be considered complete until the

23          airplane decelerates to the normal taxi speed during the landing roll

24          or has been brought to a complete stop when clear of the landing

25          area.

26  (See Alden Decl., Ex. B at 45).

27    Thus, there is no merit in Honeywell's attempt to limit the patent to a weight-

28  on-wheels sensor by narrowly defining the isolated terms "landing," "when,"

1   "upon," "automatically," and "in response to."  Similarly, for the reasons discussed

2   below, there is no basis for artificially limiting the transmission technology and

3   components—cellular infrastructure, cell channels, and serial card—to preferred

4   embodiments in the specification, none of which have anything to do with the

5   Examiner's reasons for allowance.

6   **II.     HONEYWELL MISINTERPRETS AND MISAPPLIES *PHILLIPS***

7        Ignoring the mandate of <u>Phillips</u>, Honeywell attempts to artificially limit

8   various terms to the examples given in the specification, including the terms

9   "landing" (attempts to limit to the "weight-on-wheels" preferred embodiment); "data

10  acquisition unit" (attempts to limit to the "flight data acquisition unit" example);

11  "cellular infrastructure" (attempts to include the structural components disclosed in

12  the specification); and "serial card" (attempts to limit to the "multi-port serial card"

13  example in the specification).

14       In each case, however, Honeywell fails to point to any disclaimer in either the

15  specification or the file history that would limit these terms to their preferred

16  embodiments.  <u>Phillips</u>, 415 F.3d at 1316 ("the specification may reveal an

17  intentional disclaimer, or disavowal, of claim scope by the inventor."); <u>Id</u>. at 1317

18  (the prosecution history can reveal "whether the inventor limited the invention in the

19  course of prosecution . . .").  Without such a disclaimer, Honeywell's limiting

20  constructions must be rejected.  <u>Id.</u> at 1323 ("although the specification often

21  describes very specific embodiments of the invention, we have repeatedly warned

22  against confining the claims to those embodiments.").

23       Honeywell's error is particularly egregious given that its narrowing

24  constructions are typically based on nothing more than abstract general dictionary

25  definitions, without reference to the specification or prosecution history.  As the

26  Federal Circuit explained:

27             The main problem with elevating the dictionary to such

28             prominence is that it focuses the inquiry on the abstract meaning of

1  words rather than on the meaning of claim terms within the context

2  of the patent. . . . [H]eavy reliance on the dictionary divorced from

3  the intrinsic evidence risks transforming the meaning of the claim

4  term to the artisan into the meaning of the term in the abstract, out

5  of its particular context, which is the specification. Id. at 1321.

6      This is exactly the systematic error that Honeywell makes throughout its

7  opening brief.  As discussed below, the recurring theme of the parties' claim

8  construction disputes in this case is that Teledyne's starting point is the ordinary

9  meaning of the claim terms, unless disclaimed or otherwise specially defined in the

10  specification.  In contrast, Honeywell's starting point is the preferred embodiment

11  disclosed in the specification, which it then attempts to support by non-contextual

12  dictionary definitions.  Phillips mandates that Teledyne's approach is correct.

13  **III.  TELEDYNE'S '990 PATENT**

14      **A.  "Landing Elements"**

15          1.  Honeywell's Construction Improperly Imports a Preferred

16            Embodiment Into the Claims

17      Each of Honeywell's constructions for the "landing elements" attempts to

18  limit the concept of landing to "touching down."  Honeywell adopts this position in

19  the hopes of avoiding infringement by narrowing the scope of Teledyne's invention

20  to the transmission of flight data from an aircraft the very instant the aircraft hits the

21  ground.  Honeywell argues that, because the specification discusses a weight-on-

22  wheels signal as a preferred embodiment of a transmission trigger, transmission

23  must always begin precisely when an aircraft's wheels first hit the ground.  (HW

24  Opening Brief at 6).

25      However, absent a special definition of "landing" in the specification or file

26  history, disclaiming transmission at any point after "touching down," Honeywell's

27  artificially narrow construction must be rejected.  Phillips, 415 F.3d at 1320 ("[O]ne

28

1 of the cardinal sins of patent law [is] reading a limitation from the written

2 description into the claims.") (citation omitted).

3         2.    Nothing In the File History Suggests That Teledyne Limited

4            "Landing" to "Touching Down"

5     During the original prosecution of the '990 application, the Examiner rejected

6 as-filed claims 1, 4, 7-8, 10, 12, and 14-20 as anticipated or rendered obvious by

7 U.S. Patent No. 5,550,738 (issued Aug. 27, 1996; Bailey, et al.).  He reasoned that

8 since once an aircraft had landed it becomes a land vehicle, there is no difference in

9 transmitting data from an aircraft, as opposed to transmitting data from any other

10 land vehicle, as disclosed by Bailey.  (Alden Decl., Ex. C at 51).  To overcome this

11 rejection over a conventional land vehicle, Teledyne amended the claims to clarify

12 that transmission of flight data is "initiated automatically upon landing of the

13 aircraft." (Id. at 61-64).

14     Contrary to Honeywell's contention, nothing in the original file history

15 implies that the insertion of the words "upon landing" was intended to narrow the

16 invention to immediately upon "touching down," as opposed to any other time after

17 landing.  Rather, as evidenced by the Examiner's reasons for allowance, the intent

18 was merely to tie transmission of flight data to the process of an aircraft landing, and

19 nothing reflects any intent to restrict how or when such landing might be sensed.

