KIRKLAND & ELLIS LLP
Robert G. Krupka, P.C. (S.B.N. 196625)
rkrupka@kirkland.com
Luke L. Dauchot (S.B.N. 229829)
ldauchot@kirkland.com
Ephraim D. Starr (S.B.N. 186409)
estarr@kirkland.com
777 South Figueroa Street
Los Angeles, California  90017
Telephone:  (213) 680-8400
Facsimile:   (213) 680-8500

Attorneys for Defendant-Counterclaimant
HONEYWELL INTERNATIONAL INC.
and Counterclaimant HONEYWELL
INTELLECTUAL PROPERTIES INC.

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| TELEDYNE TECHNOLOGIES INC., a Delaware corporation, | Case No. CV 06-06803 |
| Plaintiff, | Assigned to: Hon. Margaret M. Morrow |
| vs. | |
| HONEYWELL INTERNATIONAL INC., a Delaware corporation, | **HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF RE U.S. PATENTS  6,477,152 AND 6,438,468 AND REVISED [PROPOSED] ORDER** |
| Defendant. | |
| HONEYWELL INTERNATIONAL INC. and HONEYWELL INTELLECTUAL PROPERTIES INC., a Delaware corporation, | |
| Counterclaimants. | Date:   TBD |
| vs. | Time:   TBD |
| | Place:  Courtroom 780 |
| TELEDYNE TECHNOLOGIES INC., a Delaware corporation, | |
| Counterdefendant. | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................. 1

II.     LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................................. 1

III.    THE '152 PATENT .......................................................................... 3

    A.      Data Source ......................................................................... 3

    B.      Network System ................................................................... 4

    C.      Information Request System .................................................. 5

    D.      Transmission Unit ................................................................ 6

    E.      Satellite Data Unit ............................................................... 7

    F.      Radio Frequency Unit .......................................................... 8

    G.      First and Second Communication Mediums ............................. 9

    H.      Aeronautical Satellite System .............................................. 10

    I.      Direct Broadcast Satellite; Direct Broadcast[ing] System; Broadcasting ....................................................................... 12

    J.      Selecting ............................................................................ 13

    K.      Wireless LAN System / Radio Frequency System / Voice Channel System ............................................................................... 14

IV.     THE '468 PATENT ........................................................................ 16

    A.      System Server ................................................................... 16

    B.      Vehicle Server ................................................................... 17

    C.      Data Connection ................................................................ 18

    D.      Component ........................................................................ 19

    E.      Loading Said Data Update from Said Vehicle Server into a Component at  Said Vehicle ......................................................... 20

    F.      Verifying / Receiving Confirmation of Successful Load ........... 22

    G.      Digital Storage Medium ....................................................... 22

    H.      Operable to Execute the Method ............................................ 23

    I.      At a Pre-Determined Time .................................................... 24

V.      CONCLUSION ............................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*CCS Fitness, Inc. v. Brunswick Corp.*,
   288 F.3d 1359 (Fed. Cir. 2002) ................................................................ 11, 14

*Comark Commc'ns, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) ................................................................ 5, 19

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
   93 F.3d 1572 (Fed. Cir. 1996) ..................................................................... 24

*Hoechst Celanese Corp. v. BP Chems.*,
   78 F.3d 1575 (Fed. Cir. 1996) ..................................................................... 25

*In re Paulsen*,
   30 F.3d 1475 (Fed. Cir.1994) ................................................................... 2, 3

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ............................................................... 2, 4

*Jack Guttman, Inc. v. Kopykake Enters., Inc.*,
   302 F.3d 1352 (Fed. Cir. 2002) ............................................................ passim

*Optical Disc Corp. v. Del Mar Avionics*,
   208 F.3d 1324 (Fed. Cir. 2000) ...................................................................... 2

*Osram GmbH v. Int'l Trade Comm'n*,
   505 F.3d 1351 (Fed. Cir. 2007) .................................................................... 25

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ......................................................... 2, 5, 9, 18

*RF Del., Inc. v. Pac. Keystone Techs., Inc.*,
   326 F.3d 1255 (Fed. Cir. 2003) ............................................................ passim

*Schoenhaus v. Genesco, Inc.*,
   440 F.3d 1354 (Fed. Cir. 2006) ............................................................ 2, 18

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ............................................................ 1, 11

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ............................................................ 2, 18

## OTHER AUTHORITIES

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1197
   (10th ed. 1996) ........................................................................................ 15

RANDOM HOUSE WEBSTER'S COMPUTER & INTERNET DICTIONARY 320
   (3rd ed. 1999) ........................................................................................ 21

THE AM. HERITAGE DICTIONARY 975
   (2d College ed. 1991) ........................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      INTRODUCTION

The vast majority of the claim terms of the Honeywell patents have meanings that are understandable to a POSITA as well as a lay jury and have not been redefined by the respective patents.  Accordingly, those terms need no construction.  Should the Court differ, Honeywell proposes alternate constructions for these terms that are consistent with their plain meaning.  There are instances where the specification clearly defines claim terms; in such cases, Honeywell relies on those definitions.

On the other hand, Teledyne's constructions seek  to impose limitations that not only run afoul of the terms' plain import, but yield redundancies and inconsistencies with the balance of the claim language.  Teledyne's claim analysis also suffers from repeated efforts to add limitations to the claims either with no support in the intrinsic record, or the improper "support" of an alternative embodiment.

## II.     LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Honeywell incorporates the statements of law and the analysis in its *Markman* opening and responsive briefs.  In view of the Court's request for supplemental briefing not only on the proper construction of the disputed terms, but also on the antecedent need for construction, three legal standards warrant highlighting.  First, Federal Circuit authority makes it clear that not all disputed terms require construction.  In *U.S. Surgical,* the Federal Circuit held that claim construction is required only "when the meaning or scope of technical terms and words of art is unclear **and** in dispute **and** requires resolution to determine" the issue before the court.[1]  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). The en banc court in *Phillips* likewise stated, "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Phillips*

---

[1] Unless otherwise indicated, all emphasis appearing in this brief has been added.

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

*v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *see also Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1334 (Fed. Cir. 2000) ("Without evidence in the patent specification of an express intent to impart a novel meaning to a claim term, the term takes on its ordinary meaning.").

