QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Frederick A. Lorig (Bar No. 057645)
  fredericklorig@quinnemanuel.com
  Steven M. Anderson (Bar No. 144014)
  stevenanderson@quinnemanuel.com
  Joseph M. Paunovich (Bar No. 228222)
  josephpaunovich@quinnemanuel.com
  Anthony P. Alden (Bar No. 232220)
  anthonyalden@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Plaintiff and Counter-
Defendant Teledyne Technologies
Incorporated

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| TELEDYNE TECHNOLOGIES INCORPORATED, a Delaware corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>HONEYWELL INTERNATIONAL, INC., a Delaware corporation,<br><br>                    Defendant.<br><br>─────────────────────────────<br><br>AND COUNTERCLAIM | CASE NO. CV 06-06803-MMM (SHx)<br><br>The Honorable Margaret M. Morrow<br><br>PLAINTIFF AND COUNTER-DEFENDANT TELEDYNE TECHNOLOGIES INCORPORATED'S SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF CONCERNING THE HONEYWELL PATENTS-IN-SUIT |

1

## **TABLE OF CONTENTS**

2
**Page**

3

4  I.      INTRODUCTION ..................................................................................... 1

5  II.     THE '152 PATENT .................................................................................. 2

6         A.    The Prosecution History of the '152 Patent .............................. 2

7         B.    "First communication medium"/"second communication
                medium": Claims 1 and 10 ........................................................ 4

8
          C.    "Aeronautical satellite system": Claims 1, 5, 6, 7, 10 and 11 ............... 6
9
          D.    "Direct broadcast satellite": Claims 1, 4, 7, and 10 ............................ 8
10
          E.    "Network system": Claims 1, 3, 4 and 10 ............................................ 10
11
          F.    "Transmission unit": Claims 1, 7 and 10 ............................................. 11
12
          G.    "Data source": Claims 1 and 10 ........................................................... 12
13
          H.    "Information request system": Claims 1, 4, and 10 ............................. 13
14
          I.    "Satellite data unit": Claims 1, 4, 5, 7, 8, and 10 ................................ 14
15
          J.    "Radio frequency unit": Claims 1, 4, 7, 8 and 10 ................................ 15
16
    III.   THE '468 PATENT .................................................................................. 16
17
          A.    "System Server":  Claims 1, 2, 7, 9, 12, 13 and 15 .............................. 16
18
          B.    "Vehicle Server":  Claims 1, 2, 7, 9, 12, 13 and 15 ............................. 18
19
          C.    "Data Connection":  Claims 1, 2, 7, 9, 12, 13 and 15 .......................... 19
20
          D.    "Component":  Claims 1, 2 and 7 ......................................................... 20
21
          E.    Construction of the "Loading," "Verifying" and "Receiving"
22              Steps .................................................................................................... 21

23              1.    "Loading Said Data Update From Said Vehicle Server Into
                      A Component At Said Vehicle":  Claims 1, 2 and 7 ................. 21
24
                2.    "Verifying From Said Vehicle Server To Said System
25                    Server Via Said Data Connection That Said Loading Step
                      Completed Successfully":  Claims 1, 2 and 7. ........................ 22
26
                3.    "Receiving A Confirmation From Said Vehicle Server Via
27                    Said Data Connection When Said Data Update Is
                      Successfully Loaded":  Claims 9, 12, 13 and 15. ..................... 23
28

-i-                    Case No. CV 06-06803-MMM (SHx)
                TELEDYNE'S SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF

F.      "Digital Storage Medium":  Claims 7, 13 and 15 ................................. 23

G.     "Operable To Execute The Method": Claims 7, 13 and 15 ................. 23

H.     "At A Pre-Determined Time":  Claims 9, 12, 13 and 15 ..................... 24

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

4

## CASES

5

Applied Med. Res. Corp. v. U.S. Surgical Corp.,
    448 F.3d 1324 (Fed. Cir. 2006) .................................................5, 6, 10

6

CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG,
    224 F.3d 1308 (Fed. Cir. 2000) ....................................4, 5, 6, 10, 18

7

8

Halliburton Energy Servs., Inc. v. M-I LLC,
    2008 WL 216294  (Jan. 25, 2008) ........................................................1

9

Harris Corp. v. IXYS Corp.,
    114 F.3d 1149 (Fed. Cir. 1997) .........................................................21

10

11

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
    381 F.3d 1111 (Fed. Cir. 2004) ...........................................................1

12

Medrad, Inc. v. MRI Devices Corp.,
    401 F.3d 1313 (Fed. Cir. 2005) ...........................................................2

13

14

Nystrom,
    424 F.3d at 1143 ...................................................................................6

15

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005) ..............................4, 16, 17, 20, 24

16

17

SanDisk Corp. v. Memorex Prods., Inc.,
    415 F.3d 1278 (Fed. Cir. 2005) ......................................................5, 7

18

Schriber-Schroth Co. v. Cleveland Trust Co.,
    311 U.S. 211 (1940) .............................................................................5

19

20

Southwall Techs,
    54 F.3d at 1576 ....................................................................................7

21

TM Patents L.P. v. IBM Corp.,
    72 F. Supp. 2d 370 (S.D.N.Y. 1999) ..................................................1

22

23

United Carbon,
    317 U.S. at 236 ..................................................................................10

24

Verve, LLC v. Crane Cams, Inc.,
    311 F.3d 1116 (Fed. Cir. 2002) ...........................................................1

25

26

27

## STATUTES

28

35 U.S.C. § 112 ..................................................................................23

TELEDYNE'S SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF

# I.    INTRODUCTION

Honeywell argues that the majority of claim terms in its patents do not require construction because a person skilled in the relevant art would understand these terms.  In doing so, Honeywell fundamentally misconceives the purpose of claim construction.  Every term in a patent should be understood by a person of ordinary skill in the art of that patent. See Verve, LLC v. Crane Cams, Inc., 311 F.3d 1116, 1119 (Fed. Cir. 2002) (patent documents are meant to be "a concise statement for persons in the field").  Indeed, claim terms that cannot be understood by skilled persons should be held indefinite.  Halliburton Energy Servs., Inc. v. M-I LLC, 2008 WL 216294 at *4 (Jan. 25, 2008) (a claim term is indefinite if "a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area.").  Rather, the purpose of claim construction is to determine how a person skilled in the art would have understood a claim term as of the effective date of invention, and to convey that understanding to the jury.  See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention.").