20     This is confirmed by the Reexamination History.  The Reexaminer initially

21 rejected claims 1, 4, 6, 7, 15-20, and 33 as being anticipated by U.S. Patent No.

22 5,351,194 (issued Sept. 27, 1994; Ross, et al.). (Alden Decl., Ex. A at 3-5, 9-11).  To

23 overcome this rejection, Teledyne amended the claims to insert the phrase: "at least

24 a second sensor configured to sense a landing of the aircraft."  (Id. at 17-22, 24-25).

25     The Reexamination file history nowhere suggests that the sensor must sense

26 the preferred embodiment "weight-on-wheels," as opposed to the myriad of other

27 sensors that can sense landing, such as a decrease in speed or doors opening.  This

28

1    was made clear by the Reexaminer, who made no mention of weight-on-wheels in

2    his reasons for allowance:

3         As argued by the patent owner, the art of record fail [sic] to teach

4         an aircraft data transmission system and method comprising,

5         among other limitations, at least one first sensor on the aircraft

6         which gathers in-flight data <u>and at least one second sensor</u>

7         <u>configured to sense a landing of the aircraft,</u> wherein

8         communication is initiated via a cellular infrastructure in response

9         to the second sensor sensing the landing of the aircraft.

10    (Alden Decl., Ex. A at 33).

11       Accordingly, the file history simply does not support Honeywell's

12    attempt to limit the sensor that senses landing to just one of the myriad of

13    sensors that can perform this function.  Without such support, Honeywell's

14    narrow construction of "landing" must be rejected.

15          3.     <u>The '990 Specification Refers to the Transmission of Flight Data</u>

16               <u>After the Aircraft Has Landed</u>

17       Honeywell argues that "nothing in the '990 patent suggests, let alone dictates,

18    the meaning urged by Teledyne."  (HW Opening Brief at 6)  This assertion,

19    however, deliberately ignores numerous references in the specification and the

20    claims.  For example, the specification explains that the "cellular infrastructure [is]

21    in communication with the data communication unit <u>after the aircraft has landed.</u>"

22    (Declaration of Joseph M. Paunovich ("Paunovich Decl."), Ex. 1, 1:66-2:1).[1]  Figure

23    1 also shows an aircraft "<u>after landing.</u>" (<u>Id.</u> at 2:64-65).

24       What is more, the specification reveals that, contrary to Honeywell's

25    construction, the patentee contemplated time passing between touching-down and

26

27

28

data transmission.  In discussing a preferred embodiment, the specification states that "[u]pon receipt of the weight-on-wheels signals from the landing gear of the aircraft 12, the processor 32 <u>prepares the flight data for [later] transmission</u> . . ." (Paunovich Decl., Ex. 1, 3:30-32) (emphasis added).  This language shows that the patentee contemplated some unspecified time passing between "touching down" and transmission, during which time the data to be transmitted is processed.  Because Honeywell's construction forces data to be "downloaded <u>as soon as</u> the plane lands," it would exclude this preferred embodiment, and must therefore be rejected.  <u>Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.</u>, 257 F.3d 1364, 1378 (Fed. Cir. 2001) ("[A] claim construction that excludes a preferred embodiment is '*rarely, if ever, correct.*'") (quoting <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1583 (Fed. Cir. 1996)) (emphasis in original).

Finally, as discussed in Teledyne's Opening Claim Construction Brief, Honeywell's "touching down" construction renders claim language superfluous. Claims 1, 19 and 33 include "<u>at least</u> a second sensor" that senses the aircraft has landed, and claim 18 includes "<u>at least</u> a first sensor" that senses the aircraft has landed.  (Paunovich Decl., Ex. 2, 1:34-35, 66-67, 2:19-20, 35-36) (emphasis added). By using the words "at least," these claims contemplate that the aircraft could have a third, fourth or even fifth sensor that senses that the aircraft has landed.  For example, the aircraft may sense weight-on-wheels and then a rapid decrease in ground speed.

Under Honeywell's "touching down" construction, however, transmission must begin "<u>immediately</u>" upon the aircraft receiving the weight-on-wheels signal, even if it is yet to receive the "speed decrease" signal.  Such a construction thus renders the words "at least" in claims 1, 18, 19, and 33 superfluous because—even if

---

[1]   All references herein to the Declaration of Joseph M. Paunovich are to the (footnote continued)

1  there are additional sensors—transmission must always be triggered by the "second

2  sensor."  In contrast, Teledyne's constructions harmonize the claim language

3  because transmission can begin after <u>all</u> sensors sense that the aircraft has landed.

4  <u>Innova</u>, 381 F.3d at 1119 ("all claim terms are presumed to have meaning in a

5  claim.").

6            4.     <u>Leading Aeronautical Texts Also Demonstrate That "Landing" Is</u>

7                   <u>Not Limited to "Touching Down"</u>

8            Were a person of ordinary skill in the art of aircraft communications to

9  consult extrinsic evidence to understand a term in the '990 patent, he or she may

10  consult a technical dictionary, but <u>not</u> the Merriam-Webster's Collegiate Dictionary,

11  The Oxford English Dictionary or any other general dictionary urged by Honeywell.

12  This is because, as the <u>Phillips</u> court noted, "general dictionaries collect definitions

13  of a term as used not only in a particular field, but in many different settings."

14  <u>Phillips</u>, 415 F.3d at 1321.