Second, the Federal Circuit has also made clear that it is improper to construe claim terms in a manner that renders other claim language redundant.  *See, e.g.*, *RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003) ("To construe the 'filter bed' of claim 1 as including a flocculation, a transitional, and a filter layer . . . renders redundant or meaningless the limitation 'a flocculation layer' in claim 7 and the limitation 'a transitional layer' in claim 12."); *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1357 (Fed. Cir. 2002) (rejecting construction of "tortuous" as "'marked by repeated twists, bends, or turn' . . . because it simply makes the phrase 'tortuous bend' redundant"); *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) (holding that "all claim terms are presumed to have meaning in a claim").

And third, a patentee may expressly define claim terms in the specification. *See, e.g.*, *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1358 (Fed. Cir. 2006) ("The patentee is free to act as his own lexicographer, and may set forth any special definitions of the claim terms in the patent specification or file history, either expressly or impliedly."); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996) (where specification clearly and unambiguously defines claim term, that definition is controlling).  Consistent with *In re Paulsen*, the patentee should act clearly and deliberately if he or she seeks to define terms in the specification.  *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir.1994) ("Although an inventor is indeed free to define the specific terms used to describe his or her invention, this must be done with reasonable clarity, deliberateness, and precision.").

1

2

## III.   THE '152 PATENT

### A.   Data Source[2]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "a source of data." | A source of data remote from the vehicle, which stores or channels information, receives requests for information from the information request system and transmits the requested data to the receiver. |

"Data source" is a term that carries no specialized meaning to a POSITA and is understandable to a jury.  Neither the patent's specification nor the file history has redefined it.  Therefore, no construction is required.  Teledyne nonetheless attempts to inject several limitations into the term's plain meaning.  These limitations are redundant to, and inconsistent with, the balance of the claim language.  Teledyne's proposal, for example, adds that the data source is "remote" from the vehicle.  Yet neither the specification nor claim language supports this narrowed view of the term.  Teledyne also proposes defining "data source" as something "which stores or channels information."  Yet the claim language states that the data source includes "a network system for the storage **and** delivery of data information."  ('152 col.10 ll.48-49.)

Teledyne's construction also adds limitations that appear later in the respective claims, making its proposed construction redundant.  For example, Teledyne adds that the data source "stores" information—language appearing later in the claim.  (*Id.* ("data source comprising a network system for the **storage** and delivery of the data").)  Teledyne also adds that the data source "transmits the requested data to the receiver" —again, language appearing later in the claim.  ('152 col.11 ll.4-7 ("a direct broadcast satellite adapted to receive data information from said data source and to **broadcast said data information to said receiver**").)  And in a third instance for this one term alone, Teledyne also seeks to impose the redundant language that the data source "receives requests from the information request system."  ('152 col. 11 ll.8-11 ("a

---

[2] Appears in claims 1 and 10 of the '152 patent.

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

1   receiver . . . adapted to **receive the data information requested** by said information

2   request system and from said data source").)  Inserting even one, much less all, of

3   Teledyne's proposed limitations into "data source" improperly renders other the claim

4   language superfluous.  *See Innova/Pure Water*, 381 F.3d at 1119; *RF Del.*, 326 F.3d at

5   1264; *Jack Guttman*, 302 F.3d at 1357.

6   　　　In its efforts to add a limitation of remoteness, Teledyne relies on the

7   specification's "field of the invention," (Pl.'s Br. 13 (citing '152 col. 1 ll.6-8)), but

8   this section does not purport or operate to redefine "data source."  Moreover, the

9   specification states that the data source is remote from the information request system

10  and the **receiver**, not the **vehicle** as Teledyne proposes.  ('152 col.2 ll.52-54.)

11  Teledyne also argues that if the data source were not remote, there would be no need

12  for the satellite system that appears later in the claim.  (Pl.'s Br. 13.)  While the

13  claim's satellite elements give context to the term "data source," they do not redefine

14  the term.  To hold otherwise would, again, render claim language superfluous.

15  　　　Although no construction of "data source" is required, if construed, this term

16  should be given its plain meaning:  a source of data.  The specification plainly states

17  that "data source" means any source of data.  (*See, e.g.*, '152 col.2 ll.64-65 ("The data

18  source 104 may comprise **any appropriate source of data** . . . ")).[3]

19  　　　**B.**　　**Network System**[4]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| A network that communicates requests to the data source. | A system remote from the vehicle configured to transmit data or voice communications between various communication systems. |

22  　　　The parties agree that this claim term should be construed.  They primarily

23  dispute whether the construction should include "remote from the vehicle."  Teledyne

_____

25  　　[3] While the representative sources of data *may* be remote from the vehicle, not all

26  necessarily are.  Nothing in the specification states, for example, that the "host computer system" and "dedicated or general information database" examples of data

27  sources cannot be on board the vehicle.  ('152 col.2 l.64 – col.3 l.2.)

28  　　[4] Appears in claims 1, 4, and 10 of the '152 patent.

supports its addition of this limitation solely by extending its flawed "data source" argument:  "Because, as explained above, the data source is remote from the vehicle, it follows that the 'network system' must be as well."  (Pl.'s Br. 13.)

As discussed in Honeywell's *Markman* Responsive Brief, Teledyne imports additional elements into its proposed construction of "network system" on the basis of a preferred embodiment:  "Network 314 ***preferably*** comprises…"  (Pl.'s Br. 13 (citing '152 col.8 ll.56-58).)  This approach, too, is flawed.  *See Phillips,* 415 F.3d at 1320 ("one of the cardinal sins of patent law" is "reading a limitation from the written description into the claims"); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) (upholding "our repeated statements that limitations from the specification are not to be read into the claims").  Worse, in arguing that the above text from the specification defines "network system," Teledyne overlooks the following unequivocal statement that comes two lines later:  "Accordingly, network system 314 can be a private network or a public network, such as a telephone network or television cable network, or ***any other suitable system for communicating the request to the data source*** 104."  ('152 col.8 ll.60-64.)  This statement, rather than an excerpt from the preferred embodiment, provides the POSITA with guidance as to the term's intended breadth, and hence it forms the basis for Honeywell's construction.