Honeywell's assertion that the Court and lay persons would inherently appreciate how those skilled in the art of aircraft communications would understand terms such as "aeronautical satellite system," "first communication medium," and "operable to execute a method," in the context of technical patents concerning satellite communications and software uploading is not only unsupported, but defies belief.  The jury will require guidance from the Court to understand these terms in the context of the patents.  TM Patents L.P. v. IBM Corp., 72 F. Supp. 2d 370, 377-78 (S.D.N.Y. 1999) (Markman "require[s] that the Court construe the patent for the jury as a matter of law")  (emphasis added).  As counseled by the Federal Circuit, Teledyne's proposed constructions properly provide that guidance in the context of

1  the claim language, written description, and the prosecution history, and should be

2  adopted the Court.  See Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319

3  (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term ... in a

4  vacuum. Rather, we must look at the ordinary meaning in the context of the written

5  description and the prosecution history.").[1]

6  **II.   THE '152 PATENT**

7         **A.   The Prosecution History of the '152 Patent**

8         Honeywell filed the '152 application on December 30, 1998.  (Declaration of

9  Anthony P. Alden ("Alden Decl."), Ex. A at 6).  In a first Office Action, the

10  Examiner found each as-filed claim to be anticipated by U.S. Patent No. 6,201,797

11  (Leuca, et al.; filed 12/12/97).  (Alden Decl., Ex. A at 74).  Honeywell responded by

12  amending claims 1 and 10 to include the terms "first communication medium,"

13  "second communication medium," and "aeronautical satellite system." (Alden Decl.,

14  Ex. A at 90-91, 94).  Honeywell argued that the amended claims were patentable

15  because the Leuca reference did not disclose these newly-added elements:

16         Leuca does not disclose, teach or suggest various elements of

17         claim 1. For example, Leuca fails to disclose, teach or suggest a

18         **first communication medium** having both an **aeronautical**

19         **satellite system** and a radio ground station, a **second**

20         **communication medium** comprising a **direct satellite** is

21         adapted to receive data information and to broadcast data

22  _____

23      [1]   Teledyne has not had the opportunity to depose the attorneys who prosecuted
        the Honeywell patents, who were unavailable prior to the briefing deadline, despite
24      being subpoenaed in early January.  Moreover, because Honeywell did not address
        numerous disputed terms from the Honeywell patents in its previous briefs,
25      Teledyne will not have the opportunity to respond to any arguments that Honeywell
        now makes concerning these terms.  Accordingly, Teledyne respectfully requests
26
27         (footnote continued)

28

1          information to said receiver, or wherein the information request

2          system is configured to select one said aeronautical system and

3          said radio ground station from said first communication

4          medium.[2]

5    (Alden Decl., Ex. A at 91).

6         Honeywell contends that it "did not argue that the first and second

7    communication mediums were different" because—according to Honeywell—"the

8    prior art Honeywell distinguished also had two different communication mediums."

9    (HW Responsive Brief, p. 21).

10        Honeywell's argument is unpersuasive for many reasons.  First, it begs the

11   question—why did Honeywell amend the claims to include a "<u>first</u> communication

12   medium" and a "<u>second</u> communication medium" if it intended for them to be the

13   <u>same</u> media? Second, as the above-quoted passage shows, Honeywell <u>did</u>

14   distinguish amended claims 1 and 10 over the prior art on the basis of two <u>different</u>

15   communication media—the first being "both an aeronautical satellite system and a

16   radio ground station," and the second "comprising a direct [broadcast] satellite."

17   Finally, the Examiner certainly believed that the prior art did not teach <u>first</u> and

18   <u>second</u> communication media:

19         The following is an examiner's statement of reasons for

20         allowance: the prior art made of record does not teach or fairly

21         suggest in combination a data communications system for

22         retrieving data information, said data communications system

23         comprising:  . . . **a first communication medium** configured for

24         transmission of requests for the data information from the

25   _____

26   that the Court schedule a hearing so that any additional evidence and responsive

27   argument may be presented.
     [2]   Unless otherwise noted, all emphasis herein has been added by Teledyne.

28

1   information request system to said data source, **said first**

2   **communication medium comprising: an aeronautical satellite**

3   **system** and a ground station, . . .; **a second communication**

4   **medium comprising a direct broadcast satellite** adapted to

5   receive data information from said data source and to broadcast

6   said data information to said receiver; . . . .

7   (Alden Decl., Ex. A at 104-105).

8   **B.   "First communication medium"/"second communication**

9   **medium": Claims 1 and 10**

10   The phrases "first communication medium" and "second communication

11   medium" have no ordinary meaning to lay persons or to those skilled in the art, and

12   thus require the Court's interpretation.  Teledyne's constructions adopt those

13   imparted by the claims themselves.  Claims 1 and 10 define the term "first

14   communication medium" as "comprising "an aeronautical satellite system and a

15   ground station . . . and a radio ground station. . ." '152 patent at 10:55-66, 12:55-66.

16   Similarly, these claims define the term "second communication medium" as

17   "comprising a direct broadcast satellite." '152 patent at 13:11-12.  Honeywell's

18   assertion that the first and second communication media can be "any suitable media"

19   or "any medium" is thus plainly inconsistent with the language of these claims.

20   Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("[T]he claims

21   themselves provide substantial guidance as to the meaning of particular claim

22   terms.") (citations omitted).