15            Indeed, contrary to Honeywell's general dictionary definitions, seminal texts

16  in the aeronautical field confirm that a person of ordinary skill in the art would not

17  limit "landing" to merely "touching down."  Rather, "landing" is a phase or process

18  that begins with touching down and ends when the aircraft is brought to normal

19  taxiing speed or a stop.  For example, the *Airplane Flying Handbook* published by

20  the Federal Aviation Administration ("FAA") states:

21            The landing process must never be considered complete until the

22            airplane decelerates to the normal taxi speed during the landing roll

23            or has been brought to a complete stop when clear of the landing

24            area.  Many accidents have occurred as a result of pilots abandoning

25

26  _____

27  declaration filed in support of Teledyne's Opening Claim Construction Brief.

28

1  their vigilance and positive control after getting the airplane on the

2  ground.

3  (See Alden Decl., Ex. B at 44).

4      Similarly, the *2001 Federal RadioNavigation Systems* published by the

5  Departments of Defense and Transportation provides that "[t]he landing phase

6  begins at the final approach fix (FAF) and continues through touchdown and

7  rollout." (Alden Decl., Ex. D at 79) (emphasis added).  Additionally, in examining

8  aircraft accidents occurring during "landing," the National Transportation Safety

9  Board and other air safety organizations do not limit their purview to mishaps

10  during "touching down."  (See, e.g., Alden Decl., Ex. E at 91) ("Other Landing

11  Accidents. . . .The Board's investigation found that although the touchdown was

12  uneventful, the airplane veered off the side of the runway shortly thereafter . . .").

13      That the term "landing" does not mean "touching down" to a person of

14  ordinary skill in the art is also supported by common sense.  There are those

15  unfortunate travelers who have experienced a "bounced" landing.  During a

16  "bounced" landing, an aircraft may touch-down once, lift-off the ground again, and

17  then touch-down a second time.  (See, e.g., id. at 90 ("FDR data indicated that after

18  the airplane's initial touchdown, it became airborne and rolled to the right as it

19  touched down again . . .")).  According to Honeywell, each of these touch-downs

20  would be a separate "landing," even though the aircraft ultimately comes to rest on

21  the ground only once.  This is surely incorrect.

22      **B.**    **"When" and "upon"**

23      To support its narrowing of the claims to the weight-on-wheels preferred

24  embodiment, Honeywell argues that the words "when" and "upon" in isolation

25  require no construction.  But these terms do not appear in isolation.  They are part of

26  a patent, and Phillips mandates that they must be construed as such.  Phillips, 415

27  F.3d at 1321 ("Properly viewed, the 'ordinary meaning' of a claim term is its

28  meaning to the ordinary artisan after reading the entire patent.") (emphasis added).

It is for this reason that, unlike Honeywell, Teledyne construed claim phrases, as opposed to single, unrelated words.

For the reasons discussed above, the specification undeniably reveals that the inventor contemplated the transmission of data <u>after</u> landing.  (<u>See</u>, <u>e.g.</u>, Paunovich Decl., Ex. 1, 1:66-2:1 ("cellular infrastructure [is] in communication with the data communication unit <u>after the aircraft has landed</u>."); <u>Id.</u> at 2:64-65 (an aircraft "illustrated <u>after landing.</u>") (emphasis added)).  The words "when" and "upon" are employed consistent with this intention.  For example, the specification states that "[t]he processor 32 is responsive to a weight-on-wheels signal . . . to initiate transmission or reception of data <u>when</u> the aircraft has landed."  (<u>Id.</u> at 3:26-30).  Similarly, in discussing the prior art, the specification explains that "[w]hen the aircraft lands, ground personnel board the aircraft, remove the media, and mails the media . . .") (<u>Id.</u> at 1:33-34).  In both of these instances, the term "when" is clearly used in the sense of "after."[2]

**C.  "Automatically"**

Honeywell asks the Court to construe the word "automatically" so as to require no human involvement.  The specification of the '990 patent, however, defines the word "automatically" as "<u>little or</u> no human involvement."  (Paunovich Decl., Ex. 1, 1:55-58) (emphasis added).  This definition appears in the description of the overall invention, and specifically in the context of "automatically transfer[ring] flight data":

---

[2]  Even if the Court were inclined to consult general dictionary definitions to construe the term "when"—for which there is no need in light of the specification—such definitions also support Teledyne's proposed constructions.  (Alden Decl., Ex. F at 96 (when:- "after: *call me when you're finished.*"); Ex. G at 100 (when:- "4. after which, and then.")).  And, even Honeywell concedes that one definition of the term "upon" is "following on."  19 THE OXFORD ENGLISH DICTIONARY 301 (2nd Ed. 1989).

1           Thus, there is a need for an aircraft data transmission system that

2           <u>automatically</u> transfers flight data from an aircraft to a flight

3           operations center <u>with little or no human involvement</u> and which

4           relies on a reliable wireless delivery system.

5    (<u>Id.</u>) (emphasis added). Teledyne's construction properly reflects this definition of

6    the word "automatically" in the specification. <u>Phillips</u>, 415 F.3d at 1316 ("[T]he

7    specification may reveal a special definition given to a claim term by the patentee . .

8    . In such cases, the inventor's lexicography governs.").

9           Honeywell incorrectly contends that, in order to overcome a rejection,

10   Teledyne disclaimed everything except the complete absence of human

11   involvement. (HW Opening Brief at 9-10). But, contrary to Honeywell's assertion,

12   in the Interview Summary of July 6, 2005, the patentee distinguished the Ross

13   reference not on the basis of "human or manual activation," but rather on the basis

14   that "Ross does not communicate <u>[flight] data upon landing of the aircraft</u>." (Alden

15   Decl., Ex. A at 14) (emphasis added). More specifically, the patentee explained that

16   "Ross only teaches <u>sending a flight plan cancellation</u> upon landing of an aircraft, <u>not</u>

17   <u>'flight data'</u>." (<u>Id.</u> at 20) (emphasis added).