## C.   Information Request System[5]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "a system configured to enable a system user to request information." | A dedicated system configured to enable a system user to request information via the first communication medium from the data source. |

"Information request system" is a phrase that is understood by a jury.  Neither the patent's specification or file history redefines it.  Accordingly, no construction is required.  Teledyne disagrees and, again, attempts to inject several limitations into the phrase's plain meaning.

---

[5] Appears in claims 1, 4, and 10 of the '152 patent.

1   First, Teledyne adds the limitation "dedicated."  Teledyne offers no explanation

2   or citation for its attempt to impose this limitation.  Moreover, the additional language

3   serves to create ambiguity, not clarity:  dedicated by what, for what?  Second,

4   Teledyne's proposed addition of the limitation "via the first communication medium

5   from the data source," creates redundant claim language in the same manner as

6   Teledyne's approach to "data source."  Claim 1 already includes "*a first*

7   *communication medium* configured for transmission of requests for the data

8   information *from the information request system*" and states that the information

9   request system comprises "a transmission unit *coupled to said data source*."  ('152

10   col. 10 ll. 50-51, 55-57.)  Teledyne's definition of "information request system" thus

11   creates a morass of redundant text.  *See RF Del.*, 326 F.3d at 1264; *Jack Guttman*, 302

12   F.3d at 1357.

13   While Honeywell maintains that no construction is required, the specification

14   supports Honeywell's proposed alternative construction:  a system configured to

15   enable a system user to request information.  ('152 col. 10 ll. 50-52 (information

16   request system is "adapted to request the data information from said data source");

17   '152 col. 5 ll. 31-35 (information request system is "configured to enable a system user

18   . . . to request information from the data source 104 via the first communication

19   medium 208"); '152 Figs. 1-5, Item 102.)

20   ### D.   Transmission Unit[6]

| Honeywell's Construction | Teledyne's Construction |
| --- | --- |
| A component through which information requests to the data source are transmitted.  The transmission unit may act as a receiver and receive signals from the data source. | A unit on an aircraft that transmits a request for data to the data source via the first communication medium. |

24   The parties agree that "transmission unit" requires construction.  They dispute

25   whether the transmission unit must be "on an aircraft" and serve solely a transmitting

26   function.  Teledyne's proposed construction must be rejected in light of unequivocal

27   ───────────────

[6] Appears in claims 1, 7, and 10 of the '152 patent.

28

1
2
3
4
5
6

language in the specification contradicting its definition.  The specification describes the information request system, which "suitably comprises . . . a ***transmission unit***," ('152 col.5 ll.41-43), as "located aboard a vehicle, such as a commercial or noncommercial ***aircraft, helicopter, ship, train, or automobile***," (*Id.* at col.2 ll.55-57). Hence, the "transmission unit" may be on a helicopter, ship, train, or automobile, among other vehicles.  Teledyne points to no intrinsic evidence to the contrary.

7
8
9
10
11
12

While pointing to one sentence to support its position that the transmission unit cannot perform a receiving function, (Pl.'s Br. 15 (citing '152 col.6 ll.14-16)), Teledyne ignores the very next sentence in the specification, which establishes that the transmission unit "may also be configured as a ***transceiver to receive data signals from data source*** 104."  (*Id.*; '152 col.6 ll.16-18.)  The Court should therefore reject Teledyne's construction as conflicting with the claims and specification.

13

### E.    Satellite Data Unit[7]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "a communications unit that facilitates communications via satellite." | Satellite transmitter unit that receives a request from the information request system and generates a corresponding signal to be transmitted via satellite to the data source. |

14
15
16

17
18
19
20

The parties' dispute regarding this claim phrase stems, again, from Teledyne's attempt to insert limitations that add redundancies to the balance of the claim language.  Honeywell maintains that this term does not require construction, largely because the claim language itself provides ample context to a POSITA:

21
22

- The satellite data unit is part of the transmission unit.  ('152 col.10 ll.53-54 ("transmission unit comprises a satellite data unit and a radio frequency unit").)

23
24
25

- The "aeronautical satellite system is adapted to transmit data information requests from said satellite data unit to said ground station . . . " (*Id.* at col.10 ll.60-62.)

26

Inserting Teledyne's construction into the claim itself—e.g., in the second excerpt

27
28

[7] Appears in claims 1, 4, 7, and 10 of the '152 patent.

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

1   above—shows the extent of superfluous language that Teledyne yet again espouses in

2   contravention of *RF Del.*, 326 F.3d at 1264, and *Jack Guttman*, 302 F.3d at 1357:

3   • The "aeronautical satellite system is adapted to transmit data information

4       requests from said [satellite data unit] <u>satellite transmitter unit that receives a</u>

5       <u>request from the information request system and generates a corresponding</u>

6       <u>signal to be transmitted via satellite to the data source</u> to said ground station . . .

7       ."

8   The redundancies would be further conflated if each of Teledyne's constructions were

9   used in place of the disputed claim terms.  The Court should reject Teledyne's attempt

10  to limit the claim scope while simultaneously creating confusion for the Court or jury

11  in its infringement analysis.

12      **F.      Radio Frequency Unit**[8]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "a radio frequency communications unit." | A unit for providing conventional radio transmission signals to a ground station. |

16      Yet again, Teledyne attempts to insert limitations that add redundancies to the

17  balance of the claim language.  This term does not require construction.  In the context

18  of claim 1:

19  • The  radio frequency unit is part of the transmission unit.  ('152 col.10 ll.53-54

20      ("transmission unit comprises a satellite data unit and a radio frequency unit").)

21  • The "radio ground station is adapted to transmit data information requests from

22      said radio frequency unit to said network system."  (*Id.* at col.11 ll.1-3.)

23  Inserting Teledyne's construction into, e.g., the second excerpt above invites

24  redundancy and confusion, particularly when coupled with Teledyne's proposed

25  construction of "network system":

26  • The "radio ground station is adapted to transmit data information requests from

27  _____

28  [8] Appears in claims 1, 4, 7, and 10 of the '152 patent.

said [radio frequency unit] <u>unit for providing conventional radio transmission signals to a ground station</u> to said [network system] <u>system remote from the vehicle configured to transmit data or voice communications between various communication systems</u> . . ."