23   The claim language also differentiates between a "first communication

24   medium" and a "second communication medium," giving rise to a presumption that

25   they carry different meanings.  See CAE Screenplates, Inc. v. Heinrich Fiedler

26   GmbH & Co. KG, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any

27   evidence to the contrary, we must presume that the use of these different terms in

28   the claims connotes different meanings."); see also Applied Med. Res. Corp. v. U.S.

1   Surgical Corp., 448 F.3d 1324, 1333 n. 3 (Fed. Cir. 2006) (quoting CAE

2   Screenplates).

3        This presumption is confirmed by the prosecution history. As explained

4   above, it was only on the basis of Honeywell's amendment to include two

5   communication media that the Examiner allowed the patent.  Having relinquished

6   coverage during prosecution of any system not including two separate

7   communication media, Honeywell is now estopped from recapturing such systems

8   through claim construction.  Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S.

9   211, 220-21 (1940) ("[A] claim in a patent as allowed must be read and interpreted

10  with reference to claims that have been cancelled or rejected, and the claims allowed

11  cannot by construction be read to cover what was thus eliminated from the patent.");

12  see also SanDisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1286 (Fed. Cir.

13  2005).

14       Finally, numerous passages within the specification demonstrate that the

15  "first" and "second" communication media must be different.  (See, e.g., '152 patent

16  at 1:54-58 ("Similarly, the receiver is coupled to the data source via any appropriate

17  and available medium, such as a satellite link, and is **suitably different** from the

18  medium coupling the information request system to the data source."); '152 patent at

19  2:41-45 ("The information request system 102 is suitably coupled to the data source

20  104 via a **first communication medium** 208, and the receiver 106 is suitably

21  coupled to the data source 104 via a **second communication medium** 210."); '152

22  patent at 10:22-27 ("a system user may request data information from a data source

23  104 through information request system 102 and **first communication medium**

24  208. . .[D]ata source 104 may retrieve the requested data and transmit the data to

25  receiver 106 through **second communication medium** 210." ).

26       Ignoring all of this—the claim language, the specification and the file

27  history—Honeywell contends that the "first communication medium" can be "any

28  suitable media," and the "second communication medium" can be "any medium."  In

1   support of this contention, Honeywell points to several passages in the specification,

2   such as "first and second communication media 208, 210, may be the same or

3   different media or separate channels of the same medium." '152 patent at 2:45-47.

4   But the specification was not amended to reflect Honeywell's narrowing

5   amendments to the claims, Honeywell's arguments to the Examiner, and the

6   Examiner's reasons for allowance.  Teledyne's construction properly reflects both

7   the language of the amended claims and the prosecution history of the patent.

8           **C.      "Aeronautical satellite system": Claims 1, 5, 6, 7, 10 and 11**

9           The phrase "aeronautical satellite system" appears in claims 1, 5, 6, 7, 10 and

10   11 of the '152 patent.  As at the constructive date of invention—December 30,

11   1998—the term had a particular meaning to those skilled in the art of satellite

12   communications.  (Declaration of Dr. R. William Kreutel ("Kreutel Decl."), ¶ 10).

13   This meaning would not necessarily be apparent to lay persons who—while familiar

14   with the term "satellite"—would probably not be familiar with the meaning of the

15   technical phrase "aeronautical satellite system."

16           The parties' respective constructions of the term are identical, with one

17   important exception—Teledyne's construction[3] clarifies that an "aeronautical

18   satellite system" is not the same as a "direct broadcast satellite."  This distinction is

19   once again counseled by the presumption that different claim terms have different

20   meanings.  Claims 1, 7 and 10 distinguish between an "aeronautical satellite system"

21   and a "direct broadcast satellite," clearly suggesting that these terms mean different

22   things.  See CAE Screenplates, 224 F.3d at 131; see also Applied Med. Res. Corp.,

23   448 F.3d at 1333 n. 3; Nystrom v. TREX Co., 424 F.3d 1136, 1143 (Fed. Cir. 2005).

24

25   _____

26        [3]   "At least one satellite that is not a direct broadcast satellite, which is
27   configured to receive

28

TELEDYNE'S SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF

The distinction is also confirmed by the prosecution history.  The only amendment made by Honeywell to as-filed claim 8 was to add the word "aeronautical" before the words "satellite system."  (Alden Decl., Ex. A at 98).  By adding this word, Honeywell clearly sought to distinguish an "aeronautical satellite system" from another satellite system.  And, the only other type of satellite system mentioned in the claims is a direct broadcast satellite."  As discussed above, it was only after Honeywell made this distinction that the Examiner allowed the patent.  Honeywell should not be permitted to circumvent its amendments by recapturing through claim construction what it surrendered during prosecution.  SanDisk Corp, 415 F.3d at 1286; Southwall Techs. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).

While Honeywell cherry-picks a passage from the specification to support its expansive construction, it fails to point out that the passage refers to a diagram.  That diagram—Figure 3—depicts an "aeronautical satellite system" and a "direct broadcast system" as separate systems.  Indeed, the specification explicitly identifies the Inmarsat Aeronautical Satellite Communications System as an example of an "aeronautical satellite system."  '152 patent at 8:30-34.  Conversely, nowhere does it state that Inmarsat can also be "direct broadcast satellite."[4]

In fact, Honeywell's proposed construction undermines the stated purpose of its purported invention, which is to utilize a low-bandwidth to send a request for information—usually a small amount of data—and to use a high-bandwidth to receive the requested information—usually a much larger amount of data.  '152 patent at 3:9-15  ("The satellite link 319 facilitates access to greater bandwidth than reliance solely on the telephone system 314 and afford relatively higher data transfer

---

   [4]   Remarkably, Honeywell contends that Teledyne's use of Inmarsat infringes the patent because—despite the plain words of the specification—Honeywell contends that Inmarsat is a "direct broadcast satellite."