18          Even if the definition of "automatic" in the specification is ignored, however,

19   Honeywell's understanding of the word "automatic" is simply inconsistent with how

20   even a lay person understands the word. (<u>See</u> Alden Decl., Ex. F at 95, THE NEW

21   OXFORD AM. DICTIONARY (2nd Ed. 2005) (defining "automatic" as "1 (of a device

22   or process) working by itself with <u>little or no direct human control</u>."); Ex. G at 99,

23   THE CASSELL DICTIONARY & THESAURUS (1999) (defining "automatic" as "1

24   operating without direct <u>or continuous</u> human intervention."); Ex. H at 103,

25   MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th Ed. 1993) (cited by

26   Honeywell for another term, defining "automatic" as "<u>largely</u> or wholly

27   involuntary.") (emphasis added for all)).

28

1      Lastly, Honeywell attempts to support its narrow construction by pointing to

2  constructions in other patents before the Federal Circuit.  These constructions,

3  however, are in the context of other patents and other file histories, and are therefore

4  irrelevant.  See Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1318 (Fed. Cir.

5  2005) ("the manner in which the term is used in the patent may dictate a definition

6  that differs from the definition that would be given to the same term in a different

7  patent with a different specification or prosecution history.").

8     **D.   "In Response To"**

9      Honeywell argues that Teledyne's construction of the phrase "in response to"

10  reads a "causal limitation" out of the claims.  (HW Opening Brief at 10-11).  But

11  Teledyne does not construe the phrase "in response to" out of context, as Honeywell

12  does.  Rather, Teledyne construes the phrase, "cellular infrastructure is accessed in

13  response to the signal."  Unlike Honeywell's acontextual definition of a constituent

14  phrase, Teledyne's construction harmonizes the claim language by clarifying that,

15  although the signal from the "second sensor" may be one signal in response to which

16  the cellular infrastructure is accessed, there may be additional signals.

17      As noted above, claims 18, 19 and 33 include "at least" a first or second

18  sensor that senses the aircraft has landed.  Under Honeywell's construction,

19  however, the cellular infrastructure must be immediately accessed in response to the

20  first or second sensor sensing the aircraft has landed, even though there may be

21  additional sensors that have not yet sent their respective signals, such as a door

22  opening signal.  Teledyne's construction clarifies that the cellular infrastructure is

23  accessed only after all of the sensors are triggered, whereas Honeywell's

24  construction renders these additional sensors redundant.

25

26

27

28

1    **E.    "Flight Data"**

2        1.    There Is Nothing In the Specification Or The File History That

3              Limits "Flight Data" As Honeywell Proposes

4        The term "flight data" appears in independent claims 8, 14 and 25, where it is

5    not limited to any specific parameters of flight data.  By contrast, independent

6    claims 1, 15, 18, 19 and 33 require the transmission of certain minimum parameters

7    (i.e., time, airspeed, altitude, vertical acceleration, and heading).  Honeywell would

8    improperly have the Court artificially narrow the term "flight data" in independent

9    claims 8, 14, and 25, by inserting the additional limitations of independent claims 1,

10   15, 18, 19 and 33.

11       As an initial matter, even if the doctrine of claim differentiation is ignored, it

12   is clear that "flight data" must mean more than the parameters listed in Honeywell's

13   construction—"air speed, altitude, vertical acceleration, heading, and time"—

14   because otherwise the term "flight data" would be redundant in those claims that

15   feature both phrases.  Innova, 381 F.3d at 1119 ("all claim terms are presumed to

16   have meaning in a claim.").

17       Moreover, there is nothing in the specification or the file history that supports

18   artificially limiting "flight data" to a set of five parameters.  To the contrary, the

19   specification explains that "flight data" includes not just data relating to a flight

20   direction and speed—such as those parameters identified by Honeywell—but also

21   flight data relating to "performance" of an aircraft that can be used "to assist in

22   maintenance of the aircraft."  Specifically, the specification states:

23           It is common for aircraft to generate records of data relating to flight

24           and performance parameters for each flight of the aircraft . . . The

25           data are utilized in the event of an accident or a near-accident and to

26           assist in maintenance of the aircraft by detecting faulty components

27           or gradual deterioration of a system or component, to assist in

28

1           reviewing crew performance, and to assist in logistical planning

2           activities such as scheduling and routing."

3 (Paunovich Decl., Ex. 1, 1:21-28) (emphasis added).  All "flight and performance"

4 data that can be used to "assist in maintenance of the aircraft," "reviewing crew

5 performance" or "assist[ing] in logistical planning activities" were contemplated by

6 the patentee.  Honeywell has identified no intrinsic evidence to the contrary.

7      The plain language of the claims also makes clear that the term "flight data" is

8 not limited as Honeywell suggests.  For example, claim 1 describes "flight data" as

9 "includ[ing] time, airspeed, altitude, vertical acceleration, and heading data relating

10 to a flight of the aircraft."  (Paunovich Decl., Ex. 2, 1:44-46) (emphasis added).  As

11 a patent law term of art, "includes" means "comprising," and its use does not

12 foreclose the presence of additional elements that do not satisfy stated claim

13 limitations.  See SanDisk Corp. v. Memorex Products, Inc., 415 F.3d 1278, 1284

14 (Fed. Cir. 2005).