Teledyne's proposal also attempts to read in a limitation from the preferred embodiment, namely, that the radio frequency unit provides "conventional" radio transmission signals.  (Pl.'s Br. 16; '152 col.7 ll.38-40.)  This, of course, is a "cardinal sin."  *See Phillips*, 415 F.3d at 1320.

### G.   <u>First and Second Communication Mediums[9]</u>

| Claim Term | Honeywell's Construction | Teledyne's Construction |
|---|---|---|
| **First Communication Medium** | Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "any suitable media or combination of media for transmitting data requests from transmission unit to the data source." | A manner of communication defined in the third element of claim 1 (sub-paragraphs one and two) that is different from the second communication medium. |
| **Second Communication Medium** | Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "any medium, plurality or combination of media capable of transmitting information from the data source to the receiver." | A method of communication defined in the fourth element of claim 1 that is different from the first communication medium. |

Neither of these phrases require construction.  They are generic terms that a lay person understands, particularly in light of the balance of the claim language.

Teledyne's approach to these two phrases is circular:  it proposes to define them as a manner or method of communication "defined" elsewhere in the claims.  This approach again results in the repetition of elements already in the claims.

Moreover, Teledyne imports a limitation that squarely contradicts the specification.  According to Teledyne, each communication medium be "different

---

[9] These terms, as well as the related terms "aeronautical satellite system" and "direct broadcast satellite," were addressed in both parties' earlier *Markman* briefings.  Both terms appear in claims 1 and 10 of the '152 patent.

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

from" the other; according to the specification, "first and second communication media 208, 210 *may be the same or different media, or separate channels of the same medium*." ('152 col.2 ll.45-47; *see also* '152 col.8 ll.3-4 (first communication medium "may comprise any suitable medium"); '152 col.3 ll.15-20, 38-41 (second communication medium "may comprise any medium or plurality of media capable of transmitting information from data source 104 to receiver 106" and "may comprise multiple media, which may be used individually or in any suitable combination").)

To support its position, Teledyne reaches for the prosecution history. As explained in Honeywell's *Markman* Responsive Brief, Honeywell distinguished the '152 patent from prior art *not* by arguing that the first and second communication media were different, but rather on the basis that the first communication medium comprises "both an aeronautical satellite system and a radio ground station," and that "the information request system is configured to select" one of the satellite system or radio ground station from the first communication medium. (Def.'s Rsp. Br. 21.)

While Honeywell maintains that "first communication medium" and "second communication medium" do not require construction, if the Court deems otherwise, their constructions should not depart from the breadth the specification ascribes to them. ('152 col.10 ll.55-57 (first communication medium is "configured for transmission of requests for the data information from the information request system [comprising the transmission unit] to said data source"); '152 col.11 ll.4-7 (second communication medium "compris[es] a direct broadcast satellite adapted to receive data information from said data source and to broadcast said data information to said receiver").)

### H.   Aeronautical Satellite System[10]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain | At least one satellite that is not a direct broadcast satellite, which is configured to receive data |

---

[10] Appears in claims 1, 7, and 10 of the '152 patent.

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

| meaning is "at least one satellite configured to receive data request signals from the transmission unit and forward or transmit the signals to a ground earth station." | request signals from a transmission unit and forward or transmit the signals to a ground earth station. |
|---|---|

"Aeronautical satellite system" does not require construction.  Lay persons can understand the phrase and the patent's specification and file history have not expressly redefined it.  *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002); *U.S. Surgical*, 103 F.3d at 1568.  The parties' dispute regarding this claim term is based on Teledyne's attempt to add limitations to the claim language that the aeronautical satellite system "is not a direct broadcast satellite." (*See, e.g.*, '152 claim 1.)  Teledyne's position is not consistent with the specification, which states that the aeronautical satellite system can be "an array of satellites … or ***any other suitable satellite communication system***" that facilitates the efficient communication of signals regardless of the location of the transmission unit.  ('152 col.8 ll.29-34.)  Indeed, the specification notes that a direct broadcast satellite system is one type of "satellite system."  ('152 col.4 ll.19-20).

In arguing that the aeronautical satellite and direct broadcast satellite are mutually exclusive, Teledyne points to a figure of a preferred embodiment.  (Pl.'s Br. 17; Pl.'s Rsp. Br. 23).  But that is only a preferred embodiment, and the specification expressly teaches alternate embodiments, including one where the first and second communication media are the same.  Nor, as established in Honeywell's *Markman* Responsive Brief, does the prosecution history imply that a direct broadcast satellite cannot be a type of aeronautical satellite.  (Def.'s Rsp. Br. 20-22.)  Therefore, the Court should reject Teledyne's attempts to improperly insert the limitation that the aeronautical satellite system and direct broadcast satellite are mutually exclusive as unsupported by the claim language, specification, and prosecution history.

Should the Court deem construction appropriate for this claim term, then Honeywell submits that its proposed construction is consistent with the specification.  ('152 col.10 ll.59-62 (aeronautical satellite system is "adapted to transmit data

-11-

1   information requests from said satellite data unit [a part of the transmission unit] to

2   said ground station"; '152 col.8 ll.25-34 (aeronautical satellite system comprises "a

3   satellite unit" or "an array of satellites" and is "configured to receive data request

4   signals from transmission unit 306 and forward or transmit the signals to ground earth

5   station 310").)

6       **I.**    **Direct Broadcast Satellite[11]; Direct Broadcast[ing] System[12];**

7             **Broadcasting[13]**

| Honeywell's Construction | Teledyne's Construction |
| --- | --- |
| A satellite that facilitates access to greater bandwidth than reliance solely on the telephone system and affords relatively high data transfer rates from the data source to the receiver. | A satellite that is not an aeronautical satellite, which broadcasts the same transmissions directly to all end-users and cannot receive transmissions from end-users. |

11         The parties agree that these terms require construction.  The parties' dispute

12   regarding the terms is based on Teledyne's attempt to inject limitations that the direct

13   broadcast satellite "is not an aeronautical satellite," "broadcasts the same

14   transmissions directly to all end-users," and "cannot receive transmissions from end-

15   users."  (*See, e.g.*, '152 claim 1.)  Teledyne's approach finds no support in the claim

16   language, the specification, or the prosecution history.  The specification provides that

17   a satellite link, "such as a direct satellite":

18         facilitates access to greater bandwidth than reliance solely on the

19         telephone system 314 and affords relatively high data transfer rates from

20         the data source 104 to the receiver 106. Accordingly, the second

21         communication medium 210 of the present embodiment comprises a

22         satellite link between the data source 104 and the receiver 106.