1   rates from the data source 104 to the receiver 106.").  If, as Honeywell argues, the

2   "direct broadcast satellite" could also be the "aeronautical satellite," the bandwidths

3   used to both <u>send</u> and <u>request</u> the data would be exactly the same, thus defeating the

4   purported invention's purpose.

5        Teledyne's proposed construction is also consistent with the understanding of

6   those skilled in the art of satellite communications during the 1998-1999 timeframe.

7   Dr. R. William Kreutel—who has over 40 years of experience in the satellite

8   communications industry—testifies that "[i]n the 1998-99 time period, within the

9   accepted nomenclature of the satellite communication business, an Aeronautical

10  Satellite would not be considered a Direct Broadcast Satellite."  (Kreutel Decl.,

11  ¶ 10).

12  ## D.    "Direct broadcast satellite": Claims 1, 4, 7, and 10[5]

13       The term "direct broadcast satellite" has a particular meaning to those skilled

14  in the art of satellite communications that would not be immediately apparent to lay

15  persons.  (Kreutel Decl., ¶¶ 4, 6).  Consistent with this meaning, Teledyne's

16  construction[6] properly distinguishes between a "direct broadcast satellite" and an

17  "aeronautical satellite system;" a distinction which—as explained above—is

18  supported by the claim language, the file history, the specification, and the

19  testimony of an expert in satellite communications.

20       Honeywell argues that Teledyne's proposed construction improperly inserts

21  three limitations into the claim.  Honeywell is wrong.  Rather, unlike Honeywell's

22  construction, Teledyne's construction reflects that the words "direct" and

23  _____

24     [5]  The Court's construction of the term "direct broadcast satellite" will also

25  resolve the parties' dispute concerning the terms "broadcasting" and "direct
    broadcast system."  Accordingly, Teledyne does not address them separately herein.

26     [6]  "A satellite that is not an aeronautical satellite, which broadcasts the same

27  transmissions directly to all end-users and cannot receive transmissions from end-
    users."

28

"broadcast" add meaning to the word "satellite" in the term "direct broadcast satellite."  This meaning is found in the intrinsic evidence cited by Honeywell itself—extracts from the web sites of DirecPc and Dish Network.  See, e.g. Teledyne's Opening Brief, Paunovich Decl., Ex. 11 ("DirecPC downloads content from the Internet **directly** from the server to our satellite network and **straight into the back of your PC** . . . DirecPC receives a Usenet Newsgroup feed from the Internet, which allows Turbo Newscast to automatically **broadcast thousands of newsgroups over the DirecPC satellite system**.").

These extracts show that the words "direct" and "broadcast" were intended to capture two defining characteristics of "direct broadcast satellite" service at the time: first, the transmissions were sent "directly" to end-users, as opposed to being routed from a central receiving location to consumers via a network; and, second, the satellite "broadcast" the same transmissions to all consumers (for example, "thousands of news groups").  (Kreutel Decl., ¶¶ 3-5).  Indeed, Merriam's Webster's Collegiate Dictionary (1999) defines "broadcast" as "to make widely known." (Alden Decl., Ex. B at 129).  Similarly, the Compact Oxford English Dictionary defines "broadcast" as "[t]o scatter or disseminate widely."  (Alden Decl., Ex. C at 133).

This interpretation is underscored by the claim language and the specification, which consistently use the term "broadcast" with respect to "direct broadcast satellite," but the term "transmit" with respect to an "aeronautical satellite."  (See, e.g., '152 patent at 10:59-61, 11:5-7 (the "aeronautical satellite system" is "adapted to transmit data information requests," whereas the "direct broadcast satellite" is adapted "to broadcast said data information to said receiver.").  Clearly, contrary to Honeywell's assertion, the patentee intended that "broadcast" mean something other

1  than mere transmission.  See CAE Screenplates, 224 F.3d at 1317; see also Applied

2  Med. Res. Corp., 448 F.3d at 1333 n. 3  (quoting CAE Screenplates).[7]

3  Finally, both the intrinsic evidence and expert testimony confirm that "direct

4  broadcast satellite" were broadcast only, meaning that they could not receive

5  transmissions from end-users. The Leuca reference observes that "[p]resently, the

6  available DBS systems are broadcast-only systems."  And, Dr. Kreutel testifies that

7  "the systems included a return link via a telephone circuit and a satcom earth station

8  in order to provide pay-per-view or TV-on-demand services."  (Kreutel Decl., ¶ 4).

9  Honeywell's construction conveniently ignores all of this.  Not only does it

10  conflate the fundamental distinction between an "aeronautical satellite system" and a

11  "direct broadcast system," it fails to incorporate any notion of "directness" or

12  broadcasting."  Instead, Honeywell once again relies on a passage from the

13  specification that was not revised to reflect the amended claims.  The relevant

14  passage, '152 patent at 3:9-13, is directed to a "satellite link," not a "direct broadcast

15  satellite."  Honeywell seeks to use the specification's broad definition for "satellite

16  link" for a completely different and narrower term, "direct broadcast satellite."[8]

17  **E.    "Network system": Claims 1, 3, 4 and 10**

18  Teledyne agrees that "network system" can be any "suitable system for

19  communicating the request [for information] to the data source 104."  (HW

21  [7] Honeywell's argument that Teledyne's construction undermines the purpose of
22  its purported invention is misplaced.  "Direct broadcast satellite"—properly
   construed as Teledyne contends—could certainly facilitate "business and personal
23  communications."  Just as with television provided by direct broadcast satellite,
24  "business or personal communications" would be broadcast to all, but "picked-up"
   only by the individual parties to the communication. (Kreutel Decl., ¶ 5).
25  [8] Honeywell's proposed construction would also render claims 1, 4, 7, and 10
26  indefinite. Which satellites "facilitate[s] access to greater bandwidth than reliance
   solely on the telephone system?" United Carbon Co. v. Binney & Smith Co., 317
27  U.S. 228, 236 (1942).