15           2.     The Term "Flight Data" Includes Far More Than Honeywell's

16                Five Parameters

17      A person of ordinary skill in the art would have considered "flight data" to

18 encompass more than Honeywell's five parameters.  (Declaration of K. Prasad Nair).

19 As early as 1997, aircraft were required to record 88 different parameters as part of

20 "aircraft flight recorder specifications."  (See Alden Decl., Ex. I at 104-118).

21 Included among the 88 flight data parameters are "engine parameters," such as

22 "vibration level, N2, EGT, Fuel Flow, Fuel Cut-off lever position and N3," and

23 "engine warning" discretes, such as "vibration, temp, low pressure and speed."  Id.

24 Recording these 88 parameters is mandated by federal law.  For Honeywell to thus

25 contend that a person of ordinary skill in the art would have limited "flight data" to

26 only five parameters is nothing short of fanciful.

27      What is more, Honeywell's proposed construction contradicts representations

28 Honeywell made to the Patent Office concerning its own U.S. Patent No. 6,397,128

1   (issued may 28, 2002), which explicitly discusses the use of a "flight data" recorder

2   and flight data acquisition unit to gather and store engine data.  (Alden Decl., Ex. J,

3   2:55-57) ("This results in the development of high accuracy, fast response engine

4   digital signal sensors which have stimulated requirements for improved flight data

5   monitoring systems.") (emphasis added)).  Having itself acknowledged that "flight

6   data" includes engine data, Honeywell cannot now seek to narrow its definition for

7   strategic purposes.

8        Finally, Honeywell resorts to discussions with the U.K. Patent Office by

9   Teledyne's foreign patent agents.  This approach ignores the Federal Circuit maxim

10  that statements in a foreign jurisdiction are irrelevant to the construction of these

11  terms in the United States.  See, e.g., Pfizer, Inc. v. Ranbaxy Labs., Ltd., 457 F.3d

12  1284, 1290 (Fed. Cir. 2006) ("statements made during prosecution of foreign

13  counterparts to [a] patent are irrelevant to claim construction because they were

14  made in response to patentability requirements unique to [foreign] law.").[3]

15       **F.    "Data Acquisition Unit"**

16       Again ignoring the doctrine of claim differentiation, Honeywell attempts to

17  re-write the claim phrase "data acquisition unit" as "flight data acquisition unit."

18  But Teledyne knew how to write "flight data acquisition unit," having used this

19  phrase in claims 8, 13, 14, 19, 25, 29, and 33.  Having used a different phrase in

20  claims 1, 15 and 18, the principle of claim differentiation counsels against giving

21  them the same meaning, as Honeywell advocates.  Comark Comm. Inc. v. Harris

22  Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998) ("There is presumed to be a difference

23

24  _____

25       [3] Honeywell also conveniently omits that the U.K. Patent Office Examiner
     initially rejected the argument that downloading maintenance data was not disclosed
26  by the '990 patent, pointing specifically to lines 21-28 of column 1 of the patent
     relied on by Teledyne in this proceeding.  (File History of U.K. Patent Application
27  No. 0323990.2, November 16, 2005 Examination Report).

28

1   in meaning and scope when different words or phrases are used in separate

2   claims.").[4]

3       Honeywell's attempt to re-write claim language once again ignores <u>Phillips</u>

4   and imports a limitation from a preferred embodiment.  But even the passage in the

5   specification on which Honeywell relies undermines its argument:  "The data

6   acquisition unit 20 <u>includes</u> a digital flight data acquisition unit (DFDAU) processor

7   22, . . ."  (Paunovich Decl., Ex. 1, 3:10-11) (emphasis added).  It is difficult to see

8   how the patentee could have been any clearer: a "data acquisition unit" and a "flight

9   data acquisition unit" are different things because one may include the other.  The

10  term "data acquisition unit" has a clear and well-defined meaning:  a unit that

11  gathers or "acquires" data, which includes, but is not limited to, a "flight data

12  acquisition unit."  There is nothing in the intrinsic record that supports Honeywell's

13  effort to limit the term "data acquisition unit" to the preferred embodiment.

14      Honeywell also attempts to support its artificially narrow construction with

15  the declaration of Chris Wargo.  Mr. Wargo's declaration, however, simply parrots

16  Honeywell's arguments.  As the *en banc* Federal Circuit has observed, "conclusory,

17  unsupported assertions by experts as to the definition of a claim term are not useful

18  to a court.  Similarly, a court should discount any expert testimony that is clearly at

19  odds with the . . . written record of the patent."  <u>Phillips,</u> 415 F.3d at 1318 (internal

20  quotations omitted).  For the same reasons explained above, Mr. Wargo's conclusory

21  declaration contradicts the intrinsic evidence and cannot be given any weight.