23   ('152 col.3 ll.9-15.)  Honeywell's proposed definition is consistent with the

---

[11] Appears in claims 1, 4, 7, and 10 of the '152 patent.

[12] "Direct Broadcasting System" appears in claim 2 of the '152 patent; "Direct Broadcast System" appears in claims 4 and 7.

[13] Appears in claim 4 of the '152 patent.  The parties agree that the meaning of this term will be resolved by the construction of *direct broadcast satellite.*

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

specification.  It is also consistent with the understanding of a POSITA, such as Boeing veteran Alvin H. Burgemeister.  (Starr Decl., Ex. D) ("At the time of the '152 patent was filed, direct broadcast satellites were being used by various commercial carriers and business aircraft for purposes of sending high speed data, such as television signals, to aircraft.  Within this context, and consistent with the '152 patent's discussion of the first and second communication media, a direct broadcast satellite would have been considered a part of an aeronautical satellite system to a person of ordinary skill in the field of aeronautical communications in 1998.")

### J.     Selecting[14]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "choosing." | Selecting is done by the information request system. |

This term is another example of an easily understandable claim term with plain meaning that has not been redefined by the specification or the prosecution history, and therefore should not be construed.  The parties' disagreement is based on Teledyne's attempt to insert a requirement into the claim language that the selecting must be "done by the information request system."  In context, Teledyne's definition would confront the jury as follows:

> 6. A method according to claim 4, wherein said step of transmitting data information requests from said information request system to said ground station comprises: [selecting] selecting is done by the information request system one of a group of transmission mediums comprising an aeronautical satellite system, a radio frequency system, a wireless LAN system and a voice channel system for transmission of the data information requests.

Beyond its inconsistency with the claim language, Teledyne's proposed construction

---

[14] Appears in claim 6 of the '152 patent.

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

1  is also at odds with the specification.  The specification expressly contemplates the

2  that selection of the transmission mechanism can happen in any one of several

3  possible places, including the transmission unit, the aircraft LAN, and the information

4  request system, and further states "the selection system 808 may be implemented in

5  *any suitable manner*, such as by an independent microprocessor-based system, a

6  dedicated controller, dedicated logic, or a software-based solution." ('152 col.6 ll.40-

7  44; *see also id.* at col.6 ll.23-28, 37-44, col.10 ll.13-15 (selection system is in

8  transmission unit, aircraft LAN, or information request system))  Teledyne's Opening

9  Brief cites for support to a portion of the specification that says the selection "may" be

10  performed by the information request system, but this is not enough to rebut the

11  presumption of ordinary meaning.  (Pl.'s Br. 20); *see CCS Fitness*, 288 F.3d at 1366.

12      Honeywell's alternate construction, on the other hand, adheres to the simple and

13  unchanged meaning of the term.  "Selecting" means "choosing."

14  **K.   Wireless LAN System / Radio Frequency System / Voice Channel System**[15]

| | Honeywell's Constructions | Teledyne Believes These Claim Phrases Are Indefinite; Possible Constructions Are: |
|---|---|---|
| Wireless LAN System | "a wireless LAN unit and corresponding transmission medium" | "a wireless LAN unit, and at least one ground station configured to receive transmissions from the wireless LAN unit" |
| Radio Frequency System | "a radio frequency unit and corresponding transmission medium" | "a radio frequency unit, and at least one ground station configured to receive radio transmissions" |
| Voice Channel System | "a voice channel unit and corresponding transmission medium" | "a voice channel unit, and at least one ground station configured to receive voice channel communications" |

23      The parties' chief dispute over these claim terms is whether they are definite.[16]

24  Teledyne's position that the word "system" renders each of these terms indefinite is

---

[15] Each of these claim terms appear in claim 6 of the '152 patent.

not credible.  (Pl.'s Br. 21.)  The word "system" has not hindered Teledyne from construing more than a dozen other claim terms in this litigation, including several in its own '990 patent.[17]  Nor should it:  "system" is plain English, meaning "a regularly interacting or interdependent group of items forming a unified whole[.]"  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1197 (10th ed. 1996) (Starr Decl., Ex. A).

In claim 6 of the '152 patent, each of the "wireless LAN," "radio frequency" and "voice channel" systems are three systems that—together with the "aeronautical satellite system" (which Teledyne also has no problem construing)—comprise a "group of transmission mediums."  ('152 col.11 ll.63-67.)  The '152 specification makes it clear to lay persons and POSITAs alike that these transmission mediums include "multiple media corresponding to" each of the satellite transmitter unit, wireless LAN unit, radio frequency unit and voice channel unit:

> [T]he transmission unit 206 suitably comprises a selection system 808 and multiple transmission mechanisms 810, such as a satellite transmitter unit 602, a VHF *radio unit* 406, *wireless LAN unit* 506, and/or *voice channel unit* 812.  Similarly, first communication medium 208 also suitably includes *multiple media corresponding to the various transmission mechanisms*, i.e., satellite, VHF radio, wireless, voice and/or direct cable or laser signals.

(*Id.* at col.6 ll.28-36.)  Teledyne presents no contrary evidence supporting its assertion that a POSITA would "have no idea" what these "systems" include.  The Court should therefore reject Teledyne's indefiniteness argument.

---

[16] On further consideration of the claim language and intrinsic record, Honeywell now proposes modified definitions similar to Teledyne's.  Honeywell's Revised Proposed *Markman* Order reflects these definitions, as well as revised definitions for "cell channels," "data thread" and "primary data thread" as discussed at the '990 *Markman* hearing.

[17] Stipulated Joint Claim Construction Chart, Appendix A, *passim* ("flight data" relates to "aircraft *systems*"; '990 claims 1, 2, 4, 8, 15, 34, 37 and 41 claim aircraft or data transmission *systems*.)