1   Responsive Brief, p. 23).  But, consistent with the claims and the specification,

2   Teledyne's construction[9] clarifies that such system must be remote from the vehicle.

3   The only two preferred embodiments for a "network system" identified by the

4   specification—"telephone network" and "television cable network"—are both

5   remote from the vehicle requesting data.  This is also the only way the system is

6   portrayed in figures 3 through 5 of the specification, each of which depicts the

7   network system (314) as remote from the vehicle.

8          This is confirmed by the claim language, which clearly envisions that the

9   "network system" is implicated only <u>after</u> a data request is sent from the vehicle.

10  For example, claim 1 provides that an "aeronautical satellite system is adapted to

11  transmit data information requests from said satellite data unit to said ground

12  station, said ground station being coupled to said network system to facilitate the

13  transferring of said data information request to said network system."  It is evident

14  from this claim—as it is in claims 3, 4, and 10—that the "network system" only

15  comes into play after a request is received from the vehicle at the "ground station."

16          **F.      "Transmission unit": Claims 1, 7 and 10**

17          Honeywell asserts that "the '152 patent expressly defines 'transmission unit.'"

18  (HW Responsive Brief, p. 23).  But Honeywell only quotes those portions of the

19  specification that support its broad definition, while ignoring all the others.  For

20  example, consistent with Teledyne's construction,[10] the specification provides that

21  "[i]nformation requests are transmitted to the data source 104 <u>by the transmission</u>

22  <u>unit 206 via first communication medium</u>."  '152 patent at 6:14-16.  Similarly,

23  figures 2 through 5 all show the "transmission unit"—206, 306, 406, and 506,

24

25          [9]   "A system remote from the vehicle configured to transmit data or voice

26  communications between various communication systems."

27          [10]   "A unit on an aircraft that transmits a request for data to the data source via

    the first communication medium."

28

respectively— as being the unit that actually <u>transmits the request</u>; not merely "a component through which" requests are transmitted—as Honeywell suggests—which would conceivably include a cable, adapter, or switch.

The claims also contradict Honeywell's broad construction.[11]  For example, Claim 1 prescribes that the "transmission unit comprises a satellite data unit, and a radio frequency unit."  '152 patent at 10:53-54.  Similarly, claims 10 states that the "transmission unit comprises a satellite data unit, a radio frequency unit, and a wireless LAN unit."  '152 patent at 12:53-54.  Each of these components is not merely "a component through which a request is transmitted," but the component that actually send the request.

Finally, Honeywell's construction seeks to insert a new element into the term, i.e., that "the transmission unit may act as a receiver and receive signals from the data source."  As a threshold matter, Honeywell's new element finds no support in the claims.  To the contrary, the claims call out the "transmission unit" and a "receiver" as separate elements.  <u>See</u> '152 patent claim 1 at 10:53, 11:8; claim 7 at 12:3, 12:26.  And, Honeywell's new element undermines the distinction between the first and second communication media—a distinction which, as discussed above, was critical in distinguishing the patent over the prior art.  Specifically, the Examiner only allowed the patent after Honeywell amended the claims to recite that the information request is transmitted via the first communication medium and the requested data is received via the second communication medium.

### G.    "Data source": Claims 1 and 10

The patent imparts a particular meaning to the phrase "data source" that would not be appreciated by lay persons without construction.  Consistent with

---

[11]  "A component through which information requests to the data source are transmitted.  In addition, the transmission unit may act as a receiver and receive signals from the data source."

1   Teledyne's construction[12], the specification states that "[d]ata source 104 stores or

2   channels information . . ., receives requests for information from the information

3   request system 102, and transmits the requested data to the receiver 106." '152

4   patent at 2:59-64.  While a lay person may naturally appreciate that a "data source"

5   stores information, he or she would not typically attribute to it the additional

6   "channeling," "reception" and "transmission" functions contemplated by the

7   specification.

8        The patent also clearly contemplates that the "data source" will be remote

9   from the vehicle that requests the data.  (See, e.g., '152 patent at 1:6-8 ("The present

10  invention relates to . . . systems for requesting and receiving data from a **remote**

11  data source."); 2:52-54 ("The information request system 102 and the receiver 106

12  are **remote** from the data source 104."); and figures 1-5 (104).  Indeed, there would

13  be no need for the purported invention—which Honeywell asserts "replaces air-to-

14  ground phones on aircraft"—if all the data were already on the aircraft.  (HW

15  Responsive Brief, p. 22).

16       **H.     "Information request system": Claims 1, 4, and 10**

17       Contrary to Honeywell's assertion, the term "information request system" is

18  idiosyncratic to the '152 patent and has no generally accepted meaning in the context

19  of aircraft communications.  To the extent Honeywell offers an "alternative"

20  construction, both parties appear to base their proposed constructions on the same

21  passage from the specification: "The information request system 102 is configured

22  to enable a system user . . . to request information from the data source 104 via the

23  first communication medium 208."  '152 patent at 5:32-35.  But while Teledyne's

24

25  _____

26       [12]  "A source of data remote from the vehicle, which stores or channels

27  information, receives requests for information from the information request system

    and transmits the requested data to the receiver."

28

1  construction[13] is virtually identical to this passage, Honeywell's[14] ignores its second

2  half, i.e., "via the first communication medium from the data source."

3  More importantly, the claims and the specification make clear that the

4  "information request system" is—as its name suggests—the component of the

5  overall "data communications system" dedicated only to sending a request for

6  information.  (See '152 patent claims 1, 3, 10-11; see also '152 patent Abstract ("[A]

7  data communications system having a data source, **an information request system**

8  **coupled to the data source and adapted to request data information from the**

9  **data source**, and a receiver coupled to the data source and adapted to receive the

10 data information requested the information request system.").  Teledyne's

11 construction reflects this particular purpose of the "information request system,"

12 while Honeywell's does not.