22      **G.      "Cellular Infrastructure/Cellular Communications**

23      **Infrastructure/Cellular Telephone Infrastructure"**

24      The "cellular infrastructure" terms in the '990 patent do not require

25  construction.  Honeywell's argument that the average juror will not understand these

26  ─────────────────

27  [4]   It should be noted that Teledyne does not accept Honeywell's definition of the

28  (footnote continued)

1 terms is simply not credible.  Nonetheless, the parties' only dispute regarding the

2 "cellular infrastructure" terms is Honeywell's attempt to include unclaimed,

3 structural components into the claims, i.e., "a base station transceiver subsystem

4 connected to a base station controller."  Once again, Honeywell argues that the

5 Court should limit these terms to the preferred embodiment, despite the Federal

6 Circuit's contrary instruction in Phillips.

7          Honeywell's narrow construction also violates the doctrine of claim

8 differentiation by rendering two dependent claims superfluous.  Claim 6 and 39

9 narrow the "cellular infrastructure" and "cellular telephone infrastructure" elements

10 of independent claims 1 and 8 to include a transceiver and controller.  (Paunovich

11 Decl., Ex. 1, 7:5-10; Ex. 2, 2:65-3:4 ("an antenna; a transceiver subsystem in

12 communication with said antenna; and a controller in communication with said

13 transceiver subsystem.") (emphasis added)).  To interpret the terms "cellular

14 infrastructure" and "cellular telephone infrastructure" to include a "base station

15 transceiver subsystem connected to a base station controller," as Honeywell urges,

16 would thus render claims 6 and 39 superfluous of claims 1 and 8.  Comark, 156 F.3d

17 at 1187 ("There is presumed to be a difference in meaning and scope when different

18 words or phrases are used in separate claims.").  Honeywell has not shown any

19 reason to rebut the presumption of claim differentiation.  Id.

20          **H.    "Serial Card"**

21          Honeywell's construction of the term "serial card"—i.e., "a circuit board with

22 I/O interfaces that each transmit data to or from a peripheral device one bit at a

23 time"—once again ignores Phillips and the doctrine of claim differentiation, and

24 improperly imports structural limitations from the preferred embodiment into the

25 claims.  There is nothing in the claim language, specification or file history that

26 _____

27 term "flight data acquisition unit" in light of the specification.

28

1  limits a "serial card" to the "<u>multi-port</u> serial card" identified as a preferred

2  embodiment in the specification.  That claims 8 and 14 contemplate a "serial card"

3  in communication with "a plurality of cell channels" does not justify importing a

4  <u>particular structure</u> for accomplishing this into the claims.

5         What is more, even the general dictionaries on which Honeywell improperly

6  relies say nothing about "I/O interfaces" or "peripheral devices".  (HW Opening

7  Brief p. 16). If the patentee had wanted to limit the term "serial card" to a particular

8  structure, it would have done so.  It did not.  <u>Phillips</u>, 415 F.3d at 1323 ("[W]e have

9  expressly rejected the contention that if a patent describes only a single

10  embodiment, the claims of the patent must be construed as being limited to that

11  embodiment . . .).

12     **I.      "Flight Operation Center"**

13        This phrase requires no construction.  Nonetheless, were the Court inclined to

14  construe the phrase, the specification makes clear that a "flight operation center" is

15  nothing more than the location where the downloaded flight data is processed and

16  analyzed.  (Paunovich Decl., Ex. 1 at 5, 13) (figures 2 and 11 of the patent illustrate

17  that the "flight operations center (18)" contains the "data reception unit (47).").

18  Contrary to what Honeywell would have the Court believe, neither the claims nor

19  the specification make any mention of a "base of operations for an airline or other

20  aircraft operator."

21        Even if the Court were to consider extrinsic evidence (which is not needed in

22  this instance), the Teledyne advertisement raised by Honeywell does not support its

23  proposed construction.  Indeed, the advertisement never even refers to a "flight

24  operation center."  And, Honeywell has offered no evidence—nor could it—that the

25  Teledyne marketing personnel who developed the relevant advertisement intended

26  thereby to construe, and limit the scope of, the '990 patent.

27

28

**J.      Claim 25 ("Threads"/"Primary Data Thread"/"Threads Are Active")**

1.      Honeywell's Indefiniteness Argument Is Meritless

Honeywell incorrectly argues that claim 25 is indefinite because the claim includes a "transmitting step"—i.e., "starting a primary data thread"—among "processing" steps.  (HW Opening Brief, p. 17-18).  As an initial matter, it is clear from Teledyne's construction of the term "primary data thread"—i.e., "a thread that causes the initial call to be made to the cellular infrastructure"—that the "primary data thread" does not transmit data itself, as Honeywell suggests, but merely causes the communications channel with the cellular infrastructure to be opened. Accordingly, there is no intermingling of "processing" and "transmitting" steps.

Secondly, even if "starting a primary data thread" did transmit data—which it does not—there is nothing in claim 25 that precludes the simultaneous processing and transmission of data, as Honeywell presumes.  To the contrary, claim 25 expressly contemplates that data will be concurrently processed and transmitted. (Paunovich Decl., Ex. 1, 8:63-65) ("repeating, when threads are active, the steps of waiting a predetermined period of time and determining if any threads are active.").

Finally, Union Pacific Resources Company v. Chesapeake Energy Corporation, 236 F.3d 684 (Fed. Cir. 2001) does not support Honeywell's argument. The Union Pacific court did not find the at-issue claims indefinite for "mixed" steps. Rather, the court found that the patent did not adequately define a claim term.  Id. at 692 ("Thus, the  951 patent does not define the means to "compare" the two sets of characterizing information. The district court correctly found that the "comparing" steps in claims 1 and 6 are indefinite.").

2.      Honeywell's Construction of the Term "Data Thread" Improperly Imports the Preferred Embodiment from the Specification

Honeywell proposes that the addition of the word "data" in "data thread" adds a whole sentence of structural limitations to claim 25.  (Honeywell's Opening Brief,

p. 18 (" . . . for conveying data packets to a multi-port serial card for transmission via one of a fixed number of corresponding cell channels.")).  Nothing in claim 25, the specification, or the file history so limits the term "data thread."  Indeed, the passage in the specification on which Honeywell relies does not even mention the term "data thread."  Even if it did, it is clear that this passage is merely discussing a preferred embodiment.  (Paunovich Decl., Ex. 1, 6:27-31) ("While the present invention has been described in conjunction with preferred embodiments thereof, many modifications and variations will be apparent to those of ordinary skill in the art.").