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

## IV.    THE '468 PATENT

### A.    System Server[18]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "a device or computer system or software that includes an administrative application/program, a database and an interface application." | A remote hardware storage device that obtains and stores data updates and sends data updates to a vehicle server via a data connection. |

Honeywell maintains that this term requires no construction. "Server" is a generic computing term understandable to POSITAs and lay persons. (Def.'s Br. 23 (including dictionary definitions of "server.")) The term "system," used to modify "server" in the '468 patent, is also easy to understand. The parties dispute, again, revolves around Teledyne's attempt to import unsupported limitations into the term.

Teledyne proposes that the system server is "remote" and is a "hardware storage device."[19] The word "remote" appears one time in the entire '468 patent and not in connection with the term "system server." ('468 col.1 l.10.) Rather, the term appears in the "Field of the Invention" section of the specification, which generally explains that that the invention "relates" to systems and methods for delivering data and software updates to vehicles from remote locations. This single appearance on the related field of use is not sufficient to redefine claim terms.

Likewise, neither the claims nor the specification require the system server to be a hardware storage device. To the contrary, the specification states that "[s]ystem server 102 suitably includes an administrative application/program 106, a database 104 and an interface application 108," all of which are *software*, not hardware implementations. ('468 col.3 ll.57-59.) The specification further provides:

> The various components of system server 102 *may be assembled in any manner.* Database 104, application 106 and interface 108 may be

---

[18] Appears in claims 1 and 9 of the '468 patent.

[19] The rest of Teledyne's construction is redundant to claim language because it simply recites other claim limitations that the system server performs. (*See* '468 claim 1.)

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

1    provided on a single computer or workstation, for example. Alternatively,

2    a data network could couple *multiple computing resources* to each other

3    *to provide the functionality* of the various components.

4   (*Id.* at col.4 ll.38-43.)  Therefore, the "system server" may be implement by, for

5   example, any "computing resources" that provide the functionality of the system

6   server's listed (software) components.

7          The specification's discussion of another claimed server, the "vehicle server,"

8   confirms that the term "server" in the '468 patent *may include, but is not limited to*, a

9   hardware storage device.  ('468 col.5 ll.19-22 ("Vehicle server 116 is any hardware *or*

10  *software* device . . ."))  The extrinsic evidence Honeywell submitted with its previous

11  briefs confirms that its position is consistent with the understanding of a POSITA.

12  (Def.'s Br. 23 (including definitions illustrating that a "server" can be implemented as

13  software).)  Thus, Teledyne's proposal, which attempts to add limitations that

14  contradict the specification and the understanding of a POSITA, should be rejected.

15         Teledyne's proposal should also be rejected because it creates superfluous

16  claim language.  For example, claim 1 already provides that the system server obtains

17  and stores data updates and forwards data updates to a vehicle server via a data

18  connection.  ('468 col.10 ll.37-39.)  Therefore, Teledyne's insertion of these

19  limitations into the term improperly renders the existing claim language redundant.

20  *See RF Del.*, 326 F.3d at 1264; *Jack Guttman*, 302 F.3d at 1357.  Honeywell's

21  alternative construction accords with the system server description in the specification

22  as well as with dictionary definitions.  If the Court determines that construction is

23  necessary, Honeywell's alternative construction should be adopted.

24     **B.    Vehicle Server**[20]

25

| Honeywell's Construction | Teledyne's Construction |
| --- | --- |
| Any hardware or software device that is | A hardware storage device for use in a vehicle that |

26

27       [20] This term and "component" were addressed by both parties in their original earlier Markman
briefings.  "Vehicle Server" appears in claims 1 and 9 of the '468 patent.

28

-17-

| capable of receiving data updates from the system server and loading the updates in a component. | is capable of receiving data updates from the system server and loading the data updates in a component that is separate from the vehicle server. |

The parties agree that construction of this term is required.  The patentee clearly and deliberately defined "vehicle server" in accordance with *Schoenhaus*, 440 F.3d at 1358, *Vitronics*, 90 F.3d at 1585, and other Federal Circuit authority:  "Vehicle server 116 is any hardware or software device that is capable of receiving data updates from system server 102 and loading the updates in component 118."  ('468 col.5 ll.19-22.)

Ignoring this unambiguous definition, Teledyne attempts to add limitations that the vehicle server is a "hardware storage device" and is "separate" from the component.  Teledyne offers no support as to how its "hardware storage device" limitation can be reconciled with the patentee's definition.  In support of its "separate" limitation, Teledyne engages in word games.  It argues that because the claims include both a vehicle server and a component, the two must necessarily be separate hardware devices. (Pl.'s Rsp. Br. 24-25.)  Teledyne's argument ignores the fact that, because a vehicle server can be implemented as software, it can be located on any computer or device with a processor, including a component into which it loads an update.  Teledyne also relies on an "exemplary embodiment" to import its limitations into this clearly defined term.  These efforts, of course, run afoul of *Phillips*, 415 F.3d at 1320.

### C.  Data Connection[21]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "any type of wireless, optical or electrical data connection." | A digital communication medium for transferring data updates. |

This term is a generic computing term understandable to lay persons.  Neither the '468 specification or prosecution history redefined it.  It therefore needs no construction.  The parties' dispute over this term stems chiefly from Teledyne's inclusion of redundant limitations.  For example, claim 1 already contains the

---

[21] Appears in claims 1 and 9 of the '468 patent.

limitation that the data connection is used for "forwarding said data update." ('468 col.10 l.38.)  Teledyne's insertion of "for transferring data updates" into the claim term thus improperly renders this existing language redundant.

Similarly, by specifying that the data connection is "digital," Teledyne improperly imports a limitation from an alternative embodiment:  "In various embodiments, vehicle 120 is *digitally* coupled to network 112 via a wireless communications link 114."  ('468 col.4 ll.49-51.)  But this alternative embodiment does not preclude other embodiments using an *analog* data connection.  Indeed, as dependent claims 2 and 12 illustrate by limiting "data connection" to a "wireless data connection," claims 1 and 9 really do mean "data connection" in the least restrictive sense.  *See Comark Commc'ns*, 156 F.3d at 1187 (under doctrine of claim differentiation, claim should not ordinarily be construed so as to render related dependent claim superfluous).