13     **I.**    **"Satellite data unit": Claims 1, 4, 5, 7, 8, and 10**

14 Honeywell contends that the term "satellite data unit" requires no

15 construction.  Yet, its proposed "alternative" construction differs significantly from

16 Teledyne's and from the relevant description in the patent.  Each of asserted claims

17 1, 4, 5, 7, 8 and 10 show that the "satellite data unit" does not merely "facilitate[]

18 communications via satellite"—as Honeywell contends—but actually transmits the

19 request for information.  See, e.g., '152 patent at 10:60-62 ("aeronautical satellite

20 system is adapted to transmit data information requests from said **satellite data unit**

21 to said ground station."); 11:54-55 ("transmitting the data information requests from

22 said **satellite data unit** to an aeronautical satellite system . . ."); 12:8-11 ("said

23 **satellite frequency unit** configured for providing satellite transmission signals to an

24 aeronautical satellite system . . .").

25 

26    [13]  "A dedicated system configured to enable a system user to request
information via the first communication medium from the data source."

27    [14]  "A system configured to enable a system user to request information."

28

1    Similarly, the specification states that the "SDU receives the request and

2  generates a corresponding signal to be transmitted according to any suitable satellite

3  communication technique."  '152 patent at 6:67-7:2.  And, figure 8 (602) refers to

4  the "satellite data unit" as the "satellite <u>transmitter</u> unit."  Teledyne's proposed

5  construction incorporates these concepts, while Honeywell's does not.  Indeed,

6  Honeywell's construction is so broad that it could conceivably include a telephone if

7  it somehow "facilitates communications via satellite."

8      **J.    "Radio frequency unit": Claims 1, 4, 7, 8 and 10**

9    Contrary to Honeywell's assertion, the term "radio frequency unit" is not used

10  in the patent in its ordinary sense.  As Honeywell's own "Abbreviation & Acronym

11  Dictionary" shows, a "radio frequency unit" typically refers to a component in a

12  satellite communications ("SATCOM") system.  (Alden Decl., Ex. D at 144).  In

13  contrast, as used in the patent, the "radio frequency unit" transmits conventional

14  radio signals, <u>not</u> satellite transmissions.  <u>See</u>, <u>e.g.</u>, '152 patent at 4:1-4 ("the receiver

15  106 may be compatible with any appropriate communication medium, including

16  **radio**, wireless LAN communications, **satellite communications**, or any other

17  medium."); 6:58-61 ("the transmission mechanisms include various transmitters and

18  transceivers used in the conventional operation of the aircraft, such as a **satellite**

19  **data unit**, **a radio frequency unit**, and a wireless LAN unit.").

20    Moreover, it is clear from the claims that the "radio frequency unit" provides

21  radio transmissions to a ground station.  <u>See</u>, <u>e.g.</u>, '152 patent at 10:66-67 ("a radio

22  ground station adapted to receive request signals from said **radio frequency unit**");

23  12:13-14 ("said **radio frequency unit** for providing radio transmission signals to

24  said radio ground station").

25

26

27

28

TELEDYNE'S SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF

1    Teledyne's construction[15] reflects the patent's idiosyncratic use of the term,

2    while Honeywell's[16] does not.  In fact, Honeywell's construction merely adds the

3    word "communications."  This offers little guidance to jurors who will, presumably,

4    be more familiar with the word "radio" than "radio frequency unit."  The phrase

5    requires more elaboration than merely adding the single word.[17]

6    **III.    THE '468 PATENT**

7         **A.    "System Server":  Claims 1, 2, 7, 9, 12, 13 and 15[18]**

8         The parties primary dispute concerning the term "system server" is whether

9    the device is remote from the aircraft.  Honeywell will likely argue that the claim

10   language does not explicitly require that the "system server" be <u>remote</u> from the

11   vehicle, however, Honeywell's argument misses the mark.

12        As the Federal Circuit in <u>Phillips</u> emphasized, the proper judicial construction

13   of a claim term is in the context of the particular technology and the description in

14   the specification.  <u>Phillips</u>, 415 F.3d 1313.  Here, the purpose of the '468 patent is

15   not to transfer data from one device on an aircraft to another on an aircraft as

16   Honeywell's construction for "system server" would seemingly suggest.  Rather, the

17   '468 patent "relates to systems and methods for delivering software and/or data

18   updates to vehicles (such as aircraft) from **remote locations**."  '468 patent at 1:7-10.

19   The reason being that "[a]s aircraft move about the country or the world, it is very

20   difficult for pilots to maintain accurate and timely [navigational] information," and

21   thus, the "need for current data becomes paramount" to control, navigate or

22   _____

23        [15]   "A unit for providing conventional radio transmission signals to a ground
     station."
24        [16]   "A radio frequency communications unit."
25        [17]   The terms "selecting," "wireless LAN system," "radio frequency system," and
     "voice channel system" were addressed in Teledyne's previous *Markman* briefs.
26

27

28

otherwise affect their aircraft.  '468 patent at 1:15-26.  The only device described in the '468 patent that delivers data updates to a vehicle from "remote locations" is the system server.  See, e.g., '468 patent at Fig. 1.  Thus, a person of ordinary skill in the art would clearly understand that a "system server" is remote from the vehicle in the context of the invention.

A person of ordinary skill in the art would also understand that a "system server" must be capable of "obtaining, storing and sending" data updates to a vehicle server "via a data connection," from the plain language of the claims and the specification.  '468 patent at Cl. 1 ("obtaining and storing" and "forwarding . . . via a data connection), Cl. 9 ("receiving" and "transmitting . . . via a data connection"), 2:18-20 ("The system server is configured to receive and store said data updates from a source."), 4:44-45 ("System server 102 communicates with a vehicle server 116 associated with vehicle 120 via a data network 112.").  This aspect of Teledyne's construction is not seriously disputed.  Rather, Honeywell ignores its repeated maxim of following the heavy presumption of plain meaning of the claim language, and incorporates details of the preferred system server described in the '468 patent that would "obtain, store and send" data:  "an administrative application/program 106, a database 104 and an interface application 108." Stipulated Joint Claim Construction Chart, Honeywell's Proposed Construction, Ex. A at 29; see also '468 patent at 3:57-64, 4:38-43.  The incorporation of such details from the preferred embodiment is inconsistent with the plain language of the claims and should be rejected.  Phillips, 415 F.3d at 1320 (quoting SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001)) ("one of

---

[18]   After further consideration, Teledyne has no objection to Honeywell's construction for "system server" insofar as a server can be "a device or computer system or software."