Honeywell's contention that the term "threads are active" should be construed as "more than one thread is active" because the claim uses the plural "thread<u>s</u>" is grammatically incorrect.  As Honeywell acknowledges, claim 25 contains the step of "determining if <u>any</u> threads are active."  (<u>Id.</u> at 8:62)  As Honeywell's own dictionary definitions show, the term "any" means "<u>one</u> (no matter which) of more than two."  WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY, UNABRIDGED 83 (2nd ed. 1979).   Thus, claim 25 covers determining if one thread from a plurality of threads is active.  It does not require that more than one thread be active, as Honeywell urges.

More importantly, Honeywell ignores the definition given to the term in the specification.  (Paunovich Decl., Ex. 1, 5:4-6) (". . .the processor determines if any threads are active, <u>i.e., if there are any packets that haven't been transmitted or have been transmitted and dropped</u>.")).

### K.    Claim 15: "Means-Plus-Function"

The only dispute regarding the means-plus-function language of claim 15 concerns how much structure is needed for the "means for transmitting." Here again, Honeywell ignores Federal Circuit maxims by seeking to incorporate details from the specification into the claim that are not claim limitations.  See <u>Odetics, Inc. v. Storage Tech. Corp.</u>, 185 F.3d 1259, 1268 (Fed. Cir. 1999) ("The individual

1  components, if any, of an overall structure that corresponds to the claimed function

2  are not claim limitations.  Rather, the claim limitation is the overall structure

3  corresponding to the claimed function.").[5]

4          Consistent with the description in the specification, Teledyne proposes that

5  the corresponding structure is a "communications unit, including a computer

6  processor, serial card, cell channel and antenna, and all equivalents thereof."

7  (Paunovich Decl., Ex. 1, 3:31-41).  This is the only structure necessary to perform

8  the claimed function, and it is this "overall structure corresponding to the claimed

9  function," and nothing more, that limits the scope of the claim.  Honeywell's request

10  that the Court unnecessarily import each and every detail of each and every

11  component violates the rule of Odetics.

12          Honeywell also contends that the corresponding structure for the "means for

13  transmitting" element must include an algorithm (i.e., specific program code).  But,

14  contrary to Honeywell's contention, no algorithm is disclosed in the specification

15  and none is needed.  See Med. Instrumentation & Diagnostics Corp. v. Elekta AB,

16  344 F.3d 1205, 1214 (Fed. Cir. 2003), cert. denied, 124 S.Ct. 1715 (2004) ("[T]here

17  would be no need for a disclosure of the specific program code if . . . one skilled in

18  the art would know the kind of program to use."); PolyVision Corp. v. Smart Tech.

19  Inc., 501 F. Supp. 2d 1042, 1058 (W.D. Mich. 2007) (identifying the structure to

20  accomplish the stated function as, in part, a computer processor and holding that

21  description of program (e.g., flow charts) was not part of the structure because there

22  was no algorithm or software code disclosed) (emphasis added).

23          At bottom, the corresponding structure of the "means for transmitting"

24  element at issue (i.e., a communications unit) simply does not warrant the

25

26  _____

27      [5]   In its brief, Honeywell does not oppose Teledyne's proposed structure for
   "sensing means" or "means for receiving."  (HW Opening Brief, p. 10-11.)

28

1  incorporation of an algorithm (let alone the method described in claims 25-28) for

2  transmitting flight data.

3  **IV.   HONEYWELL'S '152 PATENT**

4      Honeywell's analysis of the key terms "first communication medium,"

5  "second communication medium," "aeronautical satellite system" and "direct

6  broadcast satellite" ignores the plain language of the claims, the file history, and the

7  Examiner's reasons for allowance.  The Examiner initially rejected each as-filed

8  claim of the '152 patent as anticipated.  (Paunovich Decl., Ex. 7 at 64-68).  To

9  overcome this rejection, Honeywell amended the claims to include a "first

10  communication medium comprising: an <u>aeronautical satellite system</u>" and "a second

11  communication medium comprising a <u>direct broadcast satellite</u>."  (Paunovich Decl.,

12  Ex. 8 at 84-88) (emphasis added).  It was only on the basis of Honeywell's inclusion

13  of these <u>two</u> satellites, "an aeronautical satellite system" and a "direct broadcast

14  satellite" that the Examiner allowed the patent:

15        The following is an examiner's statement of reasons for allowance:

16        the prior art made of record does not teach or fairly suggest in

17        combination a data communication system for retrieving data

18        information, said data communications system comprising: . . . first

19        communication medium comprising: an aeronautical satellite system

20        and a ground station, . . . a second communication medium

21        comprising a direct broadcast satellite . . .

22  (Paunovich Decl., Ex. 9 at 92).  Honeywell cannot now ignore its arguments to the

23  Examiner and the Examiner's Reasons for Allowance to recapture by claim

24  construction what it surrendered during prosecution.

25      Honeywell contends that—contrary to the specification, its arguments to the

26  Patent Office, and the Examiner's reasons for allowance—the first and second

27  communication media "may comprise any suitable media."  (Honeywell's Opening

28  Brief, p. 20).  But that is not what the claims say.  Both claims 1 and 10 plainly state

that the "first communication medium compris[es]: an aeronautical satellite system and a ground station [and] . . .a radio ground station." (Paunovich Decl., Ex. 6, 10:55-67, 12:55-67).  Similarly, these claims expressly define the "second communication medium [as] comprising a direct broadcast satellite."  (Id. at 11:4-7, 13:11-14).  These limitations were added by amendment to overcome the Examiner's rejections.