### D.   Component[22]

| Honeywell's Construction | Teledyne's Construction |
| --- | --- |
| Any avionics or other aircraft device such as a flight management computer, flight management system, global positioning system, navigation computer or the like. | A vehicle hardware device that is separate from the vehicle server and that receives data updates from the vehicle server and uses the data updates to perform a function. |

The parties agree that construction of this term is required.  Honeywell takes this position because the patentee clearly and deliberately defined "vehicle server" in the specification:  "*Component* 118 *is* any avionics or other aircraft device such as a flight management computer (FMC), flight management system (FMS), global positioning system (GPS), navigation computer or the like."  ('468 col.5 ll.46-49.) Teledyne's proposal strays from the unequivocal definition by grafting four redundant or otherwise unsupported limitations onto the term.

First, "hardware."  Teledyne's attempt to define "component" as a "hardware device" should be rejected because it is inconsistent with the claim language and

---

[22] Appears in claim 1 of the '468 patent.

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

1   directly contradicts the specification.  As noted above, the express definition of

2   "component" is "***any*** avionics or other aircraft device. . ."  ('468 col.5 ll.46-49.)  And,

3   the specification is clear that the term "device" is not limited to hardware devices.

4   ('468 col.5 ll.19-20 ("Vehicle server 116 is any hardware or software device . . .").)

5        Second, Teledyne points to no support for the artificial requirement that the

6   "component" be "separate" from the vehicle server.[23]  Third, claim 1 already contains

7   the limitation, "loading said data update from said vehicle server into a component."

8   ('468 col.10 ll.41-42.)  Therefore, Teledyne's inclusion of "receives data updates from

9   the vehicle server" improperly renders the existing claim language redundant.

10       And fourth, Teledyne erroneously relies on a preferred embodiment in

11  attempting to graft onto the claim term the phrase "uses the data updates to perform a

12  function."  (Pl.'s Br. 23 (citing to portion of specification stating that component

13  "suitably" uses the update to perform a function).)  Teledyne also neglects to include

14  the context of the cited sentence, which begins "In various embodiments. . ."  ('468

15  col.5 l.52.)  Thus, the cited language at most suggests, but does not require, that in

16  some embodiments the component can use the data update to perform a function.

17  Teledyne also argues, without support, that it is "nonsensical" to suggest that the

18  component is a storage vessel for data.  (Pl.'s Br. 23.)  But such a configuration is

19  entirely sensible.  For example, a navigation computer (mentioned in the specification

20  as a possible component) could store data updates to a navigation database for later

21  use by one or more additional components.  Indeed, despite Teledyne's protests that it

22  would be "nonsensical" for a component to store but not use the data updates to

23  perform a function, Teledyne's attempt to insert this requirement into the claim

24  language suggests that it has a component that does precisely that.

25       **E.    Loading Said Data Update from Said Vehicle Server into a**

26

27       [23] The issue of whether the component is "separate" from the vehicle server is addressed above
     in the discussion of "vehicle server," where Teledyne attempts to include the same limitation.

28

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

**Component at Said Vehicle**[24]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "loading the data update from the vehicle server into the vehicle component." | A vehicle server extracts, processes, and saves a data update in a component for further processing and use by the component. |

Loading data into a device has a plain meaning to a POSITA that can also be easily understood by lay persons and has not been altered by the specification or prosecution history. *See, e.g.,* RANDOM HOUSE WEBSTER'S COMPUTER & INTERNET DICTIONARY 320 (3rd ed. 1999) (defining "load" as "To install") (Starr Decl., Ex. B). Thus, this term does not require construction. The parties' disagreement over this term stems again from Teledyne's importation of inconsistent or redundant limitations into the claim language. Teledyne improperly seeks to insert extracting and processing into the definition of "loading." For support, Teledyne one description of an embodiment in the specification, which states that "[a]fter the data update is provided to vehicle server 116, the relevant data is ***extracted, processed, and loaded*** into component [118]." (Pl.'s Br. 23, App. A 76-77 (citing '468 col.6 ll.36-38).) But contrary to Teledyne's proposed construction, this passage demonstrates that extracting and processing occur in addition to loading, not as a part of it.

Teledyne's proposed construction also adds the requirements of "further processing and use by the component."[25] The patent simply does not discuss further processing of data by the component as part of the load process. The patent discloses that, "If the load is successful, vehicle server 116 suitably performs post-load processing (step 510) as appropriate." ('468 col.9 ll.36-38.) But this processing— which is not claimed in claim 1—is performed by the vehicle server rather than the component, and occurs, if at all, ***after*** determining that the load was successful.

---

[24] Appears in claim 1 of the '468 patent.

[25] Teledyne's attempt to require that the data update is used by the component is addressed in the term "component" above, and is not repeated here.

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

1

2

### F.    Verifying / Receiving Confirmation of Successful Load

| Claim Term | Honeywell's Construction | Teledyne's Construction |
|---|---|---|
| Verifying from Said Vehicle Server to Said System Server Via Said Data Connection That Said Loading Step Completed Successfully[26] | Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "transmitting a signal from the vehicle server to the system server via a data connection indicating that the loading step completed successfully." | After the data update is loaded into the appropriate component, the vehicle server determines whether the load was successful and sends the result of this check to the system server via the same data connection used to transmit the data update to the vehicle server in the second element of claim 1. |
| Receiving a Confirmation from Said Vehicle Server Via Said Data Connection When Said Data Update is Successfully Loaded[27] | Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "receiving a signal from the vehicle server to the system server via the data connection indicating that the loading step completed successfully." | After the data update is loaded into the appropriate component, the vehicle server determines whether the load was successful and sends the result of this check to the system server via the same data connection used to transmit the data update to the vehicle server in the second element of claim 9. |

These claim phrases are understandable to POSITAs and lay persons alike. The intrinsic record has not altered their meanings. They need no construction.