1  the cardinal sins of patent law" is "reading a limitation from the written description

2  into the claims.").

3      **B.**    **"Vehicle Server":  Claims 1, 2, 7, 9, 12, 13 and 15[19]**

4      The only dispute between the parties' respective constructions concerning the

5  term "vehicle server" is whether it must be <u>separate</u> from the "component."

6  Beginning with the plain language of the claims, it is clear that the component is a

7  separate device from the vehicle server.  This must be true because if the "vehicle

8  server" is also the component, then the "system server" would be the hardware

9  device performing the loading and verifying steps of the claim.  For example, the

10  third element of claim 1 makes clear that the <u>vehicle</u> server performs the loading

11  step, not the <u>system</u> server:  "loading said data update <u>from said vehicle server into a</u>

12  <u>component at said vehicle</u>."  '468 patent at 10:40-42.  This claim language cannot be

13  ignored.  Moreover, if the "vehicle server" and "component" were one and the same,

14  the terms would be improperly redundant.  <u>See</u> <u>CAE Screenplates, Inc. v. Heinrich</u>

15  <u>Fiedler GmbH & Co. KG</u>, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of

16  any evidence to the contrary, we must presume that the use of these different terms

17  in the claims connotes different meanings.")

18      Teledyne's proposed construction also accords with the depictions and

19  description of the "vehicle server" in the specification of the '468 patent.  For

20  example, Figure 1 below depicts the vehicle server 116 and component 118 as

21  clearly identifiable separate constituent parts that make up a system that is capable

22  of performing the method of the claims.  '468 patent at Fig. 1.  This depiction

23  comports with the description that a "vehicle server 116 is any hardware or software

24  device that is capable of receiving data updates from system server 102 and loading

25  _____

26      [19]  After further consideration, Teledyne has no objection to Honeywell's

27  construction for "vehicle server" insofar as a server can be either "a hardware or software device."

28



1   the updates in component 118."  '468 patent at

2   5:18-22.  Indeed, "[t]he vehicle server 116

3   described therein is a central node through

4   which terminals are able to communicate with

5   avionics systems [separate components]."  '468

6   patent at 5:29-31.

7        In contrast, Honeywell's construction

8   improperly ignores both the claim language and

9   the specification in that the "vehicle server" and

10  "component" are not required to be <u>separate</u>

11  devices in the vehicle.  This proffered

12  construction is inconsistent with the intrinsic record and should be rejected.

13       **C.    "Data Connection":  Claims 1, 2, 7, 9, 12, 13 and 15**

14       Neither party seriously disputes that the "data connection" is the same link

15  between the system server and vehicle server that is used to "transfer" data updates.

16  Although unclear, a potential reading by Honeywell of its proffered construction

17  may be that it encompasses the prior art "data connection" that is disclaimed in the

18  specification of the '468 patent.  In particular, the disclaimed subject matter

19  includes:

20            Conventional techniques of updating databases have been
              cumbersome and time consuming. Typically, a customer (such as an
21            airline) obtains a diskette containing the upgrade . . . [and] then go[es]
              to individual aircraft and manually load[s] the data update using a
22            specialized data loader . . . It will be appreciated, then, that the process
              of duplicating, distributing and monitoring database upgrades places an
23            administrative burden upon a database customer . . . .
24

25  '468 patent at 1:50-62.

26       Indeed, Honeywell has suggested that the '468 patent may cover one prior art

27  "electrical data connection" involving the use of a USB thumb drive to "manually

28  load the data update." Accordingly, the Court should reject Honeywell's

construction insofar as it potentially encompasses these supposed types of prior art "wireless, optical or electrical data connections" that it disclaimed.  Phillips, 415 F.3d at 1316 ("the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.  In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.").

Teledyne's construction on the other hand does not improperly capture that which Honeywell explicitly disclaimed.  Teledyne's proposed construction is supported and consistent with the term as it is used in the specification of the '468 patent:  "digital communications medium."  '468 patent at 4:46-49.  Accordingly, the Court should adopt Teledyne's construction.

**D.     "Component":  Claims 1, 2 and 7**

The parties dispute two aspects of the construction for this term.  First, the parties dispute whether the "component" is separate from the vehicle server.  Second, the parties dispute whether the "component" must "use the data updates to perform a function."

As explained above with respect to the claim term "vehicle server," the plain meaning of the claim language makes clear that the "component" must be separate from the vehicle server.  Moreover, the applicants' depictions and description of the "component" hardware device set forth in the specification of the '468 patent are consistent with Teledyne's construction. '468 patent at 5:18-22, 5:29-31, and Fig. 1.  For the same reasons, Honeywell's construction should be rejected.

As regards the parties' second dispute, it is important again to understand the claim term "component" in the context of the invention and the description in the specification.  "As aircraft move about the country or the world, it is very difficult for pilots to maintain accurate and timely [navigational] information," and thus, the "need for current data becomes paramount" to control, navigate or otherwise affect their aircraft.  '468 patent at 1:15-26.  It is nonsensical to suggest that the

"component" in the context of Honeywell's invention is a mere storage vessel for data.  Rather, the component actually uses the data update to perform the function of aiding the pilot in controlling, navigating or otherwise affecting the aircraft.  This is consistent with the specification which explicitly requires that the "component" use data updates to perform a function:  the "**[c]omponent** 118 is any avionics or other aircraft device such as a flight management computer (FMC), flight management system (FMS), global positioning system (GPS), navigation computer or the like . . . [that] suitably **uses data upgrades** from data source 101 **to perform a function**." '468 patent at 5:45-54.