Having expressly defined the communication media in the claims and in the file history when these amendments were made, Honeywell cannot rely on the specification to read out these elements.  See, e.g., Schoenhaus v. Genesco, Inc., 440 F.3d 1354, 1358-59 (Fed. Cir. 2006) (rejecting argument to read limitation "rigid" out of claim);  Apple Computer, Inc. v. Articulate Sys., Inc., 234 F.3d 14, 25 (Fed. Cir. 2000) (rejecting a construction that would "read the qualifier 'help' out of the definition of 'help' access window.").  Moreover, Honeywell's construction also defies common sense.  Why would the claims include both a "first communication medium" and a "second communication medium" if they were the same thing?  CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("we must presume that the use of . . . different terms in the claims connotes different meanings.").

Honeywell's argument that a "direct broadcast satellite" ("DBS") is merely "a subset of the larger 'aeronautical satellite system'" suffers from the same fundamental flaws.  Both the claims and the specification expressly distinguish between an "aeronautical satellite system" and a "direct broadcast satellite." Nowhere is this more clearly illustrated than in Figure 3 of the patent, which clearly shows the "DBS satellite" and the aeronautical satellite systems" to be different. (Paunovich Decl., Ex. 6 at 53).  Moreover, unlike the reference in the patent to the Inmarsat system as an aeronautical satellite, nowhere does the specification mention DBS as an example of an "aeronautical satellite system."  (Id. at 8:29-34).

1    **V.    HONEYWELL'S '468 PATENT**

2         **A.    "Vehicle Server" and "Component"**

3         The parties only argument with respect to the claim terms "vehicle server"

4    and "component" is whether these devices must be separate.  In other words, the

5    parties dispute whether the "component" can be the "vehicle server."  But the Court

6    need only look to the language of the '468 claims to determine that "the applicant

7    regards [] his invention" as including a <u>separate</u> "vehicle server" and "component":

8              1. A method of providing a data update to a vehicle, the method

9              comprising the steps of:

10                  obtaining and storing said data update at a system server;

11                  forwarding said data update from said system server to a vehicle

12             server via a data connection;

13                  loading said data update from said vehicle server into a

14             component at said vehicle; and

15                  verifying from said vehicle server to said system server via said

16             data connection that said loading step completed successfully.

17   (Paunovich Decl., Ex. 13, 10:35-45).

18        Honeywell's construction must therefore be rejected because it would

19   eliminate the claim limitation requiring that the "vehicle server" perform the loading

20   step into a separate component.  <u>See</u>, <u>e.g.</u>, <u>Autogiro Co. of Am. v. U.S.</u>, 384 F.2d

21   391, 396 (Ct. Cl. 1967) ("Courts can neither broaden nor narrow the claims to give

22   the patentee something different than what he has set forth."); <u>Panduit Corp. v.</u>

23   <u>Dennison Mfg. Co.</u>, 810 F.2d 1561, 1576 (Fed. Cir. 1987) ("A disregard of patent

24   claim limitations . . . would render claim examination in the [Patent and Trademark

25   Office] meaningless.").

26        Teledyne's construction is also supported by the specification of the '468

27   patent.  There, the "component" is described as "any avionics or other aircraft <u>device</u>

28   such as a flight management computer (FMC), flight management system (FMS),

1   global positioning system (GPS), navigation computer or the like." (Paunovich

2   Decl., Ex. 13, 5:46-49) (emphasis added).  There is no suggestion that the device is a

3   constituent part of the "vehicle server." (See also Alden Decl., Ex. K at 126, THE

4   AUTHORITATIVE DICTIONARY OF IEEE STANDARD TERMS 1031 (7th ed. 2000)

5   (defining "server" as "[i]n a network, a device or computer system that is dedicated

6   to providing specific facilities to other devices attached to the network.") (emphasis

7   added)).

8        Honeywell also claims that the "component" need not "use the data update to

9   perform a function."  But the '468 patent is directed to providing and verifying the

10  successful loading of data updates to devices, such as a navigation unit.  The patent

11  is not directed merely to transferring data from point A to point B without ever

12  using it.  (Paunovich Decl., Ex. 13, 1:15-18, "As pilots, drivers, passengers and

13  others become increasingly dependent upon computerized devices to control,

14  navigate or otherwise affect their craft, the need for current data becomes

15  paramount.").  Teledyne's construction for the term "component" properly

16  incorporates the practical reality that the device ("component") that receives the data

17  update must use it to perform a function.  (Id. at 5:45-54) ("[c]omponent 118 . . .

18  suitably uses data upgrades . . . to perform a function.").[6]

19  DATED:  December 17, 2007          QUINN EMANUEL URQUHART OLIVER &
20                                     HEDGES, LLP

21                                     By /s/ Steven M. Anderson
22                                        Steven M. Anderson
                                         Attorneys for Plaintiff and Counter-Defendant
23                                       Teledyne Technologies Incorporated

24  _____

25     [6]   Honeywell contends that the only terms needing construction in the '468
    patent are "vehicle server" and "component."  However, avionics is a specialized
26  field with many terms that have a specific meaning to a person of ordinary skill in
    the art.  Accordingly, Teledyne respectfully requests that the Court construe all of
27  the terms explained by Teledyne in its Opening Claim Construction Brief.

28