The parties' dispute over these terms stems from Teledyne's attempt to add a limitation that the **vehicle server** must determine whether the load was successful. Again, no such limitation is found anywhere in the claims. To the contrary, the specification flatly contradicts Teledyne's effort to so limit the claim. It states, "When the load is complete, a CRC check . . . is **executed by component 118 or vehicle server** 116, as appropriate, to verify that the data update was properly loaded." ('468 col.9 ll.22-25.) Teledyne's citation to a different portion of the specification, which states that the vehicle server "may" perform the check, provides no basis to import that limitation. (Pl.'s Br. 23-24, App. A 76-77 (citing '468 col.6 ll.47-55).)

### G.    Digital Storage Medium[28]

---

[26] Appears in claim 1 of the '468 patent.

[27] Appears in claim 9 of the '468 patent.

[28] Appears in claims 7-8 and 13-15 of the '468 patent.

HONEYWELL'S SUPPLEMENTAL *MARKMAN* BRIEF ('152 & '468 PATENTS)

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "a medium that can store digital information." | A remote hardware device on which computer-executable instructions can be stored. |

This is another term with a meaning to a POSITA that a lay person will have no trouble understanding.  Because the phrase is not specially defined in the intrinsic record, construction is not necessary.  Teledyne's construction suffers because it yields redundancy.  For example, claim 7 already contains the limitation that the digital storage medium stores computer-executable instructions.  ('468 col.10 ll.60-61.)  Therefore, Teledyne's insertion of this limitation into the term improperly renders the existing claim language redundant.  *See RF Del.*, 326 F.3d at 1264; *Jack Guttman*, 302 F.3d at 1357.

As for it's position that the digital storage medium be "remote,"[29]  Teledyne cites to no support, intrinsic or otherwise.  Rather, it relies on its "remote" argument based on the "system server" term above.  But here, as above, the specification's use of "remote"—but a single time, in the "Field of the Invention"—does not rebut the presumption of ordinary meaning and thus does not justify importing "remote" as a limitation into multiple claim terms.  Honeywell's proposed alternative construction, by contrast, relies on the plain language of the claim terms and, if the Court determines that construction is necessary, should be adopted.

### H.    Operable to Execute the Method[30]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "able to cause one or more applications, processes, processors or devices to perform the steps." | Must execute each step of the method. |

---

[29] Teledyne also injects into this term the limitation, "on which computer-executable instructions can be stored."  Similar language appears later in each claim that contains this term, rendering this portion of Teledyne's proposed construction redundant and, thus, incorrect.

[30] Appears in claims 7-8 and 13-15 of the '468 patent.

1   As with so many of the other claim terms in dispute, lay persons will have no

2   trouble understanding these terms.  They do not require construction.  Teledyne's

3   proposed construction has two fundamental flaws.  First, by replacing "operable to

4   execute" with "must execute," Teledyne improperly reads "operable" out of the claim.

5   *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1582-83 (Fed.

6   Cir. 1996) (patentee's infringement argument "invites [the Court] to read [a] limitation

7   out of the claim. This we cannot do.") (citations omitted).

8   Second, neither the plain meaning of the term nor the intrinsic record provide

9   any basis to limit the phrase such that the computer executable instructions that are

10  "operable to execute the method" must themselves execute each step of the method.

11  To the contrary, the specification teaches that the computer executable instructions

12  can function in combination with other processes to execute the respective methods:

13  "[a] daemon or *other process* running on system server 102 *in conjunction with*

14  administrative program 106 and/or interface program 108 may execute such a process

15  350." ('468 col.8 ll.1-4.)

16  **I.      At a Pre-Determined Time**[31]

| Honeywell's Construction | Teledyne's Construction |
|---|---|
| Does not require construction, but if the Court is inclined to construe the phrase, its plain meaning is "at a time that is determined in advance, or that is determined by a program in accordance with pre-determined rules based on user inputs and/or data in a database." | Scheduled in advance. |

21  Teledyne again seeks an overly-narrow construction of an easily understood

22  term.  And again, Teledyne's proposal conflicts with the specification.  The heart of

23  the dispute regarding this term is whether the update may only be *scheduled* in

24  advance, or whether it can also occur based on some other pre-determined condition

25  or rule.  The specification states that "*[t]ime of distribution* to a particular vehicle may

26  be determined by administrative program 106 *in accordance with pre-determined*

---

[31] Appears in claim 9 of the '468 patent.

1   *rules* based upon user inputs and data in database 104, for example, or according to

2   any other scheme." (*Id.* at col.6 ll.12-16.) This accords with the plain meaning of the

3   constituent words: "Predetermine" does not merely mean to *schedule* in advance, it

4   means "to determine, decide, or establish in advance" or to "predispose." THE AM.

5   HERITAGE DICTIONARY 975 (2d College ed. 1991) (Starr Decl., Ex. C). Likewise,

6   "time" does not merely mean a particular day, hour and minute, as "schedule" implies.

7   "Time" also means, for example, "[a] suitable or opportune moment." THE AM.

8   HERITAGE DICTIONARY, *supra*, at 1271.

9       While Teledyne argues that Honeywell's proposed alternative construction is an

10  attempt to import an embodiment into the claims, (Pl.'s Br. 25), the proper analysis is

11  that Honeywell's proposed alternative construction reflects the plain meaning of the

12  disputed term. Teledyne's construction, on the other hand, improperly *excludes* the

13  preferred embodiment. But such a construction "is rarely, if ever, correct." *Osram*

14  *GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (citing *Hoechst*

15  *Celanese Corp. v. BP Chems.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996)).

16  **V.   CONCLUSION**

17      For the reasons set forth herein and in Honeywell's *Markman* Opening and

18  Responsive briefs and supporting declarations, Honeywell respectfully request that the

19  Court enter an Order construing the disputed claim terms as indicated herein and in

20  Honeywell's Revised Proposed *Markman* Order.

21  DATED: February 11, 2008        KIRKLAND & ELLIS LLP

22                                  By: /s/ Ephraim D. Starr_____
23                                  Ephraim D. Starr (S.B.N. 186409)
                                    777 South Figueroa Street
24                                  Los Angeles, California  90017
                                    Telephone:  (213) 680-8400
25                                  Facsimile:   (213) 680-8500

26                                  Attorneys for Defendant-Counterclaimant
27                                  HONEYWELL INTERNATIONAL INC. and
                                    Counterclaimant HONEYWELL
28                                  INTELLECTUAL PROPERTIES INC.

-25-