> **E.    Construction of the "Loading," "Verifying" and "Receiving" Steps**

The plain language of claim 1 of the '468 patent (and claims 2 and 7 that depend there from) requires the vehicle server to perform a "loading" step and a "verifying" step.  Similarly, the plain language of claim 9 (and claims 12, 13 and 15 that depend therefrom) requires a "receiving" step.

> 1.    "Loading Said Data Update From Said Vehicle Server Into A
> Component At Said Vehicle":  Claims 1, 2 and 7

The language of the claims require the vehicle server "load" a data update into a component, but there is no explanation in the claims of what it means to "load." The only place that the "loading" step is explained is in the specification:  "[a]fter the data update is provided to vehicle server 116, [when] the relevant data is extracted, processed, and loaded into component 116 (step 214)," the "component 118 suitably uses data upgrades from data source 101 to perform a function." '468 patent at 5:52-54, 6:36-38.  Taken in this context, it is clear that "loading" requires more than merely transferring data from a vehicle server to a component.

Honeywell's proffered construction does not explain the "loading" step (merely reciting back the language of the claim phrase), and should be rejected.  See Harris Corp. v. IXYS Corp., 114 F.3d 1149, 1152 (Fed. Cir. 1997) ("A further,

1  compelling reason for rejecting Harris's proposed construction of the [ ]limitation is

2  that Harris's construction would make the limitation entirely circular").

3                    2.      "Verifying From Said Vehicle Server To Said System Server Via

4                            Said Data Connection That Said Loading Step Completed

5                            Successfully":  Claims 1, 2 and 7.[20]

6          The parties only dispute concerning this claim phrase is whether the result of

7  the verification must be sent to the system server by the vehicle server using the

8  same data connection that was used to transmit the data update to the vehicle server

9  in the second element of claim 1.

10         The plain language of the claims requires that the vehicle server confirm to

11 the system server that a data update was successfully loaded into a component, and

12 that the vehicle server send the result of this check to the system server using the

13 same data connection that was used to transmit the data update to the vehicle server.

14 '468 patent at 10:43-45.  Indeed, the "verifying" step of claim 1 originates "from

15 said vehicle server," and uses "said data connection" to transmit the check to the

16 system server.  Id.

17         Honeywell's construction is inconsistent with the language of the claims

18 because it is silent as to what device sends the "verification" of successful load to

19 the system server.  In addition, Honeywell's construction completely ignores the

20 requirement that the results of the check be sent to the system server using the same

21 data connection that was used to send the data update to the vehicle server.  Indeed,

22 the claims require the use of "said data connection" that was used in the second

23 element of the claims.  If this were not true, then "said data connection" would lack

24 _____

25     [20]   After further consideration, Teledyne has no objection to the aspect of
26 Honeywell's construction for the "verifying step" insofar as either the vehicle server
27 or the component can perform the check to verify that the data update was properly
   loaded.

28

antecedent basis.  35 U.S.C. § 112, second paragraph.  Accordingly, the Court should reject Honeywell's proposed construction and adopt Teledyne's construction.

3.  "Receiving A Confirmation From Said Vehicle Server Via Said Data Connection When Said Data Update Is Successfully Loaded":  Claims 9, 12, 13 and 15.[21]

Both parties' constructions for this claim phrase are essentially the same as their construction for the "verifying" step discussed above.  Likewise, the parties dispute remains the same.  Accordingly, as explained above, the Court should adopt Teledyne's construction because it is consistent with the plain language of the claims.

**F.   "Digital Storage Medium":  Claims 7, 13 and 15[22]**

As explained above with respect to the claim term "system server," each of the claims of the '468 patent generally describe a remote "system server" that provides data updates to a vehicle.  Consistent with that analysis, Teledyne's proposed construction for the term "digital storage medium" in the context of these claims is "a remote device or computer system or software on which computer-executable instructions can be stored."

**G.   "Operable To Execute The Method": Claims 7, 13 and 15**

As explained above with respect to the claim term "digital storage medium," the context of these claims requires that "a remote device or computer system or software" include computer-executable instructions that are "operable to execute the method" of the '468 patent.  Accordingly, the plain language of the claims makes

---

[21]   After further consideration, Teledyne has no objection to the aspect of Honeywell's construction for the "receiving step" insofar as either the vehicle server or the component can perform the check to verify that the data update was properly loaded.

[22]   Teledyne has revised its construction to be consistent with the construction of "system server," which includes a "remote device or computer system or software."

1    clear that this digital storage medium <u>must</u> execute each and every step of the

2    method.  No other construction is suggested.

3         **H.     "At A Pre-Determined Time":  Claims 9, 12, 13 and 15**

4              The parties do not seriously dispute that the plain language of these claims

5    requires the system server to transmit a data update at a specific time that is

6    scheduled or determined in advance.  Honeywell's construction, however,

7    unnecessarily and improperly incorporates details from the specification into its

8    proffered construction, including "or that is determined by a program in accordance

9    with pre-determined rules based on user inputs and/or data in a database."

10   Stipulated Joint Claim Construction Chart, Honeywell's Proposed Construction,

11   Ex. A at 32.  There is simply no reason to incorporate such detail, and thus,

12   Honeywell's proposed construction should be rejected.  <u>Phillips</u>, 415 F.3d at 1320

13   (quoting <u>SciMed</u>, 242 F.3d at 1340) ("one of the cardinal sins of patent law" is

14   "reading a limitation from the written description into the claims.").

15

16   DATED:  February 11, 2008          QUINN EMANUEL URQUHART OLIVER &
17                                      HEDGES, LLP

18

19                                      By: _/s/ Steven M. Anderson_____
20                                           Steven M. Anderson
                                             Attorneys for Plaintiff Teledyne
21                                           Technologies, Inc.

22

23

24

25

26

27